















JOEH    4/21/04    11:19

3:03-CV-02479   ABDULLAH V. ASHCROFT

*12*

*ANSHC.*

1  CAROL C. LAM
   United States Attorney
2  ROBERT H. PLAXICO
   Assistant U. S. Attorney
3  California State Bar No. 054953
   Office of U.S. Attorney
4  Federal Office Building
   880 Front Street, Room 6293
5  San Diego, California 92101-8893
   Telephone: (619) 557-7157
6
   Attorneys for Respondents
7

**FILED**

APR 21 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11  MOHDAR ABDULLAH,                    )   Case No. 03cv2479-WQH(AJB)
    [A75-628-802],                      )
12                                      )
                 Petitioner,            )
13                                      )
         v.                             )
14                                      )
    JOHN ASHCROFT, Attorney General,    )
15  TOM RIDGE, Secretary of the         )
    Department of Homeland Security,    )
16  et al.,                             )
                                        )
17               Respondents.           )
                                        )
18  _____)

19                    GOVERNMENT'S RETURN

20

21

22

23

24

25

26

27

28

TOPICAL INDEX

Page

TABLE OF AUTHORITIES

I      INTRODUCTION                                                        1

II     STATEMENT OF FACTS                                                 2

III    ARGUMENT                                                          10

       PETITIONER IS NOT ENTITLED TO RELEASE                             10

       A.    THE BASIC LAW UNDER <u>ZADVYDAS</u>                         10

       B.    CONTINUED DETENTION IS PERMISSIBLE, AND <u>ZADVYDAS</u>
             DOES NOT APPLY, WHEN AN ALIEN REFUSES TO
             COOPERATE IN EFFECTING HIS OWN REMOVAL                      12

       C.    BEYOND THE COOPERATION ISSUE, PETITIONER CANNOT
             MEET THE <u>ZADVYDAS</u> STANDARD OF SHOWING THAT IT IS
             NOT LIKELY THAT HE CANNOT BE REPATRIATED IN THE
             REASONABLY FORESEEABLE FUTURE                              21

IV     CONCLUSION                                                        24

CERTIFICATE OF SERVICE BY MAIL

i

TABLE OF AUTHORITIES

Cases                                                                    Page

Ali v. Ashcroft,
        346 F.3d 873 (9th Cir. 2003)                                        13

INS v. Aguirre-Aguirre,
        526 U.S. 415 (1999)                                                 24

Kahn v. Fasano,
        194 F. Supp. 2d 1134 (S.D. Cal. (2001)                             22

Kahn v. INS,
        194 F. Supp. 1134 (S.D. Cal. 2001)                                 23

Lema v. INS,
        341 F.3d 853 (9th Cir. 2003)                                11, 13, 20

Mitey v. INS,
        67 F.3d 1325 (7th Cir. 1995)                                        24

Monet v. I.N.S.,
        791 F.2d 752 (9th Cir. 1986)                                        15

Pelich v. I.N.S.,
        329 F.3d 1057 (9th Cir. 2003)                          2, 12, 13, 14, 21

Southwestern Pennsylvania Growth Alliance v. Browner,
        121 F.3d 106 (3d Cir. 1997)                                         24

Xi v. INS,
        298 F.3d 832 (9th Cir. 2003)                                        12

Zadvydas v. Davis,
        533 U.S. 678 (2001)              1, 2, 7, 10, 11, 12, 13, 14, 21,
                                                                    22, 23, 24

        Docketed Cases

Gebremariam v. Ashcroft,
        Case No. 02cv0214H (AJB)                                            22

Kim v. Ashcroft,
        Case No. 02cv1524 (S.D. Cal. June 2, 2003)                         22

Statutes                                                    Page

8 U.S.C. § 1182                                               10

8 U.S.C. § 1227(a)(1)(C)                                      10

8 U.S.C. § 1227(a)(2)                                         10

8 U.S.C. § 1227(a)(4)                                         10

8 U.S.C. § 1231(a)(1)                                         10

8 U.S.C. § 1231(a)(1)(C)                                      13

8 U.S.C. § 1231(a)(2)                                         10

8 U.S.C. § 1231(a)(3)                                         10

8 U.S.C. § 1231(a)(6)                                     10, 11

18 U.S.C. § 1001                                              6

18 U.S.C. § 1546                                              6


Regulations

8 C.F.R. § 241.4                                             23

8 C.F.R. § 241.13                                            23

8 C.F.R. § 241.14                                            23

8 C.F.R. § 241.14(d)                                        24

## INTRODUCTION

This is a case worthy of a John LeCarre novel, replete with mysterious comings and goings across international borders and personalties whose true identity may never be known. The Petitioner, a prime player in this drama, and one who associated with two of the 9/11 hijackers in San Diego, seeks release from custody in spite of the fact that he has not been candid in revealing just who he is and where he is from. As the Immigration Court noted, Petitioner's circumstance "involves issues touching ... the credibility of ... [Petitioner's] citizenship and nationality" and "issues concerning ... [his] identity, as well as his motives and rationale for entering the United States." [Ex. 25 at 2.]

Petitioner is an alien subject to a final order of removal whose immigration fraud was uncovered during the course of the 9/11 investigations. His final order of removal was issued on May 12, 2003. [Ex. 11.] Petitioner argues that under Zadvydas v. Davis, 533 U.S. 678 (2001), he should be released from DHS custody because more than six months have elapsed since the date of his removal order and his removal has not yet been effectuated. Zadvydas held that an alien held in custody more than six months after a final removal order may obtain release if "the alien provides good reason to conclude there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701.

Petitioner's argument is specious. From the time he entered this country in 1998, Petitioner has engaged in a fulsome pattern and practice of dissembling and artifice as to his true identity and nationality such that securing his removal has proved difficult. This

03cv2479

lack of candor and cooperation in helping to implement his removal presumptively bars Petitioner from seeking relief under <u>Zadvydas</u>, per the admonition of <u>Pelich v. I.N.S.</u>, 329 F.3d 1057, 1061 (9th Cir. 2003) that "an alien cannot assert a viable constitutional claim when his indefinite detention is due to his failure to cooperate with the INS's efforts to remove him."

Moreover, because progress is being made in effectuating his removal, in spite of his lack of cooperation, Petitioner cannot meet his burden under <u>Zadvydas</u> to show that his removal is not likely in the reasonably foreseeable future. As such, even eliding his uncooperative stance, Petitioner is not otherwise entitled to release under <u>Zadvydas</u>.

II

<u>STATEMENT OF FACTS</u>

This modern day international mystery begins on June 28, 1998, when an individual, who may have been Petitioner, going by the name of Al Mohdar Zeid, dob August 5, 1978 in Yemen, applied for a student visa at the Canadian embassy in Riyadh, Saudi Arabia. [Ex. 1.]

Shortly thereafter, on August 8, 1998, one Al Mohdar Zeid, in possession of Yemeni passport number 00076187, arrived in Canada at the Ottawa International Airport and was granted student status with an expiration date of June 30, 1999. [Ex. 1.]

A few months afterwards, on December 16, 1998, an individual, presumably Petitioner, was admitted to the United States through pre-flight inspection at the Ottawa International Airport. This individual offered the same Yemeni passport number 00076187. His surname was Zeid and his given name was "Al Mohdar Mohammed, Al Mohdar." [Ex. 2.] Petitioner had sought and was given a B2

2

visitors visa with an expiration date of March 9, 1999. [Ex. 2.] In his application for the visa, Petitioner stated on an immigration form that he was born in Al-Baidha, Yemen, that his nationality was Yemeni, that his Yemeni passport had been issued on October 12, 1997, that he was attending college in Canada, and that his father was providing him with funds. [Ex. 27.] He specified that he would be in the United States for 10 days. Id.

Petitioner then quickly traveled to San Diego where he jettisoned his Yemeni identity, assumed a new false personality, and fraudulently endeavored to secure a more permanent status in the United States. Specifically, on December 24, 1998, only seven days after his arrival in the U.S. as a purported Yemeni student visitor, he filed with San Diego INS authorities an application for asylum and withholding of removal on a standard Form I-589. [Ex. 3.] Petitioner used the name Mohdar Mohamed Abdullah and in his Form I-589 application, he claimed he had been born in, was a citizen of, and was seeking asylum from Somalia, averring that he would be persecuted there because of his membership in a particular social group. [Ex. 3 at 5.] He falsely told INS officials that he had last entered the United States without inspection on December 7, 1998, through New York using a false Italian passport in the name of Franco de Pollo. [Ex. 8 at 3.] In fact, as noted above, only days before, he had entered the United States from Canada with a Yemeni passport.

The I-589 application also falsely stated that he had been living in Nairobi, Kenya, until December 1998, when in fact he had been in Canada since August 1998. [Compare Ex. 1 and Ex. 3 at 2.] Petitioner claimed in his fraudulent asylum application that he had been persecuted in Somalia because of membership in the Barawani clan, that

3

his father and brother had been killed, and his sister raped, and that he had fled to Kenya and been smuggled to the United States through Madrid. [Ex. 3 at 5, 10-11.] Petitioner did not tell the asylum officer that in fact he had been for several months resettled in Canada until he entered the United States in December 1998.

In support of his claim for asylum, Petitioner presented false affidavits from three individuals living in San Diego who claimed to know that Petitioner was a Somalian who had fled that country. [Ex. 22.] These individuals are now being prosecuted in federal court for their knowing participation in this fraudulent scheme. [Ex. 28.]

Petitioner's legerdemain continued when on February 23, 1999, he was interviewed by an asylum officer in San Diego and falsely reiterated that he had traveled to the United States on an Italian passport in the name of Franco de Pollo and had re-entered the United States through New York. [Ex 8 at 3.] On May 3, 2000, the asylum application was approved. [Ex. 4.]

Later, on May 5, 2000, Petitioner filed an application for registration as a permanent resident (Form I-485) in which he again fasley claimed Somalian birth and again falsely claimed to have entered the United States at New York City without inspection on December 7, 1998. [Ex. 20.]

It is not known exactly why Petitioner came to San Diego, and why he assumed a new false Somali identity, but his conduct was later proved to be very suspicious. In August, 2000, he visited Yemen for twenty-five days. [Ex. 5 at 8.] In December 2000, he tried to enter Canada with his new Somali identity, but was turned away. [Ex. 1.]

Subsequently, after the tragedy of 9/11, it surfaced that Petitioner had been associated with two of the Flight 93 hijackers who had previously resided in San Diego.

In their investigation of the 9/11 highjackings, the FBI learned that Petitioner knew two of the hijackers, Nawaf Al-Hazmi and Khalid Al Midhar. [Ex: 6 at 4.] When interviewed by FBI agents on September 18, 2001, Petitioner admitted that he had known the two hijackers in San Diego; had at one time assisted them in trying to change a return portion of round trip plane tickets to Los Angeles from Bangkok; and had assisted Hazmi in attempts to obtain flying lessons. [Ex. 6 at 5-6.][1] After this interview, Petitioner was seen by one of his acquaintances taking his Yemeni passport out of an apartment in San Diego, telling the acquaintance that he was going to destroy it because he was afraid the authorities would learn he was a Yemeni, and not a Somali. [Ex. 29.]

On September 21, 2001, Petitioner was arrested in San Diego on a federal material witness arrest warrant issued out of the Southern District of New York. [Ex. 6 at 6.] During processing, Petitioner made spontaneous statements referencing hatred for the United States government. [Ex. 6 at 7.] Petitioner later was quoted in the press in January, 2003, as recalling that when he last saw hijacker Hazami, Hazami told him, "If we don't meet again in this life, we'll meet in the hereafter, in his paradise." [Ex. 19 at 1.]

Later, federal agents conducted a search of Petitioner's apartment. One of the items seized there was a Yemeni government issued identification card with Petitioner's photograph on it. The

---

[1] Petitioner also told the FBI he had been introduced to a third of the hijackers, Hani Hanjour. Id.

writing on the card is in Arabic. Subsequent translation revealed that it was a Personal Identification Card No. 0017251 issued by the Republic of Yemen, Department of the Civil Affairs and Registrar to Mohdar Mohammad Al-Mihdar Zeid, born Al-Hamra/Al Baidayh Yemen on August 5, 1978. [Ex. 7; Ex. 10 at 2.]

Based on this identity card, a records search was conducted which revealed that Petitioner, who had sought asylum in San Diego as a Somalia refugee, had, as noted above, actually entered the United States in 1998 on a Yemeni passport. [Ex. 1.]

Accordingly, Petitioner was charged in federal court with making false statements on an immigration application (18 U.S.C. § 1546) and with making false statements to a federal officer (18 U.S.C. § 1001). Petitioner pled guilty to the second count in July, 2002, and was sentenced to time served (335 days). [Ex. 8.][2/]

Immigration Proceedings - In October, 2002, after the criminal proceedings, Petitioner was simultaneously charged with removal as an alien who had overstayed his nonimmigrant visa and as an alien convicted of a crime involving moral turpitude; and with termination of his asylum status. [Ex 14.] Respondent conceded and stipulated to the termination of his asylum status and, through the filing of a new Form I-589 [Ex. 5], sought only the remedies of withholding of removal and deferral of removal. [Ex. 9 at 2.] Petitioner was

---

[2/] Petitioner admitted in the plea that:

On or about February 23, 1999, in the Southern District of California, in a matter within the jurisdiction of Immigration and Naturalization Service, . . . [he] told an INS officer, during an asylum interview, that he last entered the United States without inspection on December 7, 1998, through New York, New York, on an Italian passport in the name of Franco de Polo.

[Ex. 8 at 3.]

03cv2479

1  ordered removed to Italy or Yemen on May 12, 2003, and did not appeal.
2  [Ex. 11.]

3  During and after these immigration proceedings, Petitioner
4  continued to engage in a shell game as to who he was and where he was
5  from.  It has apparently been his plan to insure that he cannot be
6  removed and thus obtain release from custody per the Zadvydas
7  decision.

8  During removal proceedings, he purported to offer an Italian
9  birth certificate.  [Ex. 13.]  This certificate setting forth an
10 Italian birth was in contrast to the application for a visitor's visa
11 he had filled out on entering the U.S. on a Yemeni passport in
12 December 1998 [Ex. 27].  This latter application had specified a
13 Yemeni birth.  The Italian birth certificate was also in contrast to
14 Petitioner's 1998 Form I-589 which specified a Somalian birth.
15 [Ex. 3.]

16 In the new Form I-589 he filled out in February 2003, as part of
17 the removal proceedings [Ex. 5 at 1.], under Box 12 labeled "City and
18 Country of Birth," Petitioner opaquely inscribed "On infor & belief:
19 Italy; family Somali/Yemeni combined."  For "Present Nationality"
20 (Box 13) Petitioner wrote "Info & Belief: Somali/Yem/Ital."  Id.

21 Whereas Petitioner had previously described a life in Somalia and
22 Kenya in his prior 1998 Form I-589 [Ex. 3], in the February 2003
23 I-589, Petitioner claimed that in 1998, before coming to Canada and
24 the United States, he had lived in Yemen.  [Ex. 5 at 4.]  In the new
25 Form I-589, Petitioner failed to specify that he had spent time in
26 Saudi Arabia in 1998.  [Compare Ex. 1 with Ex. 5 at 4.]

27 Petitioner's purported father, who he had previously described
28 as having been born in and killed in Somalia [Ex. 3 at 5, 10], he now

7

claimed lived in Yemen, and his siblings were described as living in Italy and Yemen. [Ex. 5 at 4.] His mother, who was described in the original Form I-589 as having been born in Somalia and living in Kenya [Ex. 3 at 2], was now described as having been born in Djibouti and now living in Yemen. [Ex. 5 at 4.] Whereas before, his father was described as having been killed in Somalia because of membership in the Barawani minority Somali clan [Ex. 3 at 5, 10-11], in the new Form I-589, the once again living father was now described as being part of the Islaheen political party in Yemen and that he and his mother's relatives had been harassed for their political views in Yemen. [Ex. 5 at 5.]

The father's miraculous reappearance was all the more significant in that a note apparently from the father was found during the search of Petitioner's apartment dated March 20, 1999, indicating that the father in fact was a medical doctor practicing in Yemen who in 1999 was sending Petitioner money for college fees. [Ex. 23.] Petitioner had also told Canadian authorities in 1998, that he was supported by a Yemeni father [Ex. 1], and he stated the same thing to U.S. authorities when he obtained his visitor's visa in December, 1998 [Ex. 27.]

In an interview with immigration officials in May 2003, Petitioner circumspectly asseverated that "[t]o the best of my knowledge, I am a native of Italy for the simple fact that I was born there. But, I might also be a Somalian or a Yemenese citizen because I have roots (grandparents and great grandparents)." [Ex. 18 at 1.]

He then claimed not to know where his father was born. [Ex. 18 at 1.] But only months before, in his February 2003 Form I-589, Petitioner had stated that his father was born in Yemen. [Ex. 5

03cv2479

at 4.] And, in the aforementioned January 2003 news interview, he claimed his father was born in Yemen. [Ex. 19 at 5.] In 2000, as part of his asylum application, Petitioner claimed his father was born in Somalia and that his mother still lived there. [Ex. 21.]

In the May, 2003 interview, Petitioner also claimed not to know what country the father was a citizen of; not to know his mother's citizenship; and not to know where his grandfather or grandmother had been born. [Ex. 18.] He claimed to have lived in Yemen for 11 years and to have been born in and having lived in Italy for five years [Ex. 18 at 2], in contrast to his earlier statement in his first Form I-589 in which he specified he had been born in and lived in Somalia before fleeing to Kenya and the United States. [Ex. 3.] Moreover, given that Petitioner was twenty when he entered Canada in August 1998 [Ex. 1], and he accounted for only sixteen years (five in Italy and eleven in Yemen), he thus failed to account for where he was for at least four years before that time.

Given Petitioner's failure to cooperate in the removal process, it is not surprising that other countries have not yet been willing to accept his removal as a national. Italy has declined to accept him on the ground that his father did not have Italian citizenship. [Ex. 15.]

As to Yemen, the identity card found in Petitioner's apartment [Ex. 7] was initially deemed by Yemeni authorities not to "exist in official record" and for that reason the Yemeni government declined to accept Petitioner. [Ex. 16.]

Because of his lack of cooperation, Petitioner's true identity remains a mystery. Even as to his birth, he has alternatively claimed that he was born in Italy [Ex. 13], Somalia [Ex. 3 at 1]; and Yemen.

[Ex. 1; Ex. 7; Ex. 27.] As noted above, it is clear that Petitioner entered Canada and the United States with a Yemeni passport [Exs. 1, 2]. Petitioner has not produced that passport, which might establish his identity to the satisfaction of the Yemeni authorities. Nor has he produced any other convincing evidence that would establish his true nationality. As such, he can hardly be deemed to have cooperated in the process to effectuate his removal.

III

ARGUMENT

PETITIONER IS NOT ENTITLED TO RELEASE

A.   THE BASIC LAW UNDER ZADVYDAS

Ordinarily, an alien subject to a final order of removal must be removed within 90 days after the removal order becomes final. 8 U.S.C. §§ 1231(a)(1), 1231(a)(3). However, under 8 U.S.C. § 1231(a)(6), aliens such as Petitioner, who are subject to removal for certain serious criminal offenses, can be held beyond the normal 90-day removal period. That section provides:

> An alien ordered removed who is inadmissible under section 212 [8 U.S.C. § 1182], removable under sections 237(a)(1)(C), 237(a)(2), or 237(a)(4) [8 U.S.C. §§ 1227(a)(1)(C), (a)(2), or (a)(4)] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph 3 [8 U.S.C. § 1231(a)(3)].

In Zadvydas v. Davis, 533 U.S. 678 (2001), the Supreme Court set forth the parameters of the continued detention sanctioned by Section 1231(a)(6). The Court first noted that "[a]fter entry of a final removal order and during the 90-day removal period ... aliens must be held in custody. § 1231(a)(2)." 533 U.S. at 683. After the 90-day period, as the Court noted, section 1231(a)(6) provides that

10

the government "may" continue to detain an alien or release the alien under supervision.  Id.  In terms of how long detention might last, the Court interpreted Section 1231(a)(6) to provide for "post-removal period detention . . .[for] a period reasonably necessary to bring about that alien's removal" (533 U.S. at 689) and that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized. . . ." (533 U.S. at 699).

This basic holding was fleshed out in the remainder of the opinion.

"[F]or the sake of uniform administration in the federal courts" (533 U.S. at 701), the Court held that a six-month period of post-removal detention constitutes a "presumptively reasonable period of detention."  Id.  See also Lema v. INS, 341 F.3d 853, 856 (9th Cir. 2003).  Moreover, release is not automatically mandated after the expiration of the six-month period.  "This six-month presumption, of course, does not mean that every alien not removed must be released after six months.  To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701.  (Emphasis added.)

Procedurally, after the six-month period has expired, the Court held that the INS can continue to detain an alien beyond six months, unless the "alien provides good reason to conclude there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701.  (Emphasis added.)  As the Ninth Circuit has recently emphasized, "Zadvydas places the burden on the alien to show, after a detention period of six months, that there is 'good reason to believe that there is no significant likelihood of removal in the

reasonably foreseeable future.'" Pelich v. INS, 329 F.3d 1057, 1059 (9th Cir. 2003) (quoting Zadvydas, 533 U.S. at 701). See also Xi v. INS, 298 F.3d 832, 840 (9th Cir. 2003). Only after the alien makes such a showing, is the burden on the Government to rebut this showing.

> [O]nce the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

533 U.S. at 701.

Thus, until an alien held in post-removal detention meets the burden of showing that there is "no significant likelihood of removal in the reasonably foreseeable future," (533 U.S. at 701), the detention is presumptively reasonable and may continue. Only if the prospect of removal is not likely in the reasonably foreseeable future should a court hold continued detention unreasonable and no longer authorized by statute. 533 U.S. at 699-700.[1]

> B. CONTINUED DETENTION IS PERMISSIBLE, AND ZADVYDAS DOES NOT APPLY, WHEN AN ALIEN REFUSES TO COOPERATE IN EFFECTING HIS OWN REMOVAL

Because Petitioner's own conduct has delayed attempts to secure his repatriation, he should not be deemed to have established that his removal is not likely in the reasonably foreseeable future.

---

[1] "Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility." 533 U.S. at 700. Accordingly, in reviewing a determination by the Attorney General that there is a significant likelihood of removal in the reasonable foreseeable future, a district court "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." 533 U.S. at 700.

In applying the <u>Zadvydas</u> holding, subsequent Ninth Circuit cases have admonished that an alien cannot frustrate attempts to secure repatriation and then seek release on the disingenuous ground that his repatriation has not been effectuated. Indeed, by statute, any time limitations on holding a removable alien are tolled for the duration of an alien's recalcitrance. 8 U.S.C. § 1231(a)(1)(C) provides that:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the aliens's departure or <u>conspires or acts to prevent the alien's removal subject to an order of removal</u>.

(Emphasis added.)

Based on this statutory mandate – and simple common sense – the Ninth Circuit has held that an alien cannot impede removal efforts and then seek redress through a habeas petition. ".[A]n alien cannot assert a viable constitutional claim when his indefinite detention is due to his failure to cooperate with the INS's efforts to remove him." <u>Pelich v. I.N.S.</u>, 329 F.3d 1057, 1061 (9th Cir. 2003); <u>see also</u> <u>Lema v. I.N.S.</u>, 341 F.3d 853, 856 (9th Cir. 2003) ("[W]hen an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot meet his or her burden to shown there is no significant likelihood fo removal in the reasonably foreseeable future. "); <u>Ali v. Ashcroft</u>, 346 F.3d 873, 892 (9th Cir. 2003) (noting that <u>Zadvydas</u> would be inapplicable when aliens "simply refused to cooperate with the INS' attempts to remove them.")

<u>Pelich</u> is particularly instructive. As in the case at bar, that alien had, during the course of his immigration history, tendered a plethora of inconsistent background facts and then sought release

13

under Zadvydas.  The Court readily held Zadvydas inapplicable because the alien, as here, had created his own "dilemma" in providing the INS with "conflicting information regarding his name, his parents' names, his parents' birthplaces and residences, his birthplace and his nationality." 329 F.3d at 1059.  Zadvydas was clearly irrelevant, as involving aliens "who, through no fault of their own, could not be removed from the United States."  Id.

> The risk of indefinite detention that motivated the Supreme Court's statutory interpretation in Zadvydas does not exist when an alien is the cause of his own detention.  Unlike the aliens in Zadvydas, Pelich has the "keys [to his freedom] in his pocket" and could likely effectuate his removal by providing the information requested by the INS.

329 F.3d at 1060.

Accordingly, the Court denied the Pelich Petition because "we agree that a petitioner who impedes INS removal efforts 'has not met his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future.'"  329 F.3d at 1060, quoting Zadvydas.  "The reason is self-evident:  the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock."  Id.

Here, the fact that Petitioner is still in detention beyond the six-month period specified in Zadvydas is because he has refused to cooperate in effectuating his removal.  Petitioner "himself is responsible for his plight."  Pelich, 329 F.3d at 1059.

Based on Pelich and its progeny, it is indeed ludicrous for Petitioner to seek release under the precepts of Zadvydas.  Petitioner is a poster child of non-cooperation.  The fact that Petitioner's removal has not yet been consummated can only be attributed to his

14

unrelenting exercise of dissembling and prevarication as to his identity, background, and nationality.

Petitioner's game playing stance is evident even in his Petition. Therein, he does not even deign to vouchsafe his nationality. Instead, Petitioner obfuscates by averring only that "Respondents identify Petitioner as a citizen of Yemen." (Petition at 2.) He compounds his artifice by averring that he "was lawfully admitted into the United States" (id.) when in reality the fact of his immigration fraud served to abrogate his status as a lawfully admitted alien.[4/]

Indeed, from the time he entered the United States - both before and after his conviction and order of removal - Petitioner has assiduously followed a practice and pattern of circumlocution and artifice as to where he was born, what his true nationality is, where he had lived, who his parents are, where his parents are, and what nationality they possess. In these circumstances, it is no surprise that DHS has not yet been able to effectuate his removal.

* <u>Petitioner's identity</u>. In 1994, in his Yemeni identity card [Ex. 7], Petitioner set forth his name as Mohdar Mohammad Al-Mohdar Zeid. The name on his now missing Yemeni passport was Al Mohdar Mohammed Al Mohdar Zeid. [Ex. 2.] In the 1998 Form I-589, he gave the name Mohdar Mohamed Abdullah. [Ex. 3.] The letter from his father referred to him as Mohdar Mohamed Zeid. [Ex. 23.] The Italian birth certificate he tendered in 2003 specified his name as Elmohdar Zeid. [Ex. 13.]

* <u>Where Petitioner was born</u>. In his 1998 visitor's visa application Petitioner claimed he was born in Yemen. [Ex. 27.] In

---

[4/] See <u>Monet v. I.N.S.</u>, 791 F.2d 752, 753 (9th Cir. 1986) (alien who obtains admission based on fraudulent pretenses is not deemed "lawfully admitted.")

the 1998 I-589, he claimed Somalian birth. [Ex. 3 at 1.] During removal proceedings and in post-removal interviews, he claimed to have been born in Italy. [Ex. 13; Ex. 18 at 1.] In his February, 2003 I-589, he claimed birth in Italy, but only "On infor & belief." [Ex. 5 at 1.]

* Petitioner's nationality. Petitioner entered Canada in August 1998, and then the United States in December, 1998, with a Yemeni Passport, claiming Yemeni citizenship. [Exs. 1, 2, 27.] This passport could be dispositive proof of his nationality, but Petitioner claims not to have the passport. As noted above, however, Petitioner had the passport during his time in San Diego, and either hid it or got rid of it after his association with the hijackers was discovered. [Ex. 29.][5/] In the 1998 Form I-589, he claimed Somalian nationality. [Ex. 3 at 1.] In the February 2003 Form I-589, for nationality, he opaquely claimed "Info & Belief: Somali/Yem/Ital." [Ex. 5 at 1.] In a May 2003 interview with DHS officials, Petitioner equivocated that he might be Italian or he might be Somalian or he might be Yemenese. [Ex. 18 at 1.]

* Where Petitioner had lived. In the 1998 Form I-589 used for falsely claiming refugee status from Somalia, Petitioner claimed to have lived in Somalia from birth in 1978 until 1991, and then in Kenya until 1998 when he claimed to have entered the United States at New York with imposter documents. [Ex. 3 at 1, 10-11; Ex. 8 at 3.] In fact, Petitioner was in Saudi Arabia in June, 1998, and entered the United States in December 1998, from Canada. [Exs. 1, 2.] In the

---

[5/] The suggestion recently made by Petitioner, through his counsel in an April 6, 2004 letter, that the Yemeni passport was "lost" thus seems apocryphal. [Ex. 31 at 2.]

03cv2479

February 2003 Form I-589, Petitioner claimed to have lived in Yemen in 1998, before going to Canada, but he failed to acknowledge his time spent in Saudi Arabia in June, 1998. [Compare Ex. 1 and Ex. 5 at 4.] In his interview with DHS officials in May 2003, Petitioner claimed to have been born and lived in Italy for five years and in Yemen for 11 years. [Ex. 18 at 2.] Since Petitioner was almost twenty-five when this interview was given, and adding five years for the time spent in the United States, this chronology leaves four years unaccounted for.

   * <u>Petitioner's Parents</u>. In the 1998 Form I-589, Petitioner claimed his father was a member of the Somalia Barawani "minority group," had been born in Somalia, and was a fisherman. [Ex. 3 at 2, 5.] He further claimed the father had been killed in Somalia because of this clan membership. [<u>Id</u>.] In the same form, he claimed his mother's name was Fatum Ahmed and that she had been born in Somalia and was then living in Kenya. [Ex. 3 at 1.] Petitioner's father experienced a miraculous resurgence, because a 1999 letter to Petitioner, found in Petitioner's apartment, indicated that the father was a doctor living in Yemen who was financially supporting Petitioner. [Ex. 23.] Petitioner's December 1998 visitor's visa application indicated the same financial support from the Yemeni father. [Ex. 27.]

   In the February 2003 Form I-589, Petitioner's mother was claimed to have been born in Djbouti and his father in Yemen. [Ex. 5 at 4.] After being ordered removed, Petitioner told a DHS official his mother had been born in Yemen. [Ex. 24.]

   In the February 2003 Form I-589, the father was now described as being alive and living in Yemen, along with his mother. [Ex. 5 at 4.]

Whereas before the father had previously been described as a member of the Somalia Barawani clan [Ex. 3 at 10], now he was described as a "sympathizer of the Islaheen Yemeni Association of Reform party." [Ex. 5 at 6.] Yet, several months later, Petitioner claimed to immigration officials not to know where his father had been born. [Ex. 18 at 1.]

Based on this history of inconsistency and inconstancy, it is little wonder that Petitioner's removal has not yet been implemented. As late as May 2003, after his criminal conviction and after the removal proceedings had commenced (in October 2002), Petitioner was still playing games, tendering an Italian birth certificate [Ex. 13], but describing his birth and citizenship only "on infor & belief" [Ex. 5 at 1]; denying that he had spent time in Saudi Arabia [Compare, Ex. 1, Ex. 5 at 4]; claiming at one point not to even know where his father was born [Ex. 18 at 1] but averring at another point that he had been born in Yemen [Ex. 5 at 4]; continuing to assert the possibility of Somali citizenship [Ex. 18 at 1] even though claiming his parents were born in Yemen and Djbouti [Ex. 5 at 4]; claiming the possibility of Somali citizenship based on his grandparents lineage [Ex. 18 at 1] but claiming not to know where his grandparents were born [Ex. 18 at 2]; and failing to account for his whereabouts for four of his twenty years before entering the U.S. [page 9, supra].[6/]

Based on this background, it is not surprising that Italy and Yemen have not yet been willing to accept him. [Exs. 15, 16.] Yemen, in particular, initially noted that Petitioner's identity card [Ex. 7]

---

[6/] Petitioner's suggestion, in the letter recently sent to DHS officers, that his inconsistencies "preceded his entry into removal proceedings" and that "[s]ince that time, he has provided factually accurate information to ICE" [Ex. 31 at 2] is, therefore, simply not correct.

1 "does not exist in official record," questioned the validity of his

2 identification card and questioned the lack of a Yemeni passport

3 [Ex. 16], which Petitioner hid or destroyed. [Ex. 29.][2/]

4     To avoid the understandable and logical penalty of _Pelich_,

5 Petitioner must be totally forthcoming. It is his responsibility to

6 provide definitive evidence of his birth, nationality, and whereabouts

7 during the years from 1978 and his 1998 entry into the United States.

8 Given that it appears his father is a physician in Yemen who has

9 provided him with financial support [Exs. 1, 23, 27] and he has

10 siblings in Italy [Ex. 5 at 4], it is incredulous to conclude that

11 Petitioner could not, with their assistance, secure necessary

12 documentation to secure his removal. Indeed, Petitioner has

13 acknowledged to DHS officials that, even while in detention, he has

14 been able to maintain telephonic contact with his mother. [Ex. 24.]

15     If his physician father is living in Yemen, he would surely be

16 able to establish his own citizenship of Yemen, through which

17 Petitioner's Yemeni citizenship would be derived, regardless of where

18 he was born. [_See_ Ex. 30 at 2.] (Article 3(a) specifying Yemeni

19 citizenship for "[a]nyone born to a Yemeni father who enjoys Yemeni

20 Nationality.") Petitioner clearly has contact with, or the ability

21

22 _2/_ Petitioner, through his counsel, has urged that the fact that
DHS personnel tendered his purported Italian birth certificate and

23 Yemeni identity card to Italian and Yemeni authorities "rebuts any
subsequent claim regarding the veracity of such information" [Ex. 31

24 at 1] and that "ICE implicitly acknowledged these documents as true
and authentic as evidenced by their submission in support of the

25 travel document requests with the governments of Italy and Yemen" [_id._
at 2.] This is hardly a logical conclusion. To obtain travel

26 documents, often all the government can do is to submit those
documents that are given to it by the alien. The federal government

27 cannot be a total guarantor of their authenticity, which is best
assessed by the governments approached for travel documents. Since

28 such documents as tendered are supposedly issued by the governments
from whom the travel documents are sought, those governments are in
the best position to determine their validity or lack thereof.

03cv2479

to contact, family members. [Ex. 18] (Petitioner provides brother's phone number in Italy). See e.g., Lema, supra, 341 F.3d at 857 (upholding an uncooperative alien's continued detention where the alien "has not furnished . . . the INS with any new evidence (such as affidavits from family members) to support his claim of . . . nationality" nor "attempted to contact the . . . consulate" of his actual native country.)

Moreover, beyond these apparent family connections, Petitioner may well have other connections and associations in Yemen. In his February 2003 Form I-589, he acknowledged that he had traveled to Yemen for twenty-five days in 2000. [Ex. 5 at 8.] How he traveled there based on what documentation is not clear, but the fact that he was able to visit and return from Yemen is strongly suggestive of a national affiliation with that country. But only Petitioner can establish this for certain. Finally, since Petitioner at one time had a Yemeni passport, which he hid or got rid of [Ex. 29], he should be able to produce it or to advise his relatives in Yemen where he obtained it so that a replacement could be obtained from the Yemeni government.

In sum, Petitioner has been "the cause of his own detention" (Pelich, 329 at 1060) and just as clearly, he "has the keys [to freedom] in his pocket" (id.). In the continuing absence of cooperation and candor, Petitioner's continued detention is valid and subsisting and Petitioner should not be heard to claim a right of release.[8/]

_____

[8/]  Petitioner's April 6, 2004 letter [Ex. 31] states a current desire to cooperate, and a recent handwritten note to a DHS detention officer by Petitioner indicates that certain documents have been given
(continued...)

03cv2479

**C. BEYOND THE COOPERATION ISSUE, PETITIONER CANNOT MEET THE ZADVYDAS STANDARD OF SHOWING THAT IT IS NOT LIKELY THAT HE CANNOT BE REPATRIATED IN THE REASONABLY FORESEEABLE FUTURE**

Even if Zadvydas were directly applicable to the circumstances of Petitioner's case, he would not be entitled to release because he cannot meet the evidentiary burdens set forth by the Supreme Court.

Zadvydas certainly does not stand for the proposition that an alien is automatically entitled to release merely upon the passage of six months from the time of his removal order. Rather, Zadvydas emphasized that an alien can continue to be held "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future" (533 U.S. at 701). Moreover, it is up to the alien to "provide[] good reason to conclude there is no significant likelihood or removal in the reasonably foreseeable future." Id. at 701. As the Ninth Circuit has emphasized, Zadvydas places the burden on the alien to show, after a detention period of six months, that there is 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.' Pelich, 329 F.3d at 1059. (Emphasis added.)

Here, Petitioner clearly fails to meet this burden. Aside from failing even to specify his true nationality, Petitioner's only asseveration as to the likelihood of removal is to note that up to now Italy and Yemen have denied travel documents. Petition at 2.

As set forth above, Yemen declined to issue travel documents in October 2003, on the ground that the Yemeni identity card [Ex. 7] that had been found in Petitioner's apartment during the search could not

---

8/ (...continued)
to his attorney. [Ex. 32.] It remains to be seen the outcome of these promises.

be found in the official record, and Petitioner had otherwise failed to provide evidence of his nationality, such as a passport. [Ex. 16.] Italy declined because it did not appear that his father was an Italian citizen. [Ex. 15.]

Given Petitioner's history of prevarication, it is not wholly surprising that the Italians and Yemenis have not issued travel documents.

Subsequent events, however, reveal that progress is being made to effectuate Petitioner's removal in spite of his lack of cooperation. State Department personnel have only recently been in communication with Yemeni authorities regarding Petitioner's nationality, and DHS authorities have recently met again with officials at the Yemeni embassy in Washington to urge that travel documents be issued for Petitioner. These officials indicated they would be reconsidering this request with authorities in Yemen. [Ex. 17.]²/

Based on these events, it cannot be concluded that there is no likelihood of Petitioner's removal in the reasonably foreseeable future. "[E]vidence of progress, albeit slow progress, in negotiating a petitioner's repatriation will satisfy _Zadvydas_ until the petitioner's detention grows unreasonably lengthy." _Kim v. Ashcroft_, Case No. 02cv1524 (S.D. Cal. June 2, 2003), (Jones, J.) (attached as Ex. 26). Particularly where, as here, Petitioner has contributed to the haze of uncertainty as to his nationality, the Court should not

---

²/  Moreover, as noted in the recent DHS Decision to Continue Detention, DHS has frequently been able to secure travel documents for Yemeni nationals, and in FY 2003, fifty such documents were issued. [Ex. 12.] Such evidence is probative of the fact that there are no institutional barriers to repatriation. _Kahn v. Fasano_, 194 F. Supp. 2d 1134, 1137 (S.D. Cal. (2001) (Keep, J.); _Gebremariam v. Ashcroft_, Case No. 02cv0214H(AJB) (S.D. Cal. July 9, 2002) (attached as Ex. 33).

conclude that the totality of circumstances is suggestive of an unlikelihood of removal or that Petitioner has even come close to meeting his burden under <u>Zadvydas</u>.

Accordingly, the DHS Decision to Continue Detention [Ex. 12] is proper because Petitioner is unable to meet his burden under <u>Zadvydas</u>. Following the <u>Zadvydas</u> decision, regulations were promulgated providing detained procedures for the INS (now DHS) to follow in case like this one where an alien has been in post-removal detention for six months. <u>See</u> 8 C.F.R. §§ 241.13, 241.14.[10/] Under these new procedures, if an alien is still in post-removal detention six months after entry of the final removal order, and the alien avers that there is good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the issue of likelihood of removal is referred to DHS headquarters for its determination. The DHS Headquarters determination is based on the broader experience of the DHS and the Department of State with the designated country of removal. As Judge Keep has observed, "[t]he HQPDU is a specialized unit within the INS constituted to do just these determinations, and such administrative expertise, particularly in the context of immigration, deserves significant deference from the judiciary." <u>Kahn v. INS</u>, 194 F. Supp. 1134, 1137 (S.D. Cal. 2001)

Given the DHS's expertise in this area and the fact that it has been entrusted by Congress with administering the nation's immigration laws, both its finding that Petitioner has not been cooperative and its conclusion that Petitioner may still be repatriated in the near future should be accorded deference by this Court. "Ordinary principles of judicial review in this area recognize primary Executive

---

[10/] The promulgation also served to amend 8 C.F.R. § 241.4.

Branch responsibility." Zadvydas, 533 U.S. at 700. Accordingly, in reviewing a determination by the Attorney General that there is a significant likelihood of removal in the reasonable foreseeable future, a district court "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." 533 U.S. at 700.[11]

IV

CONCLUSION

For the reasons stated above, the Petition should be denied.[12]

DATED: April _19_, 2004

CAROL C. LAM
United States Attorney

_R. H. Plaxico_

ROBERT H. PLAXICO
Assistant U.S. Attorney
Attorneys for Respondents

---

[11] See also INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations'"); Southwestern Pennsylvania Growth Alliance v. Browner, 121 F.3d 106, 117 (3d Cir. 1997) ("[A] reviewing court 'must generally be at its most deferential' when reviewing factual determinations within an agency's area of special expertise"); Mitev v. INS 67 F.3d 1325, 1331 (7th Cir. 1995) (Noting the "'extremely fact-intensive nature of [deportation] inquiries' and the superior expertise of the agencies that administer our immigration law.")

[12] Per the terms of DHS's Decision To Continue Detention [Ex. 12], Respondents also reserve the right to invoke the provisions of 8 C.F.R. § 241.14(d), should further investigation justify such a decision. That section permits continued detention, if repatriation is not feasible, if an alien's release "presents a significant threat to the national security. . . ." As the Zadvydas decision noted, that holding did not "consider terrorism nor other special circumstances where special argument might be made for forms of preventive detention and for heightened deference to the judgment of the political branches with respect to matter of national security." 533 U.S. at 696.

03cv2479

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MOHDAR ABDULLAH,<br>[A75-628-802] | ) | Case No. 03cv2479 WQH(AJB) |
| | ) | |
| Petitioner, | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| JOHN ASHCROFT, Attorney<br>General, et al., | ) | |
| | ) | |
| Respondents. | ) | |

STATE OF CALIFORNIA    )
                       )  ss.
COUNTY OF SAN DIEGO    )

IT IS HEREBY CERTIFIED THAT:

I, Patricia C. Terrado, am a citizen of the United States over the age of eighteen years and a resident of San Diego County, California; my business address is 880 Front Street, Room 6293, San Diego, California 92101-8893; I am not a party to the above-entitled action; and

On April 19, 2004, I deposited in the United States mail at San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of **GOVERNMENT'S RETURN** addressed to **Jason I. Ser, Esq., 225 Broadway, Suite 900, San Diego, CA 92101**, the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 19, 2004.

Patricia C. Terrado

 

Citoyenneté et
Immigration Canada

Citizenship and
Immigration Canada

Mr. D. Palacios
Acting Immigration Attaché                                          May 26, 2003
Embassy of the United States of America
PO Box 866
Station "B"
Ottawa, Ontario, K1K 5T1

Dear Mr. Palacios:

This refers to your request received at this office on May 22, 2003 under the terms of the
Statement of Mutual Understanding on Information Sharing, specifically section 2, concerning
one Al Mohdar Mohamed Al Mohdar Zeid, born August 5, 1978 in Yemen.

Information contained in our Field Operational Support System (FOSS number 3560-7865)
indicates that one Al Mohdar Zeid, born August 5, 1978 in Yemen applied for and obtained a
Student Visa and Authorization at the Canadian Embassy in Riyadh, Saudi Arabia on June 28,
1998. This was to allow the subject to attend Algonquin College in Ottawa in a Mechanical
Engineering Technology course. Al Mohdar Zeid arrived in Canada at the Ottawa International
Airport on August 8, 1998 where he was granted student status for a period to expire on June 30,
1999. FOSS shows that Al Mohdar Zeid was in possession of Yemen passport number
00076187 (date of issue unknown) with an expiry date of October 12, 2003. We have no
indication of any addresses that Mr. Al Mohdar Zeid may have lived at in Ottawa and, as the
physical files in Riyadh are destroyed on a regular basis, we also have no information concerning
the origin of funds available to the subject. I would note that FOSS indicates that the funding for
Mr. Al Mohdar Zeid to allow him to go to school in Canada originated with his father but no
further specifics are available.

No other documents have been issued to Mr. Al Mohdar Zeid since that time.

Finally, it has come to my attention through FOSS that a Mr. Mohdar Abdullah (an alias
provided in your correspondence), with the same date of birth but of Somalia citizenship, applied
for admission to Canada as a visitor at the Windsor Tunnel on December 20, 2000 and was
allowed to immediately return to Detroit, Michigan as he was not in possession of the necessary
Canadian Visitor Visa. It is unclear whether the two persons are one and the same.

...2/

Ex. 1 (1 of 2)

I trust that this information is of assistance to you.

Yours truly,

Graham C. Alldridge
Senior Analyst
Case Review Division
Case Management Branch

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
--------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

                    -v.-                          :          CERTIFICATION OF
                                                             AUTHENTICITY

AL-MOHDAR MOHAMED AL-MOHDAR ZEID  :
        a/k/a "Mohdar Mohamed Abdullah"

                                                  :          No. 01CR3240-W

                         Defendant :

--------------------------------------------------------------x

I, Patrick R. Quigley, hereby declare under penalty of perjury:

1. I am employed by the United States Department of State as Special Assistant to the Deputy
Assistant Secretary for Visa Services, Bureau of Consular Affairs. I am authorized to search the
electronic Consular Consolidated Database of the Bureau of Consular Affairs of the U.S.
Department of State for replicated records of visas issued at U.S. embassies and consular posts
abroad and to certify the authenticity of copies of printouts of visa records in that database. The
records are kept in the normal course of affairs of the Department of State, and are prepared and
maintained by individuals who have an obligation to insure their accuracy, safety and security.

2. The attached document is a true, accurate and complete copy of a printout of an electronic
document, "NIV Applicant Detail" for the nonimmigrant visa case of Al Mohdar Mohammed Al
Mohdar Zeid, foil number 24649132, control number 1998344 149 0001, in the Consular
Consolidated Database, which is maintained by the U.S. Department of State, Bureau of
Consular Affairs.

        I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is
true and correct to the best of my knowledge.

Executed on July 8, 2002.

                                        Patrick R. Quigley
                                        Special Assistant to the Deputy Assistant
                                        Secretary for Visa Services
                                        Bureau of Consular Affairs



| Home | ACS | CST | DV | IV | NIV | Support | Admin |



**The United States Department of State - Bureau of Consular Affairs**

## NIV Applicant Detail

*QUIGLEYPR on October 04, 2001 12:54 ET*

---

*Sensitive But Unclassified (SBU) - Information Protected under INA 222(f) and 9 FAM 40.4*

---



| | |
|---|---|
| **Issuing Post Name** | **Control Number** |
| OTTAWA | 1998344 149 0001 |

**Surname**
ZEID

**Given Name**
AL MOHDAR MOHAMMED AL MOHDAR

| **Passport Number** | **Gender** | **Date of Birth** | **Nationality** |
|---|---|---|---|
| 00076187, Regular | Male | 05AUG1978 | YEM |

**Place of Birth**
Yemen (YEM)

| **Fingerprint 1** | **Fingerprint 2** |
|---|---|
| Fingerprint Waived | Fingerprint Waived |

| Class | Entries | Issue Date | Expiration Date | Foil Number |
|---|---|---|---|---|
| B2 | 1 | 10-DEC-1998 | 09-MAR-1999 | 24649132 |

---

## Adjudication History

| Adjud Date | Status |
|---|---|
| 10-DEC-1998 | Issued |

## Foil History

| Foil Number | Class | Date Printed | Foil Status |
|---|---|---|---|
| 24649132 | B2 | 10-DEC-1998 | Printed and passed QA |

## Namecheck(s)

| Seq # | Status | Source | DNC/Class Hits | DNC/Class Worst Hit | Local Worst Hit | Data Entry Date |
|---|---|---|---|---|---|---|
| 1 | RECEIVED | CLASS | 2 | 1 | NR | 10-DEC-1998 |

**Hit Override Description**
NAME AND/OR DOB OF APPLICANT DIFFERENT

**Ex. 2 (2 of 4)**

```
LN: ZEID                    FN: ALMOHDAR    DOB: 08/05/1978 COC: YEMEN
PASSPORT NUMBER           : 00076187        GENDER: M        COR: CANAD
ARRIVAL                                     ADMN REC:    1  OF     1
ADMISSION NUMBER          : 73295863805
ADMISSION CLASS           : B2                                   MISC    x
ADMISSION DATE            : DEC 16, 1998
ADMITTED TO DATE          : JUN 14, 1999
PORT OF ENTRY             : OTTAWA CN
INSPECTOR NUMBER          : 13
VISA ISSUE POST           : OTTAWA
VISA ISSUE DATE           : DEC 10, 1998
ARRIVAL CARRIER           :
AIRLINE FLIGHT NUMBER     : 01722                    TRAVEL MODE: AIR
INTENDED STREET ADDRESS: SAN DIEGO
INTENDED CITY ADDRESS     : SAN DIEGO              STATE: CALIFORNIA
MICROFILM NUMBER          :
DEPARTURE                            ACTUAL DEPARTURE CARRIER :
DEPARTURE DATE     :                 ACTUAL DEPARTURE FLIGHT #:
PORT OF DEPARTURE :                                  SCREEN HELP:
PF1=NEXT PAGE    PF2=PRIOR PAGE   PF4=RETURN   PF5=HELP   PF6=MAIN MENU
PF7=FIRST PAGE   PF8=LAST PAGE    PF10=INQUIRY
NI900047 ENTER AN "X" TO VIEW ANOTHER SCREEN
```


LN: ZEID          FN: ALMOHDAR     DOB: 08/05/1978 COC: YEMEN

ADMISSION NUMBER         : 73295863805
CLASSIFICATION DATE      : DEC 16, 1998
EXTENDED ADMITTED TO DATE :
ITINERARY                : STUDENT IN CANADA
ITINERARY (CON'T)        :
BOND FLAG                :
NOTATIONS                :
CONTROL OFFICE           :
ADJUST TO PERM RESIDENT  :
ALIEN NUMBER             :


                                                        SCREEN HELP:


PF4=RETURN   PF5=HELP   PF6=MAIN MENU   PF10=INQUIRY

U.S. Department of Justice
Immigration and Naturalization Service

# Application for Asylum and for Withholding of Removal

OMB No. 1115-0086

**Start Here - Please Type or Print.     USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION.**

## PART A - INFORMATION ABOUT YOU.

1. Alien Registration Number(s), if any (A#'s)  **75 028 802**

2. Social Security Number  **N/A**

3. Complete Last Name  **ABdullaH**

4. First Name  **Mohalar**

5. Middle Name  **MOHamed**

6. What Other Names Have You Used? *(Include maiden name and aliases.)*

7. Residence in the U.S. C/O

Telephone Number  **619-465-5084**

Street Number and Name  **7240 El calon BLVD**

Apt. No  **#09**

City  **San-Diego**

State  **CA**

ZIP Code  **92115**

8. Mailing Address in the U.S. if Other than Above C/O

Telephone Number

Street Number and Name

Apt. No.

City

State

ZIP Code

9. Sex:  ☒ Male   ☐ Female

10. Marital Status:  ☒ Single   ☐ Married   ☐ Divorced   ☐ Widowed

11. Date of Birth *(Mo/Day/Yr)*  **aug / 05 / 79**

12. City and Country of Birth  **Borauc, somalia**

13. Present Nationality *(Citizenship)*  **Somali**

14. Nationality at Birth  **somali**

15. Race, Ethnic or Tribal Group  **Borwani / Hatim.**  Sub-clan

16. Religion  **musLim**

17. *Check each box that applies.*
☐ I am not now in removal, deportation or exclusion proceedings.
☐ I am now in removal, deportation or exclusion proceedings.
☐ I was previously in removal, deportation or exclusion proceedings.
☒ I have never been in removal, deportation or exclusion proceedings.

18. *Complete 18a through 18g.*
a. When did you last leave your country? *(Mo/Day/Yr)*  **02-13-91**

d. What was your status when you last entered the U.S.? *(What type of visa did you have, if any?)*  **EW1**  fraudulent docs.

b. When did you last enter the U.S.? *(Mo/Day/Yr)*  **Dec-07-98**

e. What is your I-94 Number?  **N/A**

c. Where did you last enter the U.S.?  **New York, new york**

f. What is the expiration date of your authorized stay, if any?  **N/A**

g. Have you previously entered the U.S.?  ☒ No   ☐ Yes. If YES, list place, date, and your status for each entry. *(Attach additional sheets as needed.)*

Date _____ Place _____ Status _____

Date _____ Place _____ Status _____

Date _____ Place _____ Status _____

FOR INS USE ONLY

Returned ____

Receipt

Resubmitted ____

Reloc Sent ____

Reloc Rec'd ____

Action:
Interview Date: **2/23/99**

Asylum:
☒ Granted
☐ Denied
☐ Referred
☒ Recommended Approval Date **2/25/99**

Date A. O. final decision or referral issued **4/1/99**

Total number of persons granted asylum  **1**

For EOIR Use Only

To Be Completed by Attorney or Representative, if any

☐ Check if G-28/EOIR-28 is attached showing you represent the applicant.

INS VOLAG or PIN #

ATTY State License #

**Ex. 3 (1 of 13)**

Form I-589 (Rev. 05-01-98) N

**Information About You - Continued.** (5)

| 19. What is your native language? | 20. Are you fluent in English? | 21. What other languages do you speak fluently? |
|---|---|---|
| CHimini, Somali Arabic | ☒ Yes   ☐ No | ARabic, |

22. Have you ever applied to the United States Government or to any other Government(s) for refugee status, asylum, withholding of deportation, or withholding of removal?

☒ No.

☐ I was included in a pending application of my parent(s). However, I am now 21 years old or married so I am filing my own application.

☐ I was included in my spouse's application, but now I wish to file my own application.

☐ Yes. (In what country and what was the decision? Also specify the date of the decision.) Country _____ Date _____

Decision _____

| 23. What country issued your last passport or travel document? | 24. Passport #   Travel Document # | 25. Expiration Date |
|---|---|---|
| N/A | N/A | N/A |

26. Prior address in last country of residence or country in which you fear persecution. *(List Address, City/Town, Province, State, Department, and Country)*

Barave, Somalia    Baraye (6)

27. Provide the following information about your education, beginning with the most recent.

| Name of School | Type of School | Location | From *(Mo/Yr)* | Attended To *(Mo/Yr)* |
|---|---|---|---|---|
| QASiM ALBarave | elementary | Barave, Somalia | 09-85 | 06-90 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

28. Provide the following information about your residences during the last five years. List your present address first. *(Use additional sheets of paper if necessary.)*

| Number and Street | City | Province or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 7240 ELcajon #9 | San-Diego | CA | U-S-A | DEC-98 | Present |
| cist Leigh | Nairobi | Nairobi | Kenya | May-95 | DEC-98 |
| utanga | Mombasa | coast | Kenya | feb-91 | May-95 |
|  |  |  |  |  |  |

29. Provide the following information about your employment during the last five years. List your present employment first. *(Use additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| unemployed |  |  |  |
|  |  |  |  |
|  |  |  |  |

30. Provide the following information about your parents.

| Name | Country and City of Birth | Location |
|---|---|---|
| Mohamed ABdullaH | Barave, Somalia | deceased |
| fatum AHmed | Barave, Somalia | Nairobi, Kenya |

**Ex. 3 (2 of 13)**

## PART B. INFORMATION ABOUT YOUR SPOUSE AND CHILDREN.

Your Spouse.  ☐ I am not married.  *(Skip to Part B, Your Children.)*

| 1. Alien Registration Number (A#) | 2. Passport/ID Card, etc,.# | |
|---|---|---|
| 3. Complete Last Name | 4. First Name | 5. Middle Name | 6. Date of Birth *(Mo/Day/Yr)* |
| 7. Date of Marriage *(Mo/Day/Yr)* | 8. Place of Marriage | 9. City and Country of Birth | |
| 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex  ☐ Male  ☐ Female | |
| 13. Is this person in the U.S.?  ☐ Yes.  *(Complete blocks 13 to 24.)*  ☐ No.  *(Specify Location)* | | 14. Social Security # |
| 15. Place of Last Entry in the U.S.? | 16. Date of Last Entry in the U.S.? | 17. I-94# | 18. Status when Last Admitted *(Visa type, if any)* |
| 19. Expiration of Status *(Mo/Day/Yr)* | 20. Is your spouse in removal, deportation or exclusion proceedings?  ☐ Yes  ☐ No | 21. If previously in the U.S., Date of Previous Arrival *(Mo/Day/Yr)* | |
| 22. Place of Previous Arrival | | 23. Status at Time of Previous Arrival | |

24. If in the U.S., is this person to be included in this application?  *(Check the appropriate box.)*

    ☐ Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of Page 3 on the extra copy of the application submitted for this person.)*
    ☐ No, because my spouse is/has:
        ☐ Filing separately.
        ☐ Separate application pending.
        ☐ Other reasons.

## All of Your Children, Regardless of Age or Marital Status.

*(Use Supplement A Form or attach additional pages and documentation if you have more than two (2) children.)*

| 1. Alien Registration Number (A#) | 2. Passport/ID Card, etc.# | |
|---|---|---|
| 3. Complete Last Name | 4. First Name | 5. Middle Name | 6. Date of Birth *(Mo/Day/Yr)* |
| 7. City and Country of Birth | 8. Nationality *(Citizenship)* | 9. Race, Ethnic or Tribal Group | 10. Sex  ☐ Male ☐ Female |
| 11. Is this child in the U.S.?  ☐ Yes.  *(Complete blocks 12 to 22.)*  ☐ No.  *(Specify Location)* | | 12. Social Security # |
| 13. Place of Last Entry in the U.S.? | 14. Date of Last Entry in the U.S.? *(Mo/Day/Yr)* | 15. I-94# | 16. Status when Last Admitted *(Visa type, if any)* |
| 17. Expiration of Status *(Mo/Day/Yr)* | 18. Is this child in removal, deportation or exclusion proceedings?  ☐ Yes  ☐ No | 19. If previously in the U.S., Date of Previous Arrival *(Mo/Day/Yr)* | |
| 20. Place of Previous Arrival | | 21. Status at Time of Previous Arrival | |

22. If in the U.S., is this person to be included in this application?  *(Check the appropriate box.)*
    ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of Page 3 on the extra copy of the application submitted for this person.)*
    ☐ No, because child is/has:
        ☐ Filing separately.
        ☐ Separate application pending.
        ☐ Over 21 years of age.
        ☐ Married.
        ☐ Other reasons.

**Ex. 3  (3 of 13)**

**Information About Your Spouse and Children - Continued**   *(Use Supplement A Form or attach additional sheets of paper to list additional children.)*

All of Your Children, Regardless of Age or Marital Status.

| 1. Alien Registration Number (A#) | | | 2. Passport/ID card, etc.# | | |
|---|---|---|---|---|---|
| 3. Complete Last Name | 4. First Name | | 5. Middle Name | | 6. Date of Birth *(Mo/Day/Yr)* |
| 7. City and Country of Birth | 8. Nationality *(Citizenship)* | | 9. Race, Ethnic or Tribal Group | | 10. Sex ☐ Male ☐ Female |
| 11. Is this person in the U.S.? ☐ Yes. *(Complete blocks 11 to 22.)* ☐ No. *(Specify Location)* | | | | | 12. Social Security # |
| 13. Place of Last Entry in the U.S.? | 14. Date of Last Entry in the U.S.? *(Mo/Day/Yr)* | 15. I-94# | | 16. Status when Last Admitted *(Visa type, if any)* | |
| 17. Expiration of Status *(Mo/Day/Yr)* | 18. Is this child in removal, deportation or exclusion proceedings? ☐ Yes ☐ No | | 19. If previously in the U.S., Date of Previous Arrival *(Mo/Day/Yr)* | | |
| 20. Place of Previous Arrival | | | 21. Status at Time of Previous Arrival | | |

22. If in the U.S., is this person to be included in this application? *(Check the appropriate box.)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of Page 3 on the extra copy of the application submitted for this person.)*
   ☐ No, because child is/has:
      ☐ Filing separately.
      ☐ Separate application pending.
      ☐ Over 21 years of age.
      ☐ Married.
      ☐ Other reasons.

---

**PART C. INFORMATION ABOUT YOUR CLAIM TO ASYLUM.**
   *(Use Supplement B Form or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1. Why are you seeking asylum? Explain in detail what the basis is for your claim. *(Attach additional sheets of paper as needed.)*

Please see attach statement

**Information About Your Claim to Asylum - Continued.**

2. Have you or any member of your family ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No.   ☒ Yes.  If yes, provide a detailed explanation of your or your relatives' involvement with each group and include the name of each organization or group; the dates of membership or affiliation; the purpose of the organization; your duties or your relatives' duties or responsibilities in the group or organization; and whether you or your relatives are still active in the group(s). *(Attach additional sheets of paper as needed.)*

yes, my family and I belong to the a
distinct minority group call Barubani
we have our own language called chimini
wich is a lightaskin because of our origin
and Portugese sailor who Intermarried local

3. Have you or any member of your family ever been mistreated or threatened by the authorities of your home country or any other country or by a group or groups that are controlled by the government, or that the government of the country is unable or unwilling to control?

☐ No.   ☒ Yes.  If YES, was it because of any of the following reasons?  *(Check each of the following boxes that apply.)*

☐ Race   ☒ Religion   ☐ Nationality   ☒ Membership in a particular social group   ☐ Political Opinion

On a separate sheet of paper, specify for each instance, what occurred and the circumstances; the relationship to you of the person involved; the date; the exact location; who it was who took such action against you or your family member(s); his/her position in the government or group; the reason why the incident occurred. Attach documents referring to these incidents, if they are available. *(Attach additional sheets of paper as needed.)*

for no other reason that our clan membership
we were attacked By the USC who
killed my father elder Brother fuad
Raped my Sister Samia beat me to unconsciene
looted our home

4. Have you or any member of your family ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in your country or any other country, including the United States?

☒ No.   ☐ Yes.  If YES, for each instance, specify what occurred and the circumstances; dates; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; the treatment received during the detention or imprisonment; any formal charges that were lodged against you or your relatives; the reason for release; treatment after release. Attach documents referring to these incidents if they are available. *(Attach additional sheets of paper as needed.)*

I was arrested By the Kenyan Police
for lack of legal residence, and since
as a Somali refugee we are not
Given any legal status and I had
to Pay Bribe to be release.

Information About Your Claim to Asylum - Continued.

5. Do you fear being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in your home country or any other country if you return?

☐ No.  ☑ Yes.  If YES, explain why.  *(Attach additional sheets of paper as needed.)*

Please see attach declaration

6. What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution? Explain in detail and provide information or documentation to support your statement, if available. *(Attach additional sheets of paper as needed.)*

Please see attach declaration

7. Describe in detail your trip to the United States from your home country. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?

☐ No.  ☑ Yes.  If YES, for each person, identify each country and indicate the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for residence purposes; and if the person applied for refugee status or for asylum while there; or why he or she did not do so. *(Attach additional sheets of paper as needed.)*

Please see attach declaration

PART D. ADDITIONAL INFORMATION ABOUT YOUR APPLICATION FOR ASYLUM.
*(Use Supplement B Form or attach additional sheets of paper as needed to complete your responses to the questions contained in Part D.)*

1. Do you, your spouse, or your child(ren) now hold, or have you ever held, permanent residence, other permanent status, or citizenship, in any country other than the one from which you are now claiming asylum?

   ☒ No. ☐ Yes. If YES, explain. *(Attach additional sheets of paper as needed).*

2. Have you, your spouse, your child(ren), your parents ever filed for, been processed for, or been granted or denied refugee status or asylum by the United States Government?

   ☒ No. ☐ Yes. If YES, explain the decision and what happened to any status you received as a result of that decision. If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change in country conditions or your own circumstances since the date of the denial that may affect your eligibility for asylum. *(Attach additional sheets of paper as needed.)*

3. Have you, your spouse, your child(ren), or your parents ever filed for, been processed for, or been granted or denied refugee status or asylum by any other country?

   ☒ No. ☐ Yes. If YES, explain the decision and what happened to any status you received as a result of that decision. *(Attach additional sheets of paper as needed.)*

4. Have you, your spouse, or child(ren) ever caused harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion, or ever ordered, assisted, or otherwise participated in such acts?

   ☒ No. ☐ Yes. If YES, describe, in detail, each such incident and your own or your spouse's or child(ren)'s involvement. *(Attach additional sheets of paper as needed.)*

5. After you left your country of claimed persecution for the reasons you have described, did you return to that country?

   ☒ No. ☐ Yes. If YES, describe, in detail, the circumstances of your visit, for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s). *(Attach additional sheets of paper as needed.)*

6. Are you filing the application more than one year after your last arrival in the United States?

   ☒ No. ☐ Yes. If YES, explain why you did not file within the first year after you arrived. You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question see Part 1: Filing Instructions, Section V. "Completing the Form," Part D. *(Attach additional sheets of paper as needed.)*

PART E. SIGNATURE.

*After reading the information on penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part F.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it is all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact -- shall be fined in accordance with this title or imprisoned not more than five years, or both". I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

Staple your

photograph

here.

*WARNING: Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See INA 208(d)(6) and 8 CFR 208.18.*

Signature of Applicant *(The person named in Part A)*

[ X *M. M. Abdullah* ] *Abdullah*        *12·24·98*

Sign your name so it all appears within the brackets.        Date *(Mo/Day/Yr)*

Print Name *Mohdar Mohamed*        Write your name in your native alphabet *muxaar mavamme abdullah*

Did your spouse, parent or child(ren) assist you in completing this application? ☒ No ☐ Yes *(If YES, list their name(s) and relationship.)*

*(Name)* _____ *(Relationship)* _____ *(Name)* _____ *(Relationship)* _____

Did someone other than you or your spouse, parent or child(ren) prepare this application? ☐ No ☒ Yes *(Complete Part F)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim? ☒ No ☐ Yes

PART F. SIGNATURE OF PERSON PREPARING FORM IF OTHER THAN ABOVE. *Sign below.*

I declare that I have prepared this application at the request of the person named in Part E, that the responses provided are based on all information of which I have knowledge, which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. Section 1324(c).

Signature of Preparer *Medic'*        Print Name *MOHAMED' aiacol*        Date *(Mo/Day/Yr)* *12·24·98*

Daytime Telephone Number ( )        Address of Preparer: Street Number and Name *3870 50th Street*

Apt. No. *#3*        City *San·Diego*        State *CA*        ZIP Code *92105*

PART G. TO BE COMPLETED AT INTERVIEW.

*You will be asked to complete this Part when you appear before an asylum officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that corrections numbered __/__ to __∅__ were made by me or at my request.

*M. H.*

X *M. M. Abdullah*        Signed and sworn to before me by the above-named applicant on: _____

Signature of Applicant

X *mux aar Maxamed Abdullah* _____        Date *(Mo/Day/Yr)* _____

Write your Name in your Native Alphabet        Signature of Asylum Officer or Immigration Judge

## PART E. SIGNATURE.

*After reading the information on penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part F.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it is all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact -- shall be fined in accordance with this title or imprisoned not more than five years, or both". I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

*WARNING:* Applicants who are in the United States illegally are subject to removal if their asylum or withholding an asylum officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See INA 208(d)(6) and 8 CFR 208.18.

Signature of Applicant (The person named in Part A)

[ *M. M. Abdullah* ]                     *12-24-98*

Sign your name so it all appears within the brackets.          Date (Mo/Day/Yr)

Print Name *Mohdar Mohamed Abdullah*   Write your name in your native alphabet *mu_ydar maxamad catdullah*

Did your spouse, parent or child(ren) assist you in completing this application?  ☒ No  ☐ Yes  *(If YES, list their name(s) and relationship.)*

(Name) _____ (Relationship) _____ (Name) _____ (Relationship) _____

Did someone other than you or your spouse, parent or child(ren) prepare this application?  ☐ No  ☒ Yes  *(Complete Part F)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?  ☒ No  ☐ Yes

## PART F. SIGNATURE OF PERSON PREPARING FORM IF OTHER THAN ABOVE. *Sign below.*

I declare that I have prepared this application at the request of the person named in Part E, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. Section 1324(c).

| Signature of Preparer *Mided* | Print Name *MOHamed aidad* | Date (Mo/Day/Yr) *12·24·98* |
|---|---|---|
| Daytime Telephone Number (   ) | Address of Preparer: Street Number and Name *3810 50th Street* | |

| Apt. No. *# 3* | City *san·Diego* | State *cA* | ZIP Code *92105* |
|---|---|---|---|

## PART G. TO BE COMPLETED AT INTERVIEW.

*You will be asked to complete this Part when you appear before an asylum officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that corrections numbered _____ to _____ were made by me or at my request.

Signed and sworn to before me by the above-name applicant on:

_____          _____
Signature of Applicant                    Date (Mo/Day/Yr)

_____          _____
Write your Name in your Native Alphabet          Signature of Asylum Officer or Immigration Judge

I MOHADAR MOHAMED ABDULLAH wish to petition the USINS to grant me asylum on account of past persecution that me and my familly suffered at the hand of the USC militia.

I Mohadar Mohamed Abdullah hereby depose and say.
I am a citizen and a National of Somalia .I was born on August 05-79 in Barawe somalia, I am the third oldest of 5 sibling born to my father Mohamed Abdullah and mother Fatum Ahmed.

My familly and I belong to the Barawani clan and our subgroup is reer fiqi during the long and horrible clans war that followed the overthrow of Siyad and continuing to this day in our homeland somalia our clans did not took side and remained neutral.
My kinsmen were not involve in politic they owned small store and little grocery shop.
My father was a fisherman and our mother was a house wife.

On Feb 11-91 about 8:00 clock at night I was home with my entire familly consisting of me, brother's and sister's father and mother we were having diner when we heard a loud noise coming from our door, and before we realized what was happening about seven men entered our home they pointed theirs guns on us and demanded that we give them contribution my father gave them some money but they wanted more than we hold.
They told us that us Barawani were vulture who amased fortune while other people fought for the liberation of the country from the dictator ship, they ordered us to lie down putting theirs guns on our heads, they tied my father and older brother together and took them outside, then they grabed my sister's Samia and tore her clothe I could not restrain myself and two men's immediatly hold me back and beat me savagely as I strugled with them I was hit on the neck and lost conscience, when I regained consciense my mother was holding my head and calling my name.

As I gained more strenght I saw the body of my elder's brother and father, my sister was also raped she was crying for the lost of our loves ones, I was devasted and could not understand why they attacked us and treated us this way. Our neighboor who were also attacked came to our home they also fell victim to the USC thug and we burried our deaths together.

On Feb 13-91 we had a chances to escape our hometown that was under USC occupation and sought refuge in Kenya.
We took a boat and 3 days later arrived in Mombassa, it was a horrible journey a lot of people felt sick and we had to wait for the authorisation to dock from the Kenyans health departement, finaly we were allowed to enter Kenya, and were send to Utanga refugie camps.

14

During my stay in Kenya I lived from Feb 91 to May 95 in Utanga refugie camps the Kenyans civilian did not want us in theirs country and burned the camps several times to make matter worse as a refugie we were only allowed to remain in the camps and if we were found outside these facility were arrested by the police, who extorted money from us, I was arrested more than 10 times because I was considered illegal in Kenya. On May 95 when Utanga was closed I moved to Nairobi while the rest of my familly went to Ifo.

While on Nairobi I stayed in eistleight with my cousin and friends sharing our little resources together.
In 1997 few of my friends had an opportunity to go to Australia and promised me that they will help me out in the future, they helped me with living expense once they went there and on Oct 98 they sending me some money and urged me to use it to escape Kenya.

I contacted a somali smuggler who arranged my departure from Nairobi on Dec 06-98 and arrived in New-York via Madrid Spain on the 7th of Dec 98 and knowing asking to be granted asylum on the humanitarian base since I do not have a safe place to go back in my home country, the USC who butchered my familly and caused us to flee our birth place are still there, killing innocent people, since we do not have any militia to defend ourself, I have no doubt in my mind that I'll be killed if returned to the present day Somalia where guns constitute law and order
Furthermore there is no future for me in Kenya as the governement of that country made it clear that it will not issue any legal status to somali refugie.

In the light of the above mentioned fact I hope that your good office will grant me asylum and I pledge to contribute to the good of your society.
I Swear that all information stated above are true and correct to the best of my knowledge and belief.

15

## ASSESSMENT TO GRANT

ALIEN NUMBER: 75 628 802        DATE: 2/25/99

NAME: Abdullah, Mohdar Mohamed      ASYLUM OFFICER: D. Diaz

COUNTRY: Somalia               REVIEWING SA

LOCATION: ZLA

The applicant indicated that he is a 20 year-old male native and citizen of Somalia who entered the United States at New York, JFK on 11/28/98 as an impostor with fraudulent documents.

Applicant fears returning to Somalia because he will be persecuted by members of the United Somali Congress. Applicant bases his claim for asylum on account of his membership in a particular social group.

Applicant credibly testified that he was born in Baraawe, Somalia and was a member of the Baraawani clan. He lived with his parents, 4 brothers and 1 sister in this village which contained about 25, 000 people. Everybody in the village was Baraawan. On February 11, 1991, about 7 to 8 Somali armed men came to applicant's village and attacked all the homes. They heard a loud noise and his father opened the door. The men burst into the house. They gathered everybody and then requested money and valuables. Applicant's father gave them the money. They called them bad names, and were told they were blood suckers because they were not fighting for their independence. His father and older brother were tied and his mother and the smaller children were crying. The men began taking off his sister's clothes. Applicant tried to help her, but was struck with a blow to the head. Applicant was unconscious for about 3 hours. When applicant awoke, he learned that his father and brother were killed and his sister had been raped by 3 men.

After the massacre, the village people made a common burial ground to bury the dead. His mother planned a getaway from the village because it was not safe.. They boarded a ship and went to Mombasa, Kenya. Applicant's family went to the refugee camp in Utonga and stayed there from 1991 to 1995. After utonga closed his family went to IFO refugee camp and he went to Nairobi, Kenya to try to find a job. While in Kenya applicant was detained about 10 times and had to pay bribes to be released.

Thus, Applicant has established that he is a refugee because the experiences he endured rise to a level to be considered persecution and because the harm inflicted was on account of his Baraawani clan membership, race and particular social group. His father and brother killed. His sister raped, and family forced to be displaced. Cummulatively this amounts to persecution.




UNITED STATES DEPARTMENT OF JUSTICE
Immigration and Naturalization Service
Asylum Office
Box 65015
Anaheim CA 92815-5015

Date: **MAY 0 3 1999**
A 75 628 802

Mohdar Mohamed Abdullah
7240 El Cajon B. Apt. 9
San Diego, CA  92115

### Asylum Approval

Dear Mr. Abdullah,

.This letter refers to your request for asylum in the United States filed on Form I-589. This office previously issued you a letter to notify you that your request for asylum had been recommended for approval, pending the results of the mandatory, confidential investigation of your identity and background.

It has been determined that you are eligible for asylum in the United States. Attached please find a completed Form I-94, Arrival Departure Record, indicating that you have been granted asylum status in the United States pursuant to §208(a) of the Immigration and Nationality Act (INA) as of 4/14/99. You have been granted asylum in the United States for an indefinite period. This grant of asylum includes your dependents listed above who are present in the United States, were included in your asylum application, and for whom you have established a qualifying relationship by a preponderance of evidence.

In order to request derivative asylum status for any spouse or child who was not included in your asylum request, you must submit a Form I-730, Refugee and Asylee Relative Petition, to the Immigration and Naturalization Service (INS).

You are eligible for employment authorization for as long as you remain in asylum status. Your dependents listed above are also eligible for employment authorization, so long as they retain derivative asylum status. However, you must apply for and obtain an Employment Authorization Document (EAD) as evidence of your eligibility to work in the United States. To obtain an EAD, you must submit to the INS a Form I-765, Application for Employment Authorization. We suggest that you include a copy of this letter when applying for work authorization as an asylee.

If you plan to depart the United States, you must obtain permission to return to the United States before you leave this country. If you do not obtain permission, you may be unable to reenter the United States, or you may be placed in proceedings where you will be required to establish your asylum status. You may apply for a Refugee Travel Document on a Form I-131, Application for Travel Document.

Asylum status does not give you the right to remain permanently in the United States. Asylum status may be terminated if you no longer have a well-founded fear of persecution because of a fundamental change in circumstances, you have obtained protection from another country, or you have committed certain crimes or engaged in other activity that makes you ineligible to retain asylum status in the United States. See INA § 208(c)(2) and 8 C.F.R. §208.22(a).

You may apply for lawful permanent resident status under section 209(b) of the Immigration and Nationality Act after you have been physically present in the United States for a period of one year after the date you were granted asylum status. To apply for lawful permanent residence status, you must submit to the INS a Form I-485, Application to Register Permanent Residence or Adjust Status.

**Ex. 4 (1 of 2)**

16



You must notify the INS of any change of address within ten days of any such change. You may obtain a Form AR-11 at your nearest post office or INS office to comply with this requirement.

You may obtain any of the forms noted above at an INS District Office or INS Forms Center. Instructions with or on the forms explain how to complete the forms, what documents to attach and where to send the completed forms.

Sincerely,

*for Robert V. Looney*
Asylum Office Director

Enclosure: I-94 Card

2

OMB No. 1115-0086

**U.S. Department of Justice**
Immigration and Naturalization Service

**Application for** ... **Withholding of Removal**

*Start Here - Please Type or Print.* USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION. (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture. ☑

### PART A. I. INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s)(A#'s)*(If any)* A 75 628 802 | 2. Social Security No. *(If any)* 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 |

| 3. Complete Last Name Abdullah | 4. First Name Mohdar | 5. Middle Name Mohammed |
|---|---|---|

6. What other names have you used? *(Include maiden name and aliases.)*

| 7. Residence in the U.S. <br> C/O INS - In custody | Telephone Number |
|---|---|
| Street Number and Name | Apt. No. |
| City | State | ZIP Code |

| 8. Mailing Address in the U.S., if other than above | Telephone Number |
|---|---|
| Street Number and Name | Apt. No. |
| City | State | ZIP Code |

| 9. Sex ☑ Male ☐ Female | 10. Marital Status: ☑ Single ☐ Married ☐ Divorced ☐ Widowed |
|---|---|

| 11. Date of Birth *(Mo/Day/Yr)* <br> 08/05/1978 | 12. City and Country of Birth <br> On infor & belief: Italy; family Somali/Yemeni combined |
|---|---|

| 13. Present Nationality *(Citizenship)* <br> Info&Belief:Somali/Yem/Ital | 14. Nationality at Birth <br> See 13 | 15. Race, Ethnic or Tribal Group <br> Arab | 16. Religion <br> Muslim |
|---|---|---|---|

17. *Check the box, a through c that applies:*   a. ☐ I have never been in immigration court proceedings.
b. ☑ I am now in immigration court proceedings.   c. ☐ I am **not** now in immigration court proceedings, but I have been in the past.

18. *Complete 18 a through c.*
a. When did you last leave your country? *(Mo/Day/Yr)* August 2000   b. What is your current I-94 Number, if any? N/A

c. Please list each entry to the U.S. beginning with your most recent entry.
*List date (Mo/Day/Yr), place, and your status for each entry. (Attach additional sheets as needed.)*

| Date | 08/2000 | Place | ~~New York~~ Atlanta, Ga. | Status | Travel | Date Status Expires | 08/2000 |
|---|---|---|---|---|---|---|---|
| Date | | Place | | Status | | | |
| Date | | Place | | Status | | | |
| Date | | Place | | Status | | | |

| 19. What country issued your last passport or travel document? USA | 20. Passport # Unk <br> Travel Document # Unk | 21. Expiration Date *(Mo/Day/Yr)* <br> 08/2000 |
|---|---|---|

| 22. What is your native language? <br> Arabic & Italian(info/belief) | 23. Are you fluent in English? <br> ☑ Yes ☐ No | 24. What other languages do you speak fluently? <br> Arabic/English |
|---|---|---|

DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

FEB 1 9 2003

IMMIGRATION COURT
SAN DIEGO, CA

**FOR INS USE ONLY**

Action:
Interview Date: _____
Decision:
___ Approval Date: _____
— Denial Date: _____
— Referral Date: _____
Asylum Officer ID# _____

Form I-589 (Rev. 10/18/01)N

**Ex. 5 (1 of 12)**

## PART A. II.   INFORMATION ABOUT YOUR SPOUSE AND CHILDREN

**Your Spouse.** ☑ I am not married. (Skip to *Your Children, below.*)

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | | 3. Date of Birth *(Mo/Day/Yr)* | 4. Social Security No. *(If any)* |
|---|---|---|---|---|
| 5. Complete Last Name | 6. First Name | | 7. Middle Name | 8. Maiden Name |
| 9. Date of Marriage *(Mo/Day/Yr)* | 10. Place of Marriage | | 11. City and Country of Birth | |
| 12. Nationality *(Citizenship)* | 13. Race, Ethnic or Tribal Group | | | 14. Sex ☐ Male ☐ Female |

15. Is this person in the U.S.? ☐ Yes *(Complete blocks 16 to 24.)* ☐ No *(Specify location)*

| 16. Place of last entry in the U.S. ? | 17. Date of last entry in the U.S. *(Mo/Day/Yr)* | 18. I-94 No. *(If any)* | 19. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 22. Is your spouse in immigration court proceedings? ☐ Yes ☐ No | 23. If previously in the U.S., date of previous arrival *(Mo/Day/Yr)* |

24. If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

**Your Children.** Please list **ALL** of your children, regardless of age, location, or marital status.

☑ I do not have any children. *(Skip to Part A. III., Information about Your Background.)*
☐ I do have children. Total number of children _____

*(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S. | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

Form I-589 (Rev. 10/18/01)N Page 2

**PART A. II.   INFORMATION ABOUT YOUR SPOUSE AND CHILDREN Continued**

| 1. Alien Registration Number (A#) (If any) | 2. Passport/IDCard No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

| 13. Is this child in the U.S.?  ☐ Yes (Complete blocks 14 to 21.)   ☐ No (Specify Location) |
|---|

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S. ? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, (if any)? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

| 1. Alien Registration Number (A#) (If any) | 2. Passport/ID Card No.(If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

| 13. Is this child in the U.S. ?  ☐ Yes (Complete blocks 14 to 21.)   ☐ No (Specify Location) |
|---|

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

| 1. Alien Registration Number (A#) (If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

| 13. Is this child in the U.S.?  ☐ Yes (Complete blocks 14 to 21.)   ☐ No (Specify Location) |
|---|

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

Ex. 5  (3 of 12)




## PART A. III.    INFORMATION ABOUT YOUR BACKGROUND

1. Please list your last address where you lived before coming to the U.S.  If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State, and Country.)* *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street (Provide if available) | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| Unk-off Fisher St | Ottawa | Ottawa | Canada | 9/1998 | 12/1998 |
| El Rabit Street | Sa'ana | Yemen | Yemen | 5/1998 | 9/1998 |

2. Provide the following information about your residences during the last five years.  List your present address first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Number and Street | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| 1415 Lexington Ave. | El Cajon | CA 92019 | USA | 10/2000 | 9/2001 |
| 7200 Saranac Ave. | La Mesa | CA 91942 | USA | 3/1999 | 10/2000 |
| Osman Mosque El CajonBl | Lemmon Grove | CA 91945 | USA | 2/1999 | 3/1999 |
| No. Unk-Fisher St. | Ottawa | Ottawa | Canada | 8/1998 | 12/1998 |
| El Ribat Street | Sa'ana | Yemen | Yemen | 5/1998 | 8/1998 |

3. Provide the following information about your education, beginning with the most recent. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name of School | Type of School | Location (Address) | Attended From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|
| San Diego State | University | College Avenue | 6/2001 | 8/2001 |
| Grossmont College S.D. | Community College | Grossmont College Dr. | 1/1999 | 9/2001 |
| Algonquin College | College | Ottawa, Onario, Canada | 8/1998 | 12/1998 |
| Ali Abdul Mughni H.S. | High School | Hadda Street, Sa'an Yem. | 9/1995 | 6/1996 |

4. Provide the following information about your employment during the last five years.  List your present employment first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|
| La Mesa Texaco, La Mesa, CA | Cashier | 4/1999 | 9/2001 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

5. Provide the following information about your parents and siblings (brother and sisters).  Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| | Name | City/Town and Country of Birth | Current Location |
|---|---|---|---|
| Mother | Fatum Ahmed Al Shajri | Djbouti | ☐ Deceased  Sa'ana Yemen |
| Father | Mohammed Al Mohdar Abdul | lah Zeid, Sa'ana, Yemen | ☐ Deceased  Sa'ana Yemen |
| Siblings | Ahmed Mohammed Al Mohdar | Zeid, Rome, Italy | ☐ Deceased  Rome, Italy |
|  | Abdullah Mohammed Al Moh | dar Zeid, Sa'ana, Yemen | ☐ Deceased  Sa'ana, Yemen |

Form I-589 (Rev. 10/18/01)N Page 4

 
## PART B. INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions. Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, "Completing the Form," Part B, and Section VII, "Additional Documents that You Should Submit" for more information on completing this section of the form.

1. Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the Convention Against Torture? Check the appropriate box (es) below and then provide detailed answers to questions A and B below:

   I am seeking asylum or withholding of removal based on

   ☐ Race
   ☐ Religion
   ☐ Nationality
   ☑ Political opinion
   ☑ Membership in a particular social group
   ☑ Torture Convention

   A. Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

   ☐ No ☑ Yes If your answer is "Yes," explain in detail:

   1) What happened;
   2) When the harm or mistreatment or threats occurred;
   3) Who caused the harm or mistreatment or threats; and
   4) Why you believe the harm or mistreatment or threats occurred.

   ```
   Islaheen political party in 1996: friends and colleagues beaten by Yemeni govt. b/c
   suppported free elections. Govt. stole ballot boxes. Mother's brother arrested
   several times in disputes over politics and land issues.
   ```

   B. Do you fear harm or mistreatment if you return to your home country?

   ☐ No ☑ Yes If your answer is "Yes," explain in detail:

   1) What harm or mistreatment you fear;
   2) Who you believe would harm or mistreat you; and
   3) Why you believe you would or could be harmed or mistreated.

   ```
   I fear arrest, torture, and perhaps death at the hands of the government of Yemen.  I
   have been identified in the public forum as a casual acquaintance of the 9/11
   hijackers Nawaf Al Hazmi and Khalid Al Mihdar.  Were I to be deported to Yemen, the
   government would seize me as a suspected terrorist/al Qaida member/supporter and would
   torture me and possibly kill me in its prosecution of the war against terror as an
   ally of the United States.  I would be presumptively guilty in that venue in
   violations of human rights conventions and torture conventions.
   ```

 

## PART B.   INFORMATION ABOUT YOUR APPLICATION Continued

2. Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No   ☑ Yes  If "Yes," explain the circumstances and reasons for the action.

My brother, Ahmed, was seized by Italian authorities in Rome, Italy, in Septeber 2002, and extensively interrogated about me. My casual acquaintanceship with the two hijackers mentioned above has stigmatized me in Yemen and elsewhere and has caused me and my family to be at risk for personal harm and illegal detention.

3. A. Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No   ☑ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

My father is a sympathizer with the Islaheen, Yemeni Association of Reform, party. I would be subject to suspicion because I am his son. I fear I would be arrested, interrogated, and tortured because of his affiliation. And b/c of my own casual acquaintanceship with the two hijacers, I, too, would be subject to torture.

B. Do you or your family members continue to participate in any way in these organizations or groups?

☐ No   ☑ Yes  If "Yes," describe for each person, your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

Father still an active supporter.

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No   ☑ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

Please see attachment. Because I was casually acquainted with two of the hijackers here in San Diego, the government of Yemen would certainly presume me to be a terrorist and/or Al Qaida supporter. It then would arrest, interrogate, and torture me. In Yemen, you are guilty until proved otherwise. I would disappear into the gulug-like prison system, which also includes private prisons run by local tribal chiefs outside the scrutiny of NGOobservers and be tortured/killed.

**PART C.    ADDITIONAL INFORMATION ABOUT YOUR APPLICATION**

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1.    Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?    ☐ No  ☑ Yes

If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision.  Please indicate whether or not you were included in a parent or spouse's application.  If so, please include your parent or spouse's A- number in your response.  If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

```
I previously applied for and was granted asylum, which is now terminated.
```

2.    A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?    ☐ No  ☑ Yes

B.  Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?    ☐ No  ☐ Yes

If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and, if not, why he or she did not do so.

```
I never firmly resettled anywhere.  I was in Canada temporarily and was never
offered citizenship or permanent residency.
```

3.    Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

☑ No  ☐ Yes  If "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

**PART C. ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued**

4. After you left the country where you were harmed or fear harm, did you return to that country?

☐ No  ☑ Yes  If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

```
I visited Yemen for 25 days in August, 2000.  However, since that time the country's
circumstances have changed.  9/11/2001 brought Yemen to the forefront of the war
against terrorism, and it has proved to be a merciless ally of the United States,
just recently conspiring with the United States to kill all six occupants of a
vehicle traveling in Yemen with a missile from an unmanned drone controlled by U.S.
forces.  Undoubtedly, the publicity attendant to my acquaintanceship with the two
hijackers who visited San Diego in 2000 would impel the Yemeni authorities to arrest,
interrogate, and torture me to satisfy themselves (and their ally, the U.S.) that I
really know nothing about 9/11 or Al Qaeda, as I have contended since my first day of
incarceration here in the U.S.  Also, I believe in democracy and freedom and have
criticized Yemen in the Middle East in the media.  That would evoke torture as well.
```

5. Are you filing the application more than one year after your last arrival in the United States?

☑ No  ☐ Yes  If "Yes," explain why you did not file within the first year after you arrived.  You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived.  For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

```
I seek herein only withholding and Convention Against Torture relief.
```

6. Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

☐ No  ☑ Yes  If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

```
In October, 2002, I pled guilty to one count of violating 18 USC 1001.  I was
sentenced to time served (331 days) because I have been unable to make bail since
9/21/2001.  However, per the sentencing guidelines, my sentence actually was "time
served, 0-6 months."  See U.S. v. Mohdar Zeid, Cse No. 01CR3240-W, USDC, SD
California.  The Service has provided the documents of this case to the court.
```

## PART D. YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

> Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

**WARNING:** Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

| Print Complete Name | Write your name in your native alphabet |
|---|---|
| Mohdar Abdullah | |

Did your spouse, parent, or child(ren) assist you in completing this application?  ☑ No ☐ Yes *(If "Yes," list the name and relationship.)*

| _____ | _____ | _____ | _____ |
|---|---|---|---|
| *(Name)* | *(Relationship)* | *(Name)* | *(Relationship)* |

Did someone other than your spouse, parent, or child(ren) prepare this application?  ☐ No ☐ Yes *(If "Yes," complete Part E)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?  ☐ No ☑ Yes

Signature of Applicant *(The person in Part A. I.)*

[ _____ ]
Sign your name so it all appears within the brackets

01/28/2003
Date *(Mo/Day/Yr)*

## PART E. DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

| Signature of Preparer | Print Complete Name | | |
|---|---|---|---|
| Daytime Telephone Number ( ) | Address of Preparer: Street Number and Name | | |
| Apt. No. | City | State | ZIP Code |

## PART F. TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on:

| _____ | _____ |
|---|---|
| Signature of Applicant | Date *(Mo/Day/Yr)* |

| _____ | _____ |
|---|---|
| Write Your Name in Your Native Alphabet | Signature of Asylum Officer or Immigration Judge |

Form I-589 (Rev. 10/18/01)N Page 9

| A # (If available) | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

**LIST ALL OF YOUR CHILDREN, REGARDLESS OF AGE OR MARITAL STATUS.**
*(Use this form and attach additional pages and documentation as needed to your application if you have more than four (4) children.)*

| 1. Alien Registration Number (A#)(If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.? ☐ Yes (Complete blocks 14 to 21.)   ☐ No (Specify Location)

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A#)(If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.? ☐ Yes (Complete blocks 14 to 21.)   ☐ No (Specify Location)

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)
☐ No



**ADDITIONAL INFORMATION ABOUT YOUR CLAIM TO ASYLUM.**

| A # (If available) | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

*Use this as a continuation page for any information requested. Please copy and complete as needed.*

PART  B

QUESTION  4

Because of the earlier described 1996 incidents involving my family and because of my recent stigamatization in the public forum as a casual acquaintance of the hijackers Nawaf Al Hazmi and Khalid Al Mihdar, who visited San Diego in the year 2000, I fear persecution, arrest, interrogation, and torture in Yemen should I return there. The Yemeni government is an ally of the United States in the war against terrorism and has recently requested the US to kill six men, including an American citizen, whom the government suspected of Al Quada connections. I would be presumed to be guilty by my casual acquaintancship and certainly would be arrested, interrogated, and tortured. My name has been extensively publicized in the press, the most recent being Sunday, January 26, 2003, on the front page of the San Diego Union Tribune. In the third world, you are not guilty until proved otherwise, and there I would be presumed to be an Al Qaeda sympathesizer, or worse, and would face physical and mental abuse and long-term incarceration with no hope in sight. And I am also sad to say that I believe that the United States government would also implore the Yemeni government to arrest and interrogate me by violents means as it has done to others in its fight against suspected terrorists, a fight which often afflicts innocents like me. And because I testifed before the NY grand jury and gave a full accounting of my interaction with the hijackers, I could be subject to retaliation from the Al Qaeda sympathizers who seem to be numersous and out of control in Yemen. Just this week, an American civilian was killed by them.

Ex. 5 (11 of 12)



# PROOF OF SERVICE

Re: A # <u>75-628-802</u>

Last Name: <u>Abdullah</u>

I hereby certify that, on this date, I served the attached <u>I-589</u>

on the Immigration and Naturalization Service in the following manner (as checked):

☐   **By mailing via first class mail, postage prepaid, to:**

880 Front Street, Suite 1234
San Diego, California 92101-8834

☒   **By hand delivery to:**

INS District Counsel
Federal Building
880 Front Street, Suite 2246
San Diego, California 92101
INS Court M/C of even date.

Date <u>2/19/03</u>
     <u>~~1/28/2003~~</u>

<u>Randall B. Hamud</u>
**Name (Please print)**

Signature

<u>Attorney at Law</u>
**Title**

<u>A F F I D A V I T</u>

I, DANIEL GONZALEZ, state as follows:

    1.  I am employed as a Special Agent for the Federal Bureau of Investigation (FBI), and have been so employed for eleven (11) years.  I am currently assigned to the San Diego Division and investigate a variety of criminal offenses, including airplane hijackings and terrorism.

    2.  The statements contained in this affidavit are based on information provided by Special Agents of the FBI and other law enforcement officials, on information provided by confidential sources, and on my own experience and background as a Special Agent of the FBI.  I have set forth the facts that I assert are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Sections 32 (destruction of and conspiracy to destroy aircraft); 844 (bombing and bombing conspiracy); 1962 (racketeering and racketeering conspiracy); and 2384 (seditious conspiracy to levy war against the United States) are located both in a GEO Metro, California License 4HPH316, VIN 2C1MR2463R6717463, registered to Mohdar Abdullah, and Abdullah's current residence, identified as 1415 East Lexington Avenue, #146, El Cajon, California 92109.

    3.  The residence is an apartment located in a complex which is made up of approximately eighteen (18) buildings.  Each building contains eight apartments.  Abdullah's apartment, #146, is a single story ground level apartment in the southeast corner of the building.  Abdullah's building is beige stucco with blue

1

0036

trim, and the number "146" in white letters is located on an exterior wall surrounding the patio of Apartment #146.

4. A grand jury in the Southern District of New York is conducting an investigation of a series of terrorist attacks that appear to have been carried out in coordinated fashion on September 11, 2001. The plan consisted of, among other things, the hijacking of four commercial airliners, two of which were flown into the twin towers of the World Trade Center in lower Manhattan, killing thousands of people, and destroying both towers and several nearby buildings. A third airliner was crashed into the Pentagon in Virginia, killing hundreds of people. A fourth airliner crashed in Pennsylvania, killing all aboard. The grand jury is thus investigating various felony offenses, including, among others, violations of Title 18, United States Code, Sections 32 (destruction of and conspiracy to destroy aircraft); 844 (bombing and bombing conspiracy); 1962 (racketeering and racketeering conspiracy); and 2384 (seditious conspiracy to levy war against the United States).

5. Based on information developed to date, including interviews with witnesses and the analysis of other evidence, including phone calls made by passengers on the hijacked airliners informing others about the events that were occurring inside the aircraft, there is reason to believe groups of terrorists, some members of which were competent to fly aircraft, seized the aircraft from the assigned crews and flew the planes

2

toward targets that were destroyed as part of an attempt to levy war against the United States.

6. As part of the investigation in this matter, I have debriefed other agents and law enforcement officers who have been involved in this investigation and I have reviewed relevant reports, documents and records. Because the limited purpose of this affidavit is to establish probable cause to support the issuance of the requested warrant, I have not set forth all the facts known to me, or other agents or law enforcement personnel concerning this nationwide investigation.

7. I believe a search of the referenced GEO Metro, California License Plate 4HPH316 and residence would identify items that constitute evidence relevant to referenced investigation.

8. During the course of the investigation in this matter, the FBI has determined from a review of the passenger manifest of the hijacked flights that an individual named Nawaf Al-Hazmi was seated in Seat 5E on American Flight Number 77, which was hijacked and crashed into the Pentagon in Virginia. American Airlines records reveal that Al-Hazmi purchased an American Airlines ticket on August 27, 2001, using a charge card for travel on September 11, 2001, from Dulles International Airport to Los Angeles on AA77. On September 12, American Airlines confirmed that Al-Hazmi was aboard AA77 on September 11, 2001.

3

0038

9.　Immigration and Naturalization Service (INS) records indicate that Al-Hazmi was born in the Kingdom of Saudi Arabia, is a Saudi foreign national, and applied for and obtained a visa for travel in the United States, in Jeddah, Saudi Arabia, on April 4, 1999, using Saudi Passport Number B673987.　INS records indicate that Al-Hazmi entered the United States at the Port of Los Angeles, California on January 15, 2000.

10.　At approximately 3:45 p.m. (EDT), the FBI was advised by the Dulles Airport Police that a suspicious vehicle was found at Dulles in the hourly parking lot, row G.　Department of Motor Vehicle records were reviewed by FBI agents and it was determined that the vehicle, a 1988 Toyota, Vehicle Identification Number JT2AE92E9J3137546, was registered to Nawaf Al-Hazmi, 8451 Mount Vernon Avenue, Lemon Grove, California.

11.　The vehicle was searched by agents of the FBI and found to contain a medical prescription for Khalid Al-Midhar, from Dr. Mohamad S. Tarabishi, San Diego, California, a receipt for car service at California Motor Works, San Diego, California, signed by Khalid Al-Midhar, and an insurance card under the name of Khalid Al-Midhar, 7091 Eckstrom Avenue, San Diego, California. The passenger manifest of AA77 listed Khalid Al-Midhar as one of its passengers.

12.　Investigation by San Diego FBI disclosed that Omer Bakarbashat was another resident of 8451 Mount Vernon Avenue (see paragraph 10). During an interview of Bakarbashat it was learned Mohdar Abdullah was a close associate of Al-Hazmi and Al-Midhar.

4

0039

13.　On September 18, 2001, Agents of the FBI interviewed Mohdar M. Abdullah in San Diego, California. Abdullah advised he became acquainted with Nawaf Al-Hazmi and Khalid Al-Midhar in or about 1999, when a third individual, Omar Ahmed Al-Bayoumi, introduced Al-Hazmi and Al-Midhar to Abdullah at a Mosque, located on Saranac Street, Lemon Grove, California. Al-Bayoumi, known to Abdullah as the manager/leader of a Mosque in El Cajon, California, told Abdullah that Nawaf Al-Hazmi and Khalid Al-Midhar recently arrived in San Diego, California via Los Angeles, California, and required assistance becoming acclimated to the area given their limited language skills.

14.　Approximately three days later Abdullah assisted Al-Hazmi and Al-Midhar in their efforts to change the return portion of the round-trip plane tickets which brought them to Los Angeles, California from Bangkok, Thailand. At their request Abdullah communicated to a United Airlines ticket agent that Al-Hazmi and Al-Midhar wanted to use their return tickets to go to Jeddah, Saudi Arabia instead of Thailand. Al-Hazmi specifically instructed Abdullah not to mention to anyone he and Al-Midhar had taken a trip from Bangkok to Malaysia prior to arriving in Los Angeles, California. During the trip to Malaysia Al-Hazmi and Al-Midhar participated in activities which are contrary to the teachings of their religion.

15.　Abdullah advised he developed a close relationship, socially and religiously, with Al-Hazmi and Al-Midhar. Abdullah claimed the men were secretive regarding their

5

personal business affairs, advising Abdullah he should not question them on such matters, but instead seek Allah's help and finish his private matters secretly. Abdullah also claimed to be unaware of Al-Hazmi's and Al-Midhar's source of income, noting that although neither had legitimate employment, they always paid for their daily expenses in cash. Al-Hazmi reportedly told Abdullah his family in Saudi Arabia was funding his expenses.

16. Abdullah further advised he assisted Al-Hazmi in his attempts to obtain flight lessons at a flight school in Florida. In or about December, 2000 or January, 2001, Al-Hazmi introduced Abdullah to Hani Hanjour, whom the FBI has identified as another suspected hijacker aboard American Airlines Flight 77. Al-Hazmi told Abdullah he and Hanjour, whom Al-Hazmi identified as a pilot and long-time friend from Saudi Arabia, would be traveling to Mesa, Arizona where Al-Hazmi would be attending the flight school where Hanjour studied.

17. On September 21, 2001, Abdullah was arrested in San Diego, California, pursuant to a federal material witness arrest warrant issued out of the Southern District of New York. Special Agents of the FBI, San Diego Division, effected the arrest of Abdullah as he exited his vehicle which is referenced above. A female passenger in Abdullah's vehicle at the time of the arrest became physically incapacitated, and agents, fearing she was in shock as a result of the arrest, contacted emergency medical services to respond.

6

0041

18. After his arrest Abdullah requested that agents return his vehicle to his boss, identified as Iyad Khreiwesh. Khreiwesh and Abdullah both work at the Texaco gas station on 4925 Spring Street, La Mesa, CA, owned by Osama Mustafa. The vehicle was taken into FBI custody, and an inventory search was conducted to account for any valuables and secure any potentially dangerous items which might be a threat to agents.

19. During the inventory search agents discovered a plastic bag which when placed on the ground made a noise which indicated something heavy and hard was contained in the bottom of the bag. Upon further inspection of the contents of the bag, agents found a notebook displaying handwriting containing the word "hijacking," and references to planes falling from the sky and mass killings.

20. During the processing of Abdullah at the San Diego Division, Abdullah made several spontaneous statements referencing the hatred in his heart for the United States government. Abdullah also stated the United States brought "this" on themselves.

21. During the course of this investigation vehicle searches of associates of the hijackers have led to the discovery of evidence linking the hijackers to the owners of those vehicles. Therefore, it is believed there will be evidence in Abdullah's vehicle, in addition to his residence, either documents or other evidence, linking him to Al-Hazmi, Al-Midhar, or other conspirators.

7

0042

22.    Based upon the information above, I have probable cause to believe that the vehicle identified as 4HPH316, VIN 2C1MR2463R6717463, owned by Mohdar Abdullah, as well as his current residence, may contain evidence and fruits and instrumentalities of violations of Title 18, United States Code, Sections 32 (destruction of and conspiracy to destroy aircraft); 844 (bombing and bombing conspiracy), 1962 (racketeering and racketeering conspiracy), and/or 2384 (seditious conspiracy to levy war against the United States), for the following reasons:

a.    I believe that Khalid Al-Midhar and Nawaf Al-Hazmi were participants in the acts of terrorism of September 11, 2001, and lost their lives in the crash of AA77;

b.    I believe that the acts of terrorism on September 11, 2001, were coordinated between several individuals and required extensive financial and logistical support from many persons who did not take a direct hand in the hijacking and destruction of the aforementioned aircraft;

c. I believe that Mohdar Abdullah was one of the individuals who assisted Al-Midhar and Al-Hazmi while they prepared and planned for their role in the acts of terrorism of September 11, 2001;

d.    I believe that documents, fingerprints, hairs and fibers exist in this vehicle and residence which will show a relationship between Abdullah to Al-Midhar, Al-Hazmi, and/or other conspirators in the acts of terrorism of September 11, 2001;

8

0043

e. And I believe that this evidence may identify other conspiracy members and may establish the current whereabouts or indicate past residences of those other conspirators.

23. Therefore, I believe there is probable cause to conclude that there is now located in the above described vehicle and residence evidence and instrumentalities of the aforementioned crimes, including, but not limited to:

a. documents further identifying other individuals who provided extensive financial and logistical support to those individuals identified as participating in the acts of terrorism of September 11, 2001;

b. telephone billing notices, telephone service contracts, notice of cancellation of telephone service, long distance telephone service tolls and other information relating to communications between the co-conspirators;

c. Department of Motor Vehicle records may reveal information relating to vehicles and addresses associated with this terrorist network; and

d. correspondence between co-conspirators and their aiders and abettors and/or third parties who may not have any knowledge of the conspiracy but may have unwittingly provided assistance to the conspirators, which may disclose information identifying the participants, other means of communication used in furtherance of this conspiracy, description of their plans relating to the acts of terrorism described above, and/or further acts contemplated by these individuals, or may identify the

9

0044

current whereabouts or past residences of others involved in this conspiracy.

## REQUEST FOR SEALING

24. Since this investigation is continuing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of this investigation. Accordingly, I request that the Court issue an order that the search warrant, and all attachments thereto, be filed under seal until further order of this Court.


_____
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this 22nd day of September, 2001.


_____
UNITED STATES MAGISTRATE JUDGE

# Republic Of Yemen

## Department of the Civil Affair and Registrar

### Personal Identification

Four Names:
Mohdar Mohammad Al-Mohdar Zied

Place of Resident and Birth Date:
Al-Hamraa/ Al-Baydaa   001725
August 5th 1978

Contains a mail photo and a seal of the republic of Yemen

Personal Number: 1727
Martial Condition: Single
Blood Type: 0+
Place of Resident: Sana's/ Berysry Place
Place and Date of Issue: Sana's April 29th 1994

Signed and Sealed:

Nadia Terzibachian a certified Arabic interpreter, licensed by the state of California in 1982 with license #44027382, translated this document.

Mohdar Abdullah



See attached translation







1  PATRICK K. O'TOOLE
   United States Attorney
2  MICHAEL G. WHEAT
   Assistant U.S. Attorney
3  California State Bar No. 118598
   Federal Office Building
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-5408

6  Attorneys for Plaintiff
   United States of America
7

8
                    UNITED STATES DISTRICT COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10
   UNITED STATES OF AMERICA,      )    Criminal Case No.  01cr3240-W
11                                )
                   Plaintiff,     )
12                                )
               v.                 )
13                                )    PLEA AGREEMENT
   AL-MOHDAR MOHAMED              )
14         AL-MOHDAR ZEID (1),    )
      aka Mohdar Mohamed Abdullah,)
15                                )
                                  )
16 _____)

17

18      IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF

19 AMERICA, through its counsel, Patrick K. O'Toole, United States

20 Attorney, and Michael G. Wheat, Assistant United States Attorney,

21 and defendant, AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed

22 Abdullah, with the advice and consent of Kerry L. Steigerwalt,

23 counsel for defendant, as follows:

24 //

25 //

26 //

27 //

28 MGW:mgw:7/2/00

# I.

## THE PLEA

Defendant agrees to plead guilty to Count 3 of Superceding Indictment No. 01cr3240-W charging defendant with:

>    -false statement to a federal officer, in violation
>    of Title 18, U.S.C., § 1001.

In addition, Defendant agrees to forthwith plead guilty in San Diego Superior Court to one count of violating California Penal Code § 647(a).

# II.

## NATURE OF THE OFFENSE

A.   ELEMENTS EXPLAINED

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

1.   The defendant made a statement relating to a matter within in the jurisdiction of a government department or agency;

2.   The defendant acted willfully, that is deliberately and with knowledge that the statement was untrue;

3.   The statement was material to the components, activities, or decisions; and

4.   A statement is material if it could have influenced the agency's decisions or activities.

B.   ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS

Defendant has fully discussed the facts of this case with defense counsel.   Defendant has committed each of the elements of

2                                   01cr3240

the crime, and admits that there is a factual basis for this guilty
plea. The following facts are true and undisputed:

1. On or about February 23, 1999, in the Southern District of California, in a matter within the jurisdiction of Immigration and Naturalization Service, Defendant AL-Mohdar told an INS officer, during an asylum interview, that he last entered the United States without inspection on December 7, 1998, through New York, New York, on an Italian passport in the name of Franco de Polo.

2. Defendant knew that in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa.

3. This statement was material to the Immigration and Naturalization Service in determining Defendant Al-Mohdar's asylum application.

4. On September 10, 2001, Defendant AL-Mohdar took a minor, Wanda V., to a motel in San Diego, California, where he solicited her to engage in lewd and dissolute conduct, to wit: sexual intercourse.

### III.

### **PENALTIES**

Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

3                          01cr3240

A.     a maximum **5** years in prison;

B.     a maximum $250,000 fine;

C.     a mandatory special assessment of $100.00 per count; and

D.     a term of supervised release of no more than **3 years**. Defendant understands that failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring defendant to serve in prison all or part of the term of supervised release.

## IV.

### DEFENDANT'S WAIVER OF TRIAL RIGHTS

Defendant understands that this guilty plea waives the right to:

A.     continue to plead not guilty and require the Government to prove the elements of the crime beyond a reasonable doubt;

B.     a speedy and public trial by jury;

C.     the assistance of counsel at all stages of trial;

D.     confront and cross-examine adverse witnesses;

E.     present evidence and to have witnesses testify on behalf of defendant; and

F.     not testify or have any adverse inferences drawn from the failure to testify.

//

//

//

4

01cr3240

V.

## WAIVER OF RIGHT TO BE PROVIDED WITH
## IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION

The Government represents that any information establishing the factual innocence of the Defendant known to the undersigned prosecutor in this case has been turned over to the Defendant. The Government understands it has a continuing duty to provide any information establishing the factual innocence of the Defendant.

The Defendant understands that if this case proceeded to trial, the Government would be required to provide impeachment information relating to any informants or other witnesses. In addition, if the Defendant raised an affirmative defense (for example, entrapment or duress), the Government would be required to provide information in its possession that supports such a defense. In return for the Government's promises set forth in this agreement, the Defendant waives the right to this information, and agrees not to attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

VI.

## DEFENDANT'S REPRESENTATION THAT GUILTY
## PLEA IS KNOWING AND VOLUNTARY

Defendant represents that:

A.   Defendant has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel, and has a clear understanding of the charges and the consequences of this plea;

5

01cr3240

*M.A*

B.   No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this agreement;

C.   No one has threatened defendant or defendant's family to induce this guilty plea; and

D.   Defendant is pleading guilty because in truth and in fact defendant is guilty and for no other reason.

## VII.

### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
### SOUTHERN DISTRICT OF CALIFORNIA

This plea agreement is limited to the United States Attorney's Office for the Southern District of California, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities, although the Government will bring this plea agreement to the attention of other authorities if requested by the defendant.

## VIII.

### SENTENCING GUIDELINES

The defendant understands the sentence will be governed by the United States Sentencing Commission, Guidelines Manual ["USSG"]. Defendant has discussed the Guidelines with defense counsel, and understands that the sentence cannot be determined until a presentence report has been prepared by the U.S. Probation Office and defense counsel and the Government have had an opportunity to review and challenge the presentence report. Defendant understands that, under some circumstances, the Court may "depart" from the

6                                          01cr3240

M.A

guidelines and impose a sentence more severe or less severe than the guidelines, up to the maximum in the statute of conviction.

## IX.

### SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE

This plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(e)(1)(B). Defendant understands that the sentence is within the sole discretion of the sentencing judge. The Government has not made and will not make any representation as to what sentence defendant will receive. Defendant understands that the sentencing judge may impose the maximum sentence provided by statute, and is also aware that any estimate of the probable sentence by defense counsel is a prediction, not a promise, and is **not binding on the court**. Likewise, the recommendation made by the Government is not binding on the court, and it is uncertain at this time what defendant's sentence will be.

Defendant also has been advised and understands that if the sentencing judge does not follow any of the parties' sentencing recommendations, defendant nevertheless has no right to withdraw the plea.

## X.

### PARTIES' SENTENCING RECOMMENDATIONS

A.  BASE OFFENSE LEVEL AND ADJUSTMENTS

The parties will jointly recommend the following Base Offense Level and Adjustments under the Sentencing Guidelines:

       1.  Base Offense Level [§ 2B1.1(c)(3)- § 2L2.2(a)]    8

       2.  Acceptance of Responsibility [§ 3E1.1]    <u>-2</u>

3. Adjusted Offense Level                                    6

B.  ACCEPTANCE OF RESPONSIBILITY

Notwithstanding paragraph A.2 above, the Government will <u>not</u> recommend any adjustment for <u>Acceptance of Responsibility</u> if defendant:

    1.  Fails to admit a complete factual basis for the plea at the time it is entered, or

    2.  Denies involvement in the offense, gives conflicting statements about that involvement, or is untruthful with the court or probation officer, or

    3.  Fails to appear in court, or

    4.  Engages in additional criminal conduct, or

    5.  Attempts to withdraw the plea.

C.  <u>NO OTHER ADJUSTMENTS ARE RECOMMENDED</u>

The parties agree not to recommend any upward or downward adjustments other than those listed above.

D.  <u>NO AGREEMENT AS TO CRIMINAL HISTORY CATEGORY</u>

There is **no** agreement as to defendant's Criminal History Category.

E.  <u>DEPARTURES</u>

The parties are free to recommend any upward or downward departures.

F.  <u>"RELEVANT CONDUCT" INFORMATION</u>

Defendant agrees that the facts in the "factual basis" paragraph of this agreement are true, and may be considered as

8                                    01cr3240

*M.A.*

"relevant conduct" under USSG § 1B1.3.

G. RECOMMENDATION REGARDING CUSTODY

The Parties will recommend that defendant be sentenced within the calculated guideline range. However, if the court adopts an offense level or downward adjustment or departure below the Government's recommendations in this agreement, the Government will recommend a sentence as near as possible to what the sentence would have been if the Government's recommendations had been followed.

H. SPECIAL ASSESSMENT/FINE/RESTITUTION

The parties will jointly recommend that Defendant pay a special assessment in the amount of $100 to be paid forthwith at time of sentencing. The special assessment shall be paid through the office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

The parties do not recommend imposition of a fine or restitution order due to the Defendant's limited financial prospects and because the cost of collection, even taking into account the Inmate Responsibility Program, likely would exceed the amounts that could reasonably be expected to be collected.

## XI.

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

In exchange for the Government's concessions in this plea agreement, defendant waives, to the full extent of the law, any right to appeal or to collaterally attack the conviction and sentence, including any restitution order, unless the court imposes

a custodial sentence greater than the high end of the guideline range recommended by the Government pursuant to this agreement at the time of sentencing. If the custodial sentence is greater than the high end of that range, the defendant may appeal, but the Government will be free to support on appeal the sentence actually imposed. If defendant believes the Government's recommendation is not in accord with this agreement, defendant will object at the time of sentencing; otherwise the objection will be deemed waived.

## XII.

**CRIMES AFTER ARREST OR BREACH OF THE AGREEMENT WILL PERMIT THE GOVERNMENT TO RECOMMEND A HIGHER SENTENCE OR SET ASIDE THE PLEA**

This agreement is based on the understanding that defendant has committed no criminal conduct since defendant's arrest on the present charges, and that defendant will commit no additional criminal conduct before sentencing. If the defendant has engaged in or engages in additional criminal conduct during this period, or breaches any of the terms of this agreement, the Government will not be bound by the recommendations in this agreement, and may recommend any lawful sentence. In addition, at its option, the Government may move to set aside the plea.

## XIII.

### ENTIRE AGREEMENT

This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral.

//

//

10                                    01cr3240

*M.A.*

**XV.**

**MODIFICATION OF AGREEMENT MUST BE IN WRITING**

No modification of this plea agreement shall be effective unless in writing signed by all parties.

**XVI.**

**DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

By signing this agreement, defendant certifies that this agreement has been read to him. Defendant has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

**XVII.**

**DEFENDANT SATISFIED WITH COUNSEL**

Defendant has consulted with counsel and is satisfied with counsel's representation.

PATRICK K. O'TOOLE
United States Attorney

_7/17/2_
DATED

MICHAEL G. WHEAT
Assistant U.S. Attorney

_7/17/02_
DATED

KERRY L. STEIGERWALT
Defense Counsel for
AL-MOHDAR MOHAMED AL-MOHDAR ZEID

**IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE.**

_07-16-02_
DATED

x _M. M. Abdullah_
AL-MOHDAR MOHAMED AL-MOHDAR ZEID
Defendant

Nadia Terzibachian
Arabic Interpreter   7/19/02

11

01cr3240

Randall B. Hamud
Attorney at Law
1200 Third Avenue, Suite 1321
San Diego, CA 92101-4111
Tel: (619) 696-0815
Fax: (858) 457-1934

DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

FEB 1 9 2003

IMMIGRATION COURT
SAN DIEGO, CA

Attorney for Respondent

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OFFICE OF THE IMMINGRATION JUDGE

| | |
|---|---|
| IN THE MATTER OF: | ) |
| MODHAR MOHAMMED | ) |
| ABDULLAH | ) |
| A 75-628-802 | ) PRE-TRIAL BRIEF IN SUPPORT OF |
| | ) APPLICATION FOR WITHHOLDING & LIST |
| | ) OF EXHIBITS |
| | ) Hearing Date : February 19, 2003 |
| Respondent | ) Time : 8:30 a.m. |
| | ) Type of Hearing : Master |
| | ) Judge : Ragusa |
| | ) |

### INDEX

I. Procedural History ............................................................Page 2

II. Argument ................................................................. Page 4

    A. Concession of Termination of Asylum Status ...........................Page 4

    B. Availability of Withholding ..............................................Page 5

    C. 18 U.S.C. 1001 Is Not a Particularly Serious Crime ................... Page 10

    D. Convention Against Torture ..............................................Page 11

IV. Conclusion ................................................................ Page12

V. Index of Exhibits ........................................................ Page 14

# I.

## PROCEDURAL HISTORY

Respondent is a Yemeni national who is now informed that he was born in Italy on August 5, 1978. See Exhibit K, a copy of Italian birth certificate documenting Respondent's birth in that country. (Until the original birth certificate is authenticated by the United States Embassy in Rome and translated into English, Respondent reserves for the forthcoming hearing his arguments regarding nationality and national origin. Suffice to say at this juncture that nobody knows where he or she is born other than to rely on hearsay imparted, usually, by parents and family members.) Respondent previously applied for and was granted asylum by the District Director. According to the NTA on file herein, on October 4, 2002, Respondent was served with a notice of intent to terminate his asylum status. At this juncture, because more than thirty days (8 C.F.R. 208.24(c)) have elapsed since the service of that notice, *Respondent concedes and stipulates to the termination of his asylum status. By this Brief and by the concurrently submitted I-589, he seeks only the remedies of withholding of removal and withholding (and alternatively deferral) of removal according to the provisions of the Convention Against Torture.*

On October 2, 2002, Respondent pled guilty to one count of violating 18 U.S.C. section 1001. He was then sentenced to "time served." Within the context of the *sentencing guidelines, his sentence was to have been "zero to six months." This* translated into 331 days because he has been unable to post an exorbitant $500,000 "cash and security" bond imposed upon him during the criminal proceedings in a hysterical response to the aftermath of 9/11. As expressed by him in Exhibit J, "Detainee Describes

Local 9/11 Hijackers," San Diego Union Tribune, January 4, 2003, he knew nothing of 9/11 or Al Qaeda and himself was victimized by the two hijackers who visited San Diego in the year 2000.

Even at this writing, Respondent continues to be victimized by them. His recent INS bond hearing was nothing more than a "low tech lynching" attended by the ASUA Michael Wheat and a plethora of F.B.I. agents for the purpose of contaminating the proceedings with specious allegations of terrorist connections based upon conjecture and mendacity. Although testimony was to have been elicited from those agents and from Respondent's witnesses on the day of hearing, the judge reversed her earlier accommodation of testimony and received only unsubstantiated proffers. The denial of Respondent's due process rights at the bond has been appealed.

Because of the international media coverage of Respondent as a material witness who was casually acquainted with the two hijackers who visited San Diego in the year 2000, Respondent believes that he will be arrested, tortured, and perhaps killed, if he were to be deported to Yemen. He also believes that because of the continuing harassment of him by the United States government, it too, would implore its "ally," Yemen, to arrest and torture Respondent were he deported to Yemen. Thus, he seeks herein withholding of removal and withholding and/or deferral according to the provisions of the Convention Against Torture.

//

//

//

//

## II.

## ARGUMENT

## A. CONCESSION OF TERMINATION OF ASYLUM STATUS

At the Master Hearing on January 28, 2003, the court indicated that it wanted two questions briefed: 1) whether it has to adjudicate the previous asylum application; and if so, 2) whether a finding of frivolousness would adversely impact Respondent's ability to qualify for withholding and deferral? The first question is moot. Respondent has conceded that his asylum status was terminated thirty days (8 C.F.R. 208.24(c)) after the service upon him of the Service's notice of intent to terminate asylum status. 8 C.F.R. 208.24(f): immigration judge may terminate asylum grant of asylum at anytime after the service of a notice of intent to terminate asylum by the Service. The Service has issued such a notice, and Respondent now concedes and stipulates that his asylum status has been terminated.

However, responding to question number two, Respondent directs the court to 8 C.F.R. 208.20: " a finding that an alien filed a frivolous asylum application shall not preclude the alien from seeking withholding of removal." Moreover, if an alien expresses fear of persecution or harm, and the alien has not previously filed an application for asylum or withholding *that has been referred to the immigration judge by an asylum officer, the immigration judge "shall [a]dvise the alien that he or she may apply for asylum . . . or withholding of removal . . . ."* 8 C.F.R. 240.11. Respondent's previous asylum application was never referred to an immigration judge. Nor do asylum prohibitions apply to applications for withholding, and implicitly, applications seeking relief under the Convention Against Torture. 8 C.F.R. 208.4(a). See generally 8 C.F.R.

208.16 for the requisites of withholding of removal under section 241(b)(3)(B) of the INA and withholding of removal under the Convention Against Torture; and 208.17 for deferral of removal under the Convention Against Torture. Thus, this court is fully empowered to hear and to grant Respondent's application for withholding of removal and withholding or deferral.

## B. AVAILABILITY OF WITHHOLDING

Petitioner is entitled to a withholding of deportation "if the evidence demonstrates a clear probability that the applicant would be persecuted were he to be deported to his home country." Ladha v. INS, 215 F. 3d 889, 897 (9th Cir. 2000). Respondent must demonstrate that it is "more likely than not that he will be persecuted on account of one of the five enumerated factors were he to return." (Race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. sec. 1101 (a)(42)(A).) Here, Respondent meets this test because Yemen will categorize him as a "terrorist" or "terrorist suspect," in which case he most certainly will be arrested, tortured, and possibly killed. Respondent submits attached Exhibits A through I, which depict the tribal, primitive social conditions in Yemen – conditions which mark Respondent as a certain target for human rights violations. Further, Dr. Khaled Abou El Fadl, Respondent's expert witness (see Exhibit L, his C.V.), will testify that Yemen almost certainly will arrest, interrogate, torture, and perhaps kill, Respondent.

Yemen is the real culprit in these proceedings. 9/11 engendered a profound change in the previously strained relations between the United States and Yemen. To that point, Yemen's commitment to the war against terrorism was sketchy at best. Having arrested a number of suspects in its investigation of the terrorist bombing of the

USS Cole, the Yemeni government had been refusing the F.B.I. permission to interview the detainees. However, following 9/11, the Yemeni government announced that it would cooperate with the United States in the war against terror. Relations dramatically improved as the Yemeni government seized hundreds of "terrorist suspects," i.e., Arabs who had traveled to Afghanistan or Pakistan. See attached Exhibits: A - Amnesty International Press Release, July 17, 2002; B - Human Rights Watch Report 2002 – Yemen; C – Amnesty International Report 2002 – Yemen; and D – AP World Politics – Report, September 24, 2002.

Because of Yemen's newly found commitment to the war against terrorism, Respondent likely will be arrested and interrogated were he to return to Yemen. And interrogation in Yemen means torture. See the U.S. Department of State Country Report on Human Rights Practices, 2001, Yemen, attached as Exhibit E.

Some morsels from that report corroborate his well-founded fear:

"Members of the security forces killed a number of persons during the year. Members of the security forces *tortured and otherwise abused persons*, and continued to arrest and detain citizens arbitrarily . . .." (Exhibit E, p. 2, the Political Security Organization being the nastiest, independent and reporting directly to the President of Yemen.)

"In August 2000, Sabah Seif Salem reportedly died while being detained in a prison in the al-Udain district of Ibb governorate. *Her* family claimed that security officials tortured her to extract a confession of adultery." (Id.)

"The Constitution [of Yemen] *is ambiguous regarding the prohibition of cruel or unusual punishment, and members of the security forces tortured and otherwise abused persons in detention. Arresting authorities are known to use force during*

*interrogations . . . Detainees in some instances are confined in leg-irons and shackles,*
*despite a 1998 law outlawing this practice. [par.] The Government has acknowledged*
*publicly that torture takes place, but it claims that the use of torture is not government*
*policy. Nevertheless, the Government has not taken effective steps to end the practice*
*or to punish those who commit such abuses.* (Id., p. 4.)

Terrorist suspects, and by inference anyone connected, however indirectly, with
those involved in 9/11, will be singled out for special treatment by the Yemeni security
forces. See Exhibit D, which relates that several such suspects were detained in solitary
confinement for "long periods" and were subjected to electric shocks. They were
blindfolded, and even their families were threatened with physical punishment. None of
these "suspects" was caught attempting to perpetrate any terrorist acts or arrested
according to proper warrants.

Nor does Yemen draw the line at Yemeni suspects or Middle Eastern nationals. It
also has arrested and tortured British citizens caught up in its anti-terrorism campaign.
Exhibit G.

Unfortunately, the United States is comfortable with this state of affairs. After
9/11 it turned its back on the Bill of Rights and the international conventions against
human rights abuses. Unfortunately, it has been torturing Al Qaeda suspects held in its
custody. The wretched conditions of the caged detainees in Guantanamo, Cuba, violate
the Third Geneva Convention's requisites of the treatment of prisoners. And as the
Sacrament Bee has recently reported that the United States is quick to use "stress and
duress" methods of interrogation at its Bagram and Diego Garcia prison camps that
violate the Convention Against Torture. See Exhibit G. Its human rights violations also

have included the use of incapacitating chemicals on "terrorist" detainees. Exhibit H.
And in Exhibit F, the United States is documented as having assassinated six suspected al
Qaeda members with a remotely controlled drone and air-to-ground missile. Without
doubt, the United States has "taken the gloves off." Human rights will take a back seat to
its war against terrorism. The interface between the new United States paradigm and.
Yemen's poor human rights record make it a certainty that Respondent will be arrested,
interrogated, tortured, and possibly killed, were he to return to that primitive venue.

Without doubt, then, Respondent will suffer persecution in the sense of the
infliction of "suffering or harm upon those who differ . . . in any way regarded as
offensive." Sangha v. INS, 103 F. 2d 1482, 1487 (9th Cir. 1997). Here, because of
Yemen's history of prisoner abuse and interrogation accompanied by torture, a
reasonable person in Respondent's situation would likely be persecuted were he to return
to Yemen. See also, Matter of Moghrabbi, 19 I & N Dec. 439 (BIA 1987).

Thus, Respondent now finds himself a member of a "social group" singled out for
the special attention of the security forces in Yemen: "terrorist suspects." As stated in
Sanchez-Trujillo v. INS, 801 F. 2d 1571 (9th Cir. 1986), four criteria establish social
group persecution: is the group cognizable, does the applicant qualify as a member, has
the group been targeted because of its characteristics, and are there present "special
circumstances" which permit a per se finding not requiring findings of individual
persecution of group members? Respondent would satisfy all of these criteria merely
because he would be perceived to be a "terrorist suspect."

The tragedy of this case is that Respondent knows absolutely nothing about Al
Qaeda or the planning of 9/11. However, his casual acquaintanceship with two of the

9/11 hijackers has been extensively publicized. See Exhibit J. Without doubt, he would be considered to be a "terrorist suspect" in Yemen, where hundreds of such suspects have been arrested, their only "crimes" having been that they might have visited Afghanistan or Pakistan. Yemen's President has committed his country to the "war against terror," and his commitment included physical violence against those whom his security forces would depict as suspects in that war. Certainly Respondent would fall within their definition.

Moreover, the United States intelligence and law enforcement authorities, including the F.B.I., certainly would bring Respondent's casual connection to the San Diego hijackers to the attention of the Yemeni security forces. In this way, extralegal methods of interrogation could be practiced on Respondent – methods that law enforcement agencies in the continental United States are presently precluded from practicing. Why bring Respondent to Bagram when Yemen will suffice?

Respondent is a victim of 9/11 just as were thousands of others who have been wrongly arrested, detained in secret, and deported under suspicious circumstances. Even worse, in his own case he faces the certain prospect of arrest and torture the moment he steps onto Yemeni soil. And the United States government knows that.

Nor can Respondent look forward to any protection from the judicial authorities in Yemen. Corruption is rampant in Yemen (Exhibit E, pp. 1 [the judiciary] and 5 [prison authorities exact bribes from prisoners].) Quite frankly, Respondent would have "no chance" were he deported to Yemen.

Arguably, Respondent also will be subjected to arrest, interrogation, and torture because of his "political opinion." His being branded as a "terrorist suspect" means that

his particular brand of politics would be inimical to the present government of Yemen. Although he is not a terrorist and never has been one, being perceived as such by the Yemeni security apparatus condemns Respondent to the nightmare of indefinite detention and brutal interrogation.

Moreover, Respondent has been in the United States long enough to value the freedoms enjoyed here. He believes in the freedoms of speech and association, the right to privacy, and the right to a fair trial. See Exhibit J. He also has criticized Yemen and the repressive regimes of the Middle East. Id. The Yemeni government routinely violates human rights with reckless abandon. (Exhibit E, pp. 2 - 6 [security forces violating such freedoms and rights], 7 [denial of fair trial], 9 [violation of right to privacy], 10-12 [violation of freedom of press], 12-13 [violation of right to free association].) Frankly, it is difficult to imagine a more inhospitable venue for Respondent than Yemen.

Respondent himself will testify about his fears if deported to Yemen. And his expert witness will testify about Yemen's human rights violations. And the Yemeni government's arduous "war against terrorists," which included cold-blooded murder, almost speaks for itself relative to how Respondent will be treated should he find himself on Yemeni soil. He certainly is entitled to the withholding of deportation. His life depends upon it.

## C. 18 USC 1001 IS NOT A PARTICULARLY SERIOUS CRIME

Withholding of removal can be denied if Respondent were convicted of a "particularly serious crime." INA 241(b)(3)(B). First, Respondent was sentenced to less than one year's imprisonment. This sentence falls far short of the five-years required by

that section. Further, applicable case law supports the view that violating section 1001 does not rise to the level of a "particularly serious crime:" Hirsch v. I.N.S., 308 F. 2d 562. 567 (9th Cir. 1962); and Matter of Patel, 15 I & N Dec. 666 (BIA 1976). See also 8 C.F.R. 103.6(a)(2)(iii).

## D. CONVENTION AGAINST TORTURE

Simply stated, according to international law and the law of the United States, a person may not be deported to a country where he or she will be tortured. (United Nations Convention Against Torture and Other Crimes, Inhumane or Degrading Treatment or Punishment, opened for signature Feb. 4, 1985. G.A. Res. 39/46, 39 UN GAOR Supp. No. 51 at 197, U.N. Doc. A/Res/39/708 (1984), reprinted in I.L.M. 1027 (1984), modified in 24 I.L.M. 535 (1985). It was enacted into United States law on October 21, 1998, by Fiscal Year 1999 Omnibus Consolidated and Emergency Supplemental Appropriations Act, P.L. 105-277, Division G, Subdivision B, Title XXI Sec. 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, 112 Stat. 2681-822, 105th Cong. 2nd Sess. (1998) 136 Cong. Rec. 36198.) Article 3 of the Convention states that no state shall expel or return a person to another state where substantial grounds exist to believe he or she would be in danger of being tortured.

Interestingly, the Convention differs from withholding. Categories of mandatory ineligibility do not apply; it is not limited to someone's life or freedom being threatened on account of the previously described "five enumerated grounds," and it is limited only to the definition of torture which does not encompass all harm. 64 Fed. Regs. 8478-79 (Feb. 19, 1999), reprinted in 76 Interpreter Releases 288-89 (Feb. 22, 1999). Thus, the Department of Justice permits withholding under the Convention in a manner similar to

current law under INA sec. 241(b)(3), expressed at 8 C.F.R. 208.16(c) and deferral of removal which does not consider any of the bars to withholding under INA sec. 241(b)(3)(B), expressed at 8 C.F.R. 208.17(a). Torture is defined at 8 C.F.R. 208.18 to mean any act by which severe pain or suffering, whether physical or mental, is inflicted on a person by third persons to obtain information or a confession or to punish or intimidate him or her. The applicant need only harbor a fear that torture is "more likely than not," which is a preponderance standard. INS v. Stevie, 467 U.S. 407 (1984). The INS adopted the Stevie standard at 8 C.F.R. sec. 208.16(c)(2).

Here, Respondent clearly has a well-founded fear of persecution that is based on the knowledge that it is "more likely than not" that the Yemeni security forces would arrest, interrogate, and torture him the instant he steps onto Yemeni soil. And even more tragically, the United States may be "part and parcel" of such inhumane conduct by the Yemeni authorities in violation of both international and United States law. 9/11 continues to take its toll on human rights.

## IV. CONCLUSION

For the reasons stated, international law and United States law demand that Respondent's petition for withholding and request for the protections of the Convention Against Torture be granted. He is innocent of any involvement in any terrorist activities whatsoever. However, he will be perceived to be a "terrorist suspect" in Yemen (with the probable urging of the United States government) and certainly will be arrested, interrogated, tortured, and perhaps killed. Even were he to survive the torture, he may find himself a "desaparacido" in the Yemeni prison system. Justice and humanity demands that his application be granted.

Dated: February 18, 2003

Randall B. Hamud

Attorney for Respondent

IN RE: Defendant MOHDAR MOHAMED ABDOULAH,
a.k.a. Mihdar Mohammad Al-Mihdar Zaid

### STATEMENT OF FACTS

1.    On or about May 5, 2000, within San Diego County, Defendant
MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid
filed an application for asylum and withholding of removal [Form I-
589], and registration as a permanent resident [Form I-485] with
the Immigration and Naturalization Service [INS].   Each of these
applications was filed with the INS by Defendant MOHDAR MOHAMED
ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, in his hope to
receive lawful status in the United States.   These applications
only apply to aliens (non-citizens and non-nationals of the United
States), and the place of birth and citizenship of the alien are
critical to the INS in determining an aliens eligibility for the
requested form of relief from removal from the United States.  This
is particularly true where an alien is applying for asylum from a
particular country alleging that if he were to be returned to that
country he would be persecuted because of his religion, race,
nationality, political opinion, or membership in a particular
social group.

2.    Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-
Mihdar Zaid Form I-485 reflects that he sought asylum from Somalia
claiming that he would be persecuted there [Somalia] because of his

membership in a particular social group, a minority group in Somalia called Barwani. Defendant MOHDAR MOHAMED ABDOULAH's, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, application stated that he had last entered the United States without inspection on December 7, 1998.

3.   On Saturday September 22, 2001, Agents of the Federal Bureau of Investigation [FBI] sought and obtained a sealed federal search warrant for the residence of Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, at 1415 East Lexington Avenue, #146, El Cajon California. This warrant was also executed on September 22, 2001.

4.   One of the items seized pursuant to the warrant was a government issued identification card with a photograph of Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid on it. All writing on the identification card is in Arabic. Subsequent translation of the Arabic writing on the card by an FBI certified Arabic language specialist revealed that it was in fact Personal Identification Card No. 0017251, issued by the Republic of Yemen, Bureau of Personal Status and Civil Record, to Mihdar Mohammad Al-Mihdar Zaid, born in Al-Hamra/Al Baidayh Yemen, on 05/08/1978.

5.   Based upon the discovery of Defendant MOHDAR MOHAMED

ABDOULAH's alias: Mihdar Mohammad Al-Mihdar Zaid, a records check was conducted with the United States State Department. This check revealed that on December 10, 1998, Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, sought and obtained a "B2" visitors visa at the United States Consulate, American Embassy, in Ottawa, Canada. Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid presented his passport from Yeman, and stated that he was a student in Canada.

6. On December 16, 1998, Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, was admitted to the United States through Ottawa, and flew from there to San Diego, California.

7. When Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid, applied for asylum from Somalia, he never revealed to the INS that he was from Yeman, and that he was a firmly resettled student in Canada. Each of these facts would have had an significant influence on the adjudication of his asylum application.

8. Therefore, I believe there is probable cause to believe that when Defendant MOHDAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid completed Forms I-485 and I-589 indicating that he had last entered the United States without inspection, and failed to

Ex. 10 (3 of 4)

reveal that he had traveled on a passport from Yemen, and was a student in Canada, these were material false statements affecting the INS's determination of Defendant MO'MAR MOHAMED ABDOULAH, a.k.a. Mihdar Mohammad Al-Mihdar Zaid's ability to remain in the United States lawfully, in violation of Title 18, U.S.C. § 1546(a).


STEVEN W. SCHULTZ
Senior Special Agent, INS


Sworn to before me and subscribed in my presence October 11, 2001


JOHN A. HOUSTON
United States Magistrate Judge

Ex. 10  (4 of 4)

IMMIGRATION COURT
401 WEST A STREET, SUITE #800
SAN DIEGO, CA 92101-7904

In the Matter of

                                    Case No.: A75-628-802

ZEID, AL-MOHDAR MOHAMMED AL-MOHDAR ABDUL
        Respondent                  IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on May 12, 2003.
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reviewed, the oral decision will become
the official opinion in the case.

[✓] The respondent was ordered removed from the United States to
    ITALY or in the alternative to YEMEN.
[ ] Respondent's application for voluntary departure was denied and
    respondent was ordered removed to ITALY or in the
    alternative to
[ ] Respondent's application for voluntary departure was granted until
        upon posting a bond in the amount of $ _____ _____
    with an alternate order of removal to ITALY.
[ ] Respondent's application for asylum was ( )granted ( )denied
    ( )withdrawn.
[ ] Respondent's application for withholding of removal was ( )granted
    ( )denied ( )withdrawn.
[ ] Respondent's application for cancellation of removal under section
    240A(a) was ( )granted ( )denied ( )withdrawn.
[ ] Respondent's application for cancellation of removal was ( ) granted
    under section 240A(b)(1)   ( ) granted under section 240A(b)(2)
    ( ) denied ( ) withdrawn. If granted, it was ordered that the
    respondent be issued all appropriate documents necessary to give
    effect to this order.
[ ] Respondent's application for a waiver under section _____ of the INA was
    ( )granted ( )denied ( )withdrawn or ( )other.
[ ] Respondent's application for adjustment of status under section _____
    of the INA was ( )granted ( )denied ( )withdrawn. If granted, it
    was ordered that respondent be issued all appropriate documents necessary
    to give effect to this order.
[ ] Respondent's status was rescinded under section 246.
[ ] Respondent is admitted to the United States as a __ _____ until _____.
[ ] As a condition of admission, respondent is to post a $ _____ bond.
[ ] Respondent knowingly filed a frivolous asylum application after proper
    notice.
[ ] Respondent was advised of the limitation on discretionary relief for
    failure to appear as ordered in the Immigration Judge's oral decision.
[ ] Proceedings were terminated.
[ ] Other: _____.
    Date: May 12, 2003
    Appeal: Waived/Reserved   Appeal Due By: Jun 11, 2003

FINAL

ORDER

                                    JOSEPH M. RAGUSA
                                    Immigration Judge

LVL

        Ex. 11 (1 of 1)





*Office of Detention and Removal Operations*
U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

## U.S. Immigration and Customs Enforcement

April 16, 2004

Mohdar ABDULLAH (A75 628 802)
C/O Correctional Corporation of America
446 Alta Road
San Diego, CA 92158

### Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed, and it has been determined that you will not be released from the custody of U.S. Immigration and Customs Enforcement (ICE) at this time. This decision has been made pursuant to Section 241.13 of Title 8 of the Code of Federal Regulations (CFR) based on a review of your file and/or your personal interview and consideration of any information you submitted to ICE's reviewing officials.

You claim to be a citizen of Yemen who entered the United States as a visitor on December 16, 1998. Documents in your file show that you used a Yemeni passport to travel from Saudi Arabia to Canada. You then used this passport to obtain a non-immigrant visa from the United States Embassy in Ottawa, Canada. Upon arrival in the United States, you made a false claim for asylum, claiming that you were born in Somalia. When this false claim was discovered, you claimed that you were a citizen of Yemen. You then produced an Italian birth certificate and claimed to not know of which country you were a citizen. On June 7, 2002, you were convicted for the offense of Filing a Fraudulent Asylum Application. On May 12, 2003, an Immigration Judge ordered you removed. On September 12, 2003, your Motion to Reopen was denied.

On March 4, 2004, you were served with a Decision to Continue Detention based on your failure to cooperate with ICE's efforts to effectuate your order of removal. The acquisition of a travel document has been hampered by your earlier deception regarding your identity. Your history of fraudulent activity has, in effect, hindered ICE from removing you as directed by the Immigration Judge. Be advised that, pursuant to Section 1253(a)(1)(c) of Title 8 of the United States Code (USC), any alien who "connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure" could be subject to prosecution. Furthermore, as stated in 8 CFR 241.4(g)(5)(i), an alien's "[r]elease may be denied and the alien may remain in detention if the alien fails or refuses to make timely application in good faith for travel documents necessary to the alien's departure." It is not enough to simply provide an identity document.

Despite your lack of cooperation, ICE has continued its efforts to effect your removal. ICE considers your removal to be significantly likely in the reasonably foreseeable future. A request for a travel document was again submitted to the Embassy of the Republic of Yemen in Washington,

Ex. 12 (1 of 3)

**Decision of Post Order Custody Review – Detain**
A75 628 802  ABDULLAH, Mohdar
Page 2

D.C., and the process of verifying your identity is ongoing. The Government of Yemen regularly issues documents to effect the repatriation of its nationals. In fiscal year 2003, there were 50 such documents issued. While representatives of the Embassy initially questioned the validity of your identification document, they have subsequently agreed to reconsider the matter of issuing a travel document. According to State Department personnel in Yemen, local Yemeni civil status authorities have confirmed that the identification card was validly issued in conformance with the Yemeni Civil Code. Based on this information, officials from the Embassy in Washington, D.C., have agreed to follow up with the local authorities. There is currently no reason to believe that a travel document will not be issued.

Furthermore, ICE is in the process of making a final determination for possible continued detention on account of special circumstances pursuant to 8 CFR 241.14(d). This comes as a result of your past actions, as well as your involvement with persons who present a threat to the national security of the United States, including individuals involved in the terrorist attacks of September 11, 2001.

Based on the above, you are to remain in ICE custody pending your removal from the United States. You are advised that you must demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE's efforts to remove you by taking whatever actions ICE requests to effect your removal. You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 USC Section 1253(a).

_____            4/16/04
Signature of HQPDU Director/Designated Representative        Date

Ex. 12  (2 of 3)

**Decision of Post Order Custody Review – Detain**
A75 628 802  ABDULLAH, Mohdar
Page 3

---

## PROOF OF SERVICE

**(1)    Personal Service (Officer to complete both (a) and (b) below.)**

      (a)    I _____ , _____ ,
                    Name of ICE Officer                    Title
certify that I served _____ with a copy of
                             Name of detainee
this document at _____ on _____ , at _____ .
                    Institution              Date          Time

      (b)    I certify that I served the custodian _____ ,
                                       Name of Official
_____ , at _____ , on
      Title                        Institution
_____ with a copy of this document.
      Date

## OR

**(2)    Service by certified mail, return receipt.  (Attach copy of receipt)**

      I _____ , _____ , certify
                Name of ICE Officer               Title
that I served _____ and the custodian _____ ,
              Name of detainee                 Name of Official
with a copy of this document by certified mail at _____ on _____ .
                                   Institution         Date

( ) cc: Attorney of Record or Designated Representative
( ) cc: A-File

Randall B. Hamud
Attorney at Law
1200 Third Avenue, Suite 1321
San Diego, CA 92101-4111
Tel: (619) 696-0815
Fax: (858) 457-1934

Attorney for Respondent

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
OFFICE OF THE IMMINGRATION JUDGE

| | |
|---|---|
| IN THE MATTER OF: | ) RESPONDENT'S NOTIFICATION RE |
| MOHDAR ABDULLA | ) SUBMISSION OF ITALIAN BIRTH |
| A 75-628-802 | ) CERTIFICATE |
| | ) |
| | ) |
| | ) Hearing Date : May 12, 2003 |
| Respondent | ) Time : 8:00 a.m. |
| | ) Type of Hearing : Individual |
| | ) Judge : Ragusa |
| | ) |

Respondent still awaits receipt of his Italian birth certificate properly

authenticated by the United States Embassy in Italy. I myself have had several

telephonic conversations with Respondent's brother, who lives in Rome, and who is

prosecuting our request for the authenticated birth certificate. Respondent also has

communicated with him about the immediate need for the birth certificate. My latest

information is that I should receive the birth certificate by no later than next week. Upon

its receipt, I shall provide a copy to the District Counsel, or the original, if it wishes, for

forensic analysis; and also a copy, or the original, as appropriate, to the court. I apologize

for not being able to submit the birth certificate by today's deadline. Both Respondent

and I have diligently tried to meet the deadline, but unfortunately, have not achieved

success.

Ex. 13 (1 of 6)

1

Dated: April 25, 3003



Randall B. Hamud
Attorney for Respondent



# COMUNE DI ROMA

## SERVIZI DEMOGRAFICI

UFFICIO DELLO STATO CIVILE

CERTIFICATO di NASCITA

L'UFFICIALE DELLO STATO CIVILE
sulle risultanze dei registri di stato civile

dell'anno 1978, atto 01354, parte 1, serie A14

certifica che:

ELMOHDAR ZEID

E' NATO
il cinque agosto millenovecentosettantotto
a ROMA (RM)

l'UFFICIALE di STATO CIVILE



Roma, 26/2/2003

Dichiaro, sotto la mia personale responsabilita', che
le informazioni contenute nel presente certificato
non hanno subito variazioni dalla data del rilascio.

Firma interessato _____ Data _____
N.B. Da firmare solo nel caso che il certificato
venga presentato oltre il termine di 180 gg. dalla
data di rilascio (Legge n.127 del 15/5/97 art.2 c.4)

tura s.r.l. - Ord. n. 8209 del 29/05/2002 (c. 400.000)

# APOSTILLE

(Convention de la Haje du 5 ottobre 1951)

## REPUBBLICA ITALIANA

Il presente atto pubblico *Corsi Roberto*

è stato sottoscritto da ....................

agente in qualità di ............... *funzionario*

è segnato dal contrassegno / timbro *Gov. Roma*

di ..............................

### A T T E S T A T O

UFFICIO TERRITORIALE DEL GOVERNO DI ROMA il ....... **2 6 APR. 2003**

la Ufficio Legalizzazioni

sotto il numero ............................... *1158*

contrassegno / timbro UFFICIO TERRITORIALE DEL GOVERNO DI ROMA

COLLABORATORE AMM.VO

*Augusto Mastrucci*

ALL SER
di Dr. ELEGIM
TRADUZIONE - INTER
Via Marghera, 2
P.IVA 061

 



ICE
MOSSAD
- SERVIZIO FAX
00185 Roma
591008

# MUNICIPALITY OF ROME
## DEMOGRAFIC SERVCE


### CIVILAIN STATMENT OFFICE

CERTIFICATE OF BIRHT


The Official of the marital status
on the outcomes of the registries of marital status

of year 1978, action 01354, part 1, A14 series

it is certifyd that:

ELMOHDAR ZEID

Was born
On five august one thousand nine hundred and seventy eight
In ROME ( RM )


The Official of the marital status
Administrative instructor

( stamp of the Office and illeggible signature )

Rome, On 26/02/2003

I declar, under my personal responsibility, that the contained information in the
present certificate, they have not endured variations from the date of the release.

Signature of the interested part----------------------------------------date-------------

Note:
To only sign in the case that the certificate comes introduced beyond the term of 180
days from the release date (law n. 127 of the 15/5/97 art.2 c.4)

# TRIBUNALE DI ROMA

Ufficio Atti Notori - Perizie e Traduzioni

## VERBALE DI GIURAMENTO

CRONOLOGICO
N. 1 | 005083

Roma 2.3 APR. 2003

Addì 2.3 APR. 2003.. avanti al sottoscritto Cancelliere è presente il

Signor: ..... *E.L.E.G.* *IMP.* *MOSSAD* *MAHMOUD*

IL COLLABORATORE

MOSSAD

documento: ..... *Carta di identità* ..... N. *AH635158.1*

rilasciato da .... *Comune di Roma* il ...*31.01.2003*

il quale chiede di asseverare con giuramento il suesteso atto. Io

Cancelliere, previe ammonizioni di legge, invito il comparente al

giuramento, che egli presta ripetendo: "Giuro di avere bene e fedelmente

adempiuto all'incarico affidatomi al solo scopo di far conoscere la verità".

Letto, confermato e sottoscritto.

IL CANCELLIERE C1
(*Carlo CECCARELLI*)
*Carlo Ceccarelli*

## APOSTILLE

Convention de la Haje du 5 ottobre 1961

## REPUBBLICA ITALIANA

Il presente atto è stato sottoscritto da *CARLO CECCARELLI*

Agente in qualità di *CANCELLIERE*

E' segnato dai contrassegno/timbro *TRIBUNALE ORDINARIO ROMA*

Ex. 13 (6 of 6)

## ATTESTATO

dalla Procura della Repubblica presso il Tribunale Ordinario di Roma

in data **2 8 APR. 2003** e sotto il N. *918/1* del Reg. delle Apostille



# Notice to Appear

**In removal proceedings under section 240 of the Immigration and Nationality Act**



DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

File No: A75 628 802

In the Matter of: ABDULLAH, MOHDAR MOHAMED
AKA

Respondent: AL-MIHDAR ZAID, ~~Mihdar Mohamed~~

OCT 0 9 2002

currently residing at:

c/o US INS, 880 FRONT STREET, SAN DIEGO, CA 92101

IMMIGRATION COURT
SAN DIEGO, CA

_____
(Number, street, city, state and ZIP code)                                    (Area code and phone number)

☐ 1. You are an arriving alien.

☐ 2. You are an alien present in the United States who has not been admitted or paroled.

☒ 3. You have been admitted to the United States, but are deportable for the reasons stated below.

The Service alleges that you: *[handwritten]*

4. You are not a citizen or national of the United States;

5. You are a native of ~~Yemen~~ and a citizen of Yemen;

6. You were admitted to the United States at San Diego, California on or about December 16, 1998, as a nonimmigrant visitor for pleasure with authorization to remain in the United States for a temporary period not to exceed June 14, 1999;

7. You remained in the United States beyond June 14, 1999, without authorization from the Immigration and Naturalization Service;

8. You were, on July 19, 2002, convicted in the United States District Court, Southern District of California, for the offense of False Statements to a Federal Officer, committed on or about February 23, 1999, in violation of Title 18 United States Code, Section 1001;

9. For that offense, a sentence of one year or longer may be imposed.

10. On October 4, 2002, you were served a notice of intent to terminate asylum status and hearing before an Immigration Judge.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(B) of the of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act you have remained in the United States for a time longer than permitted.

Section 237(a)(2)(A)(i) of the Immigration and Nationality Act (Act), as amended, in that you have been convicted of a crime involving moral turpitude committed within five years after admission for which a sentence of one year or longer may be imposed.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

Section 235(b)(1) order was vacated pursuant to:   ☐ 8 CFR 208.30(f)(2)   ☐ 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at: To be calendared and notice provided by the Office of the Immigration Judge. Notice will be mailed to the address provided by the respondent.

_____
(Complete Address of Immigration Court, Including Room Number, if any)

on _____ at _____ to show why you should not be ~~removed~~ from the United States based on the
      (Date)                      (Time)

charge(s) set forth above.

_____
Assistant District Director, Investigations
(Signature and Title of Issuing Officer)

Date:    October 4, 2002            San Diego, California
                                      (City and State)

See reverse for important information

EXHIBIT NO. 1

5/13/03
(Date)

Form I-862 (Rev. 3/22/99) N

ON CASSETTE NO. _____

Ex. 14 (1 of 2)

## Notice to Respondent

**Warning: Any statement you make may be used against you in removal proceedings.**

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

## Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to have a 10-day period prior to appearing before an immigration judge.

X _M. M. Abdullah_
(Signature of Respondent)

Before
_Tevan W Schultz SrSA_
(Signature and Title of INS Officer)

Date: _October 4, 2002_

---

### Certificate of Service

This Notice to Appear was served on the respondent by me on _Oct 4, 2002_ , in the following manner and in
(Date)

compliance with section 239(a)(1)(F) of the Act:

☒ in person      ☐ by certified mail, return receipt requested      ☐ by regular mail

☒ Attached is a credible fear worksheet.

☒ Attached is a list of organizations and attorneys which provide free legal services.

☒ The alien was provided oral notice in the _English_ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_M. M. Abdullah_
(Signature of Respondent if Personally Served)

X_Tevan W Schultz SrSA_
(Signature and Title of Officer)

Ex. 14  (2 of 2)



*Codice Mittente:* **281.05.03**

*Consolato Generale d'Italia*
*Los Angeles*

MAY 3 0 2003  *4994*
.......................................
(data e numero di protocollo)

*Posizione:*  | C/ | 1 | RBA |

---

**Ref. : ZEID ELMOHDAR born in  Roma , Italy,  05.08.1978**

From : Raffaella Buiano
Italian Consulate
Ph. (310) 979-5266
Fax (310) 820-0727

To: (619) 710-8385
U.S. Department of Justice
Immigration and Naturalization Service

**Att. Kenneth C. Smith**
**Deportation Officer**


Please enclosed find n. 1 page  response to your inquiry.
Original will follow in the mail.


The consular Officer
Raffaella Buiano



*Consolato Generale d'Italia*
*Los Angeles*

Immigration and Naturalization Service
PO BOX 439020
San Diego, CA 92143-9020

Att.ne: Mr Kenneth Smith

**Object: Elmohdar Zeid, born in Rome DOB August 5, 1978.**

Dear Mr Smith

Referring your letter of March 28, 2003 we inform you that Mr Elmohdar Zeid is not an Italian citizen.

Sincerely,

Los Angeles, May 29 2003

Il Cancelliere Principale
Pasquale Tufano

---

12400 Wilshire Blvd. suite 300            Tel.: (310) 826-3832 Fax: (310) 820-0727
Los Angeles, CA 90025                     Web-site: www.conlang.com

**Ex. 15  (2 of 3)**



*Embassy of Italy*
*3000 Whitehaven Street, N.W.*
*Washington D.C. 20008*

ANTICIPATO VIA FAX

June 5, 2003 ℓ𝑎𝑜𝑡.3001

RE:  ZEID, AL-MOHDAR MOHAMMED AL-NOHDAR ABDULLAH:
     A75 628 802;

Dear Mr. Ortiz:

I make reference to your letter of May 29, 2003. I wish to confirm that Mr. Zeid is not an Italian citizen, as already stated by the Consulate General of Italy in Los Angeles with letters n. 4994 of May 30, 2003, and n. 5048 of June 3, 2003. Although Mr. Zeid's Birth Certificate is authentic, and although he was born in Italy, at the time of his birth his parents were not Italian citizens, and he never received Italian citizenship.

*Regards*

Sincerely,

Alberto Galluccio
First Counselor

Mr. Mario G. Ortiz
Deportation Officer - Removal Unit
US Department of Homeland Security
Immigration and Customs Enforcement
880 Front Street, Suite 1234
San Diego CA 92101-8834

Cc :  Consolato Generale d'Italia
      Los Angeles

Ex. 15  (3 of 3)





**EMBASSY OF
THE REPUBLIC OF YEMEN**
SUITE 705
2600 VIRGINIA AVENUE, N.W.
WASHINGTON, D.C. 20037
TEL: (202) 965-4760
FAX: (202) 337-2017

سفارة الجمهورية اليمنية
واشنطن

Bret Bradford
Detention and Deportation Officer
Removal Support and Coordination Branch

December 2nd, 2003

RE: Zeid, Al-Mohdar Mohamed Al-Mohdar Abdullah (A75-628-802)

Dear Mr. Bret,

After further investigation into the case of Mr. Zeid Al-Mohdar, it is with regret to inform you that his alleged Yemeni I.D. (which was brought to the attention of the embassy), does not exist in official record. Furthermore, the DOB certificate that was provided to the embassy indicates that he was born in Italy, not in Yemen.

The embassy therefore, can not issue him a "Transit Permit" as requested by your office.

Sincerely,

Embassy of the Republic of Yemen

December 2nd, 2003
Washington, D.C.

TOTAL P.01

Ex. 16 (1 of 4)

Dear Mr. Hamud.
The attached letter addressed to Mr. Ortiz is yet to be
sent to him. However, this is a ~~copy~~ copy for your records.
This letter will be mailed to him early next week.

Note:
A copy of the travel document is
also inclosed for your records.

Thanks
Loay ALK1851
Consular Mission
09/12/2003

District Office

Dear Mr. Ortiz,

We regret to inform you that your request concerning issuing a travel document to
Mr. Al Mohdar Mohamed AKA : Al Mohdar Zied has been denied, the reason for it is
that the above mentioned has failed to provide us with a requested document that proves
his nationality and identity such as his Yemen PID and original passport.

Should you have any further questions in this regard, please contact me at 202-
965-4760.

Sincerely,

Abdullah Al-Socotry

Consul



بسم الله الرحمن الرحيم

**EMBASSY OF**
**THE REPUBLIC OF YEMEN**
SUITE 705
2600 VIRGINIA AVENUE, N.W.
WASHINGTON, D.C. 20037
TEL: (202) 965-4760
FAX: (202) 337-2017

سفارة الجمهورية اليمنية
واشنطن

Mr. Mario G. Ortiz
Immigration and Customs enforcement
District Office

Dear Mr. Ortiz,

We regret to inform you that your request concerning issuing a travel document to Mr. Al Mohdar Mohamed AKA : Al Mohdar Zied has been denied, the reason for it is that the above mentioned has failed to provide us with a requested document that proves his nationality and identity such as his Yemen PID and original passport.

Should you have any further questions in this regard, please contact me at 202-965-4760.

Sincerely,

Abdullah Al-Socotry

Consul



**EMBASSY OF
THE REPUBLIC OF YEMEN**

SUITE 705
2600 VIRGINIA AVENUE, N.W.
WASHINGTON, D.C. 20037
TEL: (202) 965-4760
FAX: (202) 337-2017

سفارة الجمهورية اليمنية
واشنطن

Mr. Mario G. Ortiz
Immigration and Customs enforcement
District Office

Dear Mr. Ortiz,

    We regret to inform you that your request concerning issuing a travel document to Mr. Al Mohdar Mohamed AKA : Al Mohdar Zied has been denied, the reason for it is that the above mentioned has failed to provide us with a requested document that proves his nationality and identity such as his Yemen PID and original passport.

    Should you have any further questions in this regard, please contact me at 202-965-4760.

Sincerely,

Abdullah Al-Socotry

Consul

Ex. 16 (4 of 4)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MOHDAR ABDULLAH                    )
[A75 628 802],                     )
         Petitioner,        )
                  )
        v.                        )     Case No. 03cv2479-WQH (AJB)
                  )
JOHN ASHCROFT, Attorney            )
General, et al.,                   )
         Respondents.       )
_____)

DECLARATION OF BRET BRADFORD

I, Bret Bradford, state and declare as follows:

1. I am a Detention and Deportation Officer with U.S. Immigration and Customs
   Enforcement (ICE) within the Department of Homeland Security in Washington, D.C.

2. My present duties include development of policy and regulations relating to the
   enforcement of final orders of deportation and the removal of criminal aliens from the
   United States. In my current position, I am personally familiar with inter- and intra-
   governmental procedures for the repatriation of persons who are citizens and nationals of
   Yemen.

3. Over the past five (5) years, approximately one hundred thirty-six (136) Yemeni nationals
   have been repatriated to Yemen, including approximately fifty (50) Yemeni nationals
   during fiscal year 2003 (October 1, 2002 to September 30, 2003).

4. I am also familiar with the case of Mohdar Mohamed Abdullah, Agency File #75 628
   802. On October 17, 2003, I received a request from the San Diego field office for
   assistance in obtaining a travel document for Mr. Abdullah. The request included an
   original Yemeni identification card.

5. On approximately October 24, 2003, I met with Abdullah Al-Socotry, Assistant to the
   Consul General at the Embassy of the Republic of Yemen in Washington, D.C., to
   discuss the case. I gave Mr. Al-Socotry a copy of the travel document request along with
   the original identification card. Mr. Al-Socotry reviewed the information and the card.
   Mr. Al-Socotry then advised me that he felt there was a good chance that the
   identification card was fraudulent. He indicated that there was a lot of fraud during the
   time that the card was issued and further indicated that the signature of the issuing
   official, on the back of the card, appeared suspect. Mr. Al-Socotry then said that he

Ex. 17 (1 of 2)

would go ahead and send the card to Yemen for verification and that he would let me know when he got a response. He indicated that it might take some time for a response.

6. On December 2, 2003, I received a written response from the Mr. Al-Socotry stating that they would not be able to issue a travel document for Abdullah because the identification card did not exist in their official record. I called Mr. Al-Socotry to ask if the card could be returned to us. He indicated that the card was sent to Yemen and could not be returned.

7. On March 26, 2004, I learned through State Department personnel that a copy of Mr. Abdullah's identification card was faxed to Col. Badr Khayran of the Yemen Civil Status Authority (CSA) Headquarters in Sanaa, Yemen. According to State Department personnel, Col. Khayran confirmed the issuance of the identification card and that it appears to have been issued in accordance with the Yemeni Civil Code. He also noted that anyone, including Mr. Abdullah, who obtains this type of identification document is considered a full-fledged Yemeni national because an applicant cannot obtain this identification document until he/she has provided sufficient evidence to the CSA to prove their claim to Yemeni nationality. Such evidence might include but is not limited to official documentation such as a Yemeni birth certificate issued by the CSA, confirming the Yemeni nationality of the applicant's parents, and the testimony of witnesses. According to State Department personnel, although some foreigners have fraudulently obtained Yemeni identification cards, Col. Khayran said he has no reason to believe that Mr. Abdullah is not of genuine Yemeni lineage.

8. I met with Abdulmalik Al-Shabibi of the Embassy of the Republic of Yemen in Washington, D.C., on March 26, 2004. I presented the above information regarding CSA's confirmation that Mr. Abdullah's identification card was issued in accordance with Yemeni Civil Code and that Col. Khayran had no reason to believe that Mr. Abdullah is not a Yemeni national. Mr. Al-Shabibi agreed to reconsider this case and will follow up with local authorities in Yemen.

I declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury.

Executed in Washington, D.C. on the 26th day of March, 2004.

Bret Bradford
Detention and Deportation Officer
U.S. Immigration and Customs Enforcement
Department of Homeland Security

# SWORN STATEMENT

Office: San Diego Detention and Removal Unit    File Number: A75 628 802
Statement by: ZEID, Al-Mohdar Mohammed Al-Mohdar Abdullah
In the Case of: ZEID, Al-Mohdar Mohammed Al-Mohdar Abdullah
Date of Birth: August 15, 1978                     Gender: Male
At: San Diego, California
Before: Oliver A. Francisco

I am an officer of the United States Immigration and Naturalization service, authorized by law to administer oaths and take testimony in connection with the enforcement of the Immigration and Nationality laws of the United States. I want to take your sworn statement regarding your nationality/citizenship. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

*You have the right to remain silent.* Anything you say can/may be used against you in this or any administrative proceedings. You have the right to talk to a lawyer for advice before I ask you any questions and have him with you during questioning. If you can not afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to an attorney.

## WAIVER

I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been made against me.

Signature: _M·M·Abdullah_    Date/Hour: _05-19-03/ 5:30 Pm_
Place: San Diego, CA
Immigration Officer: _Oliva A. Francis_

Q: What is your nationality and citizenship?
A: To the best of my knowledge, I am a native of Italy for the simple fact that I was born there. But, I might also be a Somalian or a Yemenese citizen because I have roots (grandparents and great grandparents).
Q: How did you acquire your citizenship?
A: I was born in Italy. I believe I am an Italian citizen but then again I may be a Somalian citizen or a Yemenese citizen.
Q: What is your father's full name?
A: Mohammed Al-Mohdar Abdullah Zeid.
Q: Where was your father born?
A: I do not know.
Q: What is your father's citizenship?
A: I am not sure, but I think he is a Yemenese citizen.
Q: How did he acquire his citizenship?
A: I do not know.



CONTINUATION OF STATEMENT: ZEID, Al –Mohdar Mohammed Al-Mohdar Abdullah; 75 628 802

Q: What is your mother's full name?
A: Fatum Ahmed Al-Shajeri.
Q: Where was your mother born?
A: Djbouti. It is a place between the Somalian and Yemen border.
Q: What is your mother's citizenship?
A: I do not know.
Q: What is your grandfather's full name?
A: Al-Mohdar Abdullah Zeid.
Q: Where was your grandfather born?
A: I do not know.
Q: What is your grandfather's citizenship?
A: I do not know.
Q: What is grandmother's full name?
A: Omhani Aldumdumi.
Q: Where was grandmother born?
A: I do not know.
Q: What is your grandmother's citizenship?
A: I do not know. *She might be a Yemeni citizen. M.A*
Q: What is your brother's name and address in Rome, Italy?
A: Ahmed Mohammed Zeid. His phone number is *0113933 86044161 M.A*
Q: What was your immigration status in Italy and how long have you lived there?
A: I do not know. I was born there and lived there for 5 years after I was born.
Q: Do you claim any other place other than Italy to be your place of residence?
A: I lived in Yemen for eleven years but I do not want to go back there because of fear of persecution and torture.
Q: Do you want to add anything to this statement?
A: Yes. I am very willing to cooperate with any officers of the Immigration Service to expedite my travel.///END OF STATEMENT/// *or for any further inquiries. M.A*



CONTINUATION OF STATEMENT: ZEID, Al-Mohdar Mohammed Al-Mohdar Abdullah; 75 628 802

I have read (or have had read to me) the foregoing statement, consisting of ____3____ pages (including this page). I state that the answers made herein by me are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and naturalization Service. I have initialed each page of this statement (and the correction(s) noted on page(s)____).

*M·M·Abdullah*

ZEID, Al-Mohdar Mohammed                    May 19, 2003
     Al-Mohdar Abdullah
_____          _____
Signature of Alien                          Date

Subscribed and sworn to before   San Diego,        o   May 19, 2003
me at:                           California        n
*Oliver A. Francisco*                            _____
     O. A. FRANCISCO
_____          _____
Signature of Immigration Officer            Signature of Witness

Ex. 18 (3 of 3)



New at Coleman College

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

PRINT THIS

## War on Terror
### Detainee describes local 9/11 hijackers

**By Kelly Thornton**
UNION-TRIBUNE STAFF WRITER

**January 4, 2003**

He was there in the crowd, marching across the Laurel Street bridge in Balboa Park, ranting in Arabic as others chanted "No justice, no peace!" and waved posters. One placard featured a slain Palestinian child and the slogan, "Who is the terrorist?"

With every angry shout, every fist thrust into the air against U.S. support of Israel, future terrorist Nawaf Alhazmi took part in a cherished exercise of American democracy: the peaceful anti-government demonstration.

Standing with him in the park that 15th day of October 2000 was Mohdar Abdullah, probably the closest friend the three San Diego-linked hijackers had here, and likely the only one permitted to glimpse the psyches of men who ultimately helped crash a jet into the Pentagon.

Associated Press

Mohdar Abdullah listens during an interview at the immigration jail in Otay Mesa, where he is still in custody while fighting deportation. A judge yesterday denied his request to be released on bond. Abdullah was probably the closest friend the three San

"Nawaf was yelling, holding signs and posters with pictures of children being slaughtered," Abdullah said, recalling the protest that occurred almost a year before the attacks. "Nawaf was really infuriated about the massacres of our brothers and sisters in Palestine, and the blind eye turning toward the conflict."

But Alhazmi had his own agenda. "He was directing his voice to the Muslims," Abdullah said, "trying to push his own opinion that Palestine is not going to be liberated by signs and posters."

During Abdullah's first newspaper interview since his arrest 15 months ago, the former material witness in the terror investigation gave the most insightful descriptions to date of the terrorists who lived in Clairemont and Lemon Grove, attended mosques and flight schools and language classes, played soccer, looked for wives and worked at a La Mesa gas station.

The Texaco station is where Abdullah said goodbye to Alhazmi and another hijacker, Hani Hanjour, in late 2000. "Nawaf said, 'If we don't meet again in this life, we'll meet in the hereafter,' in his paradise," Abdullah recalled.

"I remember his gaze and his smile. And he hugged me. And that's the last time I saw him. There was no indication he was going to do something bad, but of course when I ponder about it now, I understand."

Authorities have a different version of the final farewell.

According to prosecutors, Abdullah received a goodbye call from Alhazmi in August 2001, just weeks before the terrorist attacks. When the FBI later confronted Abdullah about the call, he asked whether they had recorded it. Co-workers at the gas station told FBI agents that during that period, Abdullah seemed excessively nervous.

Abdullah said the caller was another friend named Nawaf, and he could not remember ever receiving a call from Alhazmi after his departure from San Diego. He said descriptions of odd behavior on his part are "preposterous."

**No bail**

Because of his relationship with Alhazmi and Khalid al-Midhar, Abdullah, 24, was taken to New York to testify before a grand jury in October 2001. He was returned to San Diego to face charges that he lied on his asylum application by claiming to be from Somalia when he is from Yemen.

He pleaded guilty, was sentenced to time served and is still in custody at the immigration jail in Otay Mesa while fighting deportation. A judge yesterday denied his request to be released on bond during the process, saying he is a flight risk and a danger to the community.

It was at that two-hour hearing that INS prosecutor Kathleen Zapata disclosed information about the farewell phone call. She argued that Abdullah is dangerous because of his connections to the hijackers and because he is still under investigation.

Immigration Judge Zsa Zsa DePaolo did not address the terrorism aspect of the case, saying it was irrelevant because other facts made him unfit for release. Abdullah, the judge noted, has no family in the United States and has admitted to committing fraud.

"If this young man was someone who the U.S. government thought was involved with the Sept. 11 tragedy, he would not be sitting in my courtroom," DePaolo said.

When issuing her ruling, she spoke directly to Abdullah, saying her ruling was based on his behavior, not his connections to terrorists, adding, "This is not personal."

Fifteen supporters of Abdullah attended the hearing, including former material witness Osama Awadallah, civil rights activists, friends from the Muslim community and a Christian stranger who has offered Abdullah a place to stay if released, said Abdullah's attorney, Randall B. Hamud.

Also making a rare appearance at an immigration hearing were several members of the U.S. attorney's terrorism unit and a couple of FBI agents, including Daniel Gonzalez, who interviewed Abdullah.

During the hearing, Hamud emphasized that Abdullah has not been charged with terrorism and is the victim of a "national security juggernaut" trying to "crush its perceived enemies."

**Helping a brother**

Abdullah, who acknowledges dining and praying with the hijackers and helping them overcome language barriers during their months-long stay in San Diego, said he has been eager to give an interview to explain that he was merely aiding fellow Muslim newcomers, not facilitating a terrorist plot. He had declined earlier interview requests on the advice of his attorney.

Abdullah met with a reporter at the immigration detention facility near the border in Otay Mesa in November. As a condition for the interview, he insisted that no story be published until after his bail hearing.

He wore orange prison garb, a neatly trimmed beard and an easy smile. His first language is Arabic, but his English is excellent. During a four-hour discussion about hijackers, life in jail, politics, the San Diego Muslim community and other matters, Abdullah was quick-witted, passionate and funny.

He said he was relieved to finally tell his side of the story.

"I'm a victim of circumstances," he said. "Let the public know that I have nothing to hide." During the interview, he clarified the spelling of his name, which has varied in court documents.

Although court records indicate authorities suspect Abdullah came to San Diego with sinister motives, he has not been charged with terrorism.

"I understand a lot of people look at me now as being a bad person just for knowing those guys and for trying to help them out," Abdullah said. "I never intended to do any harm to anyone, and I never knew the true intentions of those people.

"It's not abnormal or strange to help someone, a Muslim brother. (Authorities) say my main mission (was) to help the hijackers, which is absurd and preposterous."

## Fast friends

Abdullah said he met Alhazmi and al-Midhar in January 2000 at a dinner party at the El Cajon mosque. They were presented by Omar Al-Bayoumi, whom the FBI suspects of being the front man who prepared the way for the hijackers in San Diego. Al-Bayoumi, thought to be a Saudi spy by local Muslims, financed apartments for the hijackers.

Al-Bayoumi left for England in July 2001 and was held briefly by British authorities. Authorities have declined to comment on his whereabouts or whether he is still being sought.

"Bayoumi introduced them as newcomers that just came from L.A. He referred to them as guests in the community who were looking for school to enroll in," Abdullah said. "Bayoumi was telling Khalid and Nawaf, 'If you need anything, this brother (Abdullah) learned English fast and he could help you if you need any kind of assistance.' "

The trio became fast friends. Abdullah helped them with errands, drove them to Los Angeles International Airport, dined with them at Alhazmi's favorite restaurant – Little Caesars in La Mesa – and made calls to a flight school for them because they had limited English skills.

"They were very charming, friendly persons, very ordinary persons," Abdullah said. "There were no signs of violence."

Abdullah said he does not condone what the hijackers did, but, perhaps more than anyone in San Diego, had insight into their motives.

"Nawaf and Khalid, they always had that sense of rebellion, sense of opposition, defiance to the regimes and the repressive governments in the Middle East," Abdullah said. "They described them as the puppet governments for the West."

At the October 2000 rally, Alhazmi got into a confrontation with a Jewish man, angrily shouting, "We will free Palestine, even by force!" Abdullah remembered. The hijackers, who were born in Saudi Arabia, told Abdullah they resented that U.S. troops were stationed in their home country, in areas they considered sacred, a key grievance of al-Qaeda and Osama bin Laden.

"Those people, the so-called terrorists or hijackers, their hatred and animosity toward the U.S. or the Western world did not come from nowhere," Abdullah said. "It's been building, accumulating under decades of oppression.

**Ex. 19  (3 of 6)**

"(Their) actions are totally wrong and contrary to Islamic doctrine. However, it's worthy to note all of those people have been pulled into extreme doctrines because of oppressive environment."

The hijackers were often secretive, rarely answering Abdullah's many questions and only discussing politics among a small circle of friends that included Abdullah, he said.

Abdullah said that when he noted odd behavior by the future hijackers, he asked questions, but was often stonewalled. For instance, he asked Alhazmi why he failed to enroll in school, when that was his purported reason for coming to the United States.

He said he also found it odd that al-Midhar wasn't eager to plunge into American life, even expressing contempt for it.

"Khalid didn't want to blend in with American culture," Abdullah said. "He didn't like the lifestyle. He was critical, said there was too much temptation, too much tests for faith, too many women not covered. Life here was very materialistic. He showed some interest in going back."

Abdullah said he grew tired of that attitude and asked al-Midhar why, if he was so religious, did he not wear a beard as fundamentalist Muslim men do? And why not go back to the Middle East if he was so disgusted by America?

"He smiled, kind of grinned, and tapped my knee and said, 'Brother, I have my own purpose.' Of course, now I know what that was," Abdullah said.

There was never any discussion of violence, of plans for an attack on the United States or hijackings. But there were discussions that non-Muslims might, in hindsight, consider inflammatory.

"Of course there was mention of *jihad*," Abdullah said. "*Jihad* is a fundamental part of Islam. *Jihad* is spending one's effort in a just cause of God. The idea that *jihad* means 'holy war' is a very limited understanding of *jihad*."

*The hijackers repeatedly talked about the Arab-Israeli conflict, reforming Middle Eastern governments that they viewed as too cozy with the United States, and the conflict in Chechnya.*

*"Both (Alhazmi and al-Midhar) had great sympathy to brothers in Chechnya, defending their own country against Russian invasion," Abdullah said.*

*Abdullah said he came to San Diego in 1998 and "had a very rough beginning," living in mosques, struggling financially and living a lonely existence. He got a job working at Kobey's Swap Meet at the Sports Arena.*

*Eventually he was hired at the Texaco gas station in La Mesa, where Alhazmi later worked. He also enrolled in computer and English-language classes at Grossmont College. At the time of the attacks, he had transferred to San Diego State University. His language skills improved rapidly.*

*Abdullah has wondered if Al-Bayoumi chose him to help the hijackers for this reason. At one point, Alhazmi and al-Midhar asked him to interpret for them at a United Airlines ticket counter near the University Towne Centre mall. They wanted a refund on a return ticket after traveling in Thailand, Malaysia, Indonesia and Singapore.*

*The pair were adamant that Abdullah not tell anyone where they had traveled, so they could preserve their "religious reputation," Abdullah said, adding: "Those places are known for prostitution and corruption. They didn't want to be stigmatized for being immoral."*

*But later, after Sept. 11, Abdullah read news reports that a few days before they entered the United States together in Los Angeles on Jan. 15, 2000, Alhazmi and al-Midhar had attended an al-Qaeda meeting in Kuala Lumpur, Malaysia.*

*They had met with Tawfiz Attash Khallad, the alleged mastermind behind the bombing of the U.S. destroyer Cole, which was carried out nine months later. The operatives discussed other potential*

*terrorist targets at the meeting.*

*Sources told the Union-Tribune* in August that Alhazmi and al-Midhar initially came to San Diego in early 2000 to carry out a similar attack on a nuclear aircraft carrier, but for an unknown reason were diverted to the hijacking plan.

## Making the case

According to court records, federal authorities suspect that Abdullah came here to help the hijackers. Abdullah remained illegally in the United States "in order to help the before-mentioned hijackers and/or any future hijackers in the furtherance of terrorist activities against people in the United States," FBI agent Gonzalez said in an affidavit.

Abdullah "had provided substantial assistance to the hijackers as they acclimated themselves in the United States in planning the Sept. 11th attacks," court records said.

Records said Abdullah inquired at two martial-arts studios about classes for himself and "two friends," in one case indicating an interest in a self-defense method called Krav Maga, which means "contact combat" in Hebrew.

"He stated that he and two of his friends were interested in 'combat training,' " said Darryl Johnson of EC Sidekicks Martial Arts Academy, according to the records.

Johnson told the FBI he was surprised Abdullah was familiar with Krav Maga. Abdullah said he did not follow up on the conversation.

Abdullah said during the interview with the *Union-Tribune* that he did ask about martial-arts classes, but for friends other than the hijackers. He declined to name the friends. He said he had never taken martial-arts classes and just had an interest in learning self-defense and boosting his self-esteem and confidence.

He said Alhazmi had mentioned that two of his brothers were well-trained in martial arts. One of Alhazmi's brothers, Salem Alhazmi, joined him as a hijacker on the same American Airlines flight that hit the Pentagon.

## Talking with agents

Abdullah declined to talk in November about his family or even where he was born, saying he did not want to jeopardize his chance to make bail and remain in the United States. He said he has only pleaded guilty to lying about when and where he entered the United States, not about whether he was born in Yemen or Somalia.

During a telephone interview yesterday, he said he was born in Italy but moved to Yemen, where his father was born. His mother and her family are from Somalia and Djibouti, he said.

Abdullah remains adamant that he had no knowledge of the hijackers' plans, and said he believes there are no sleeper cells remaining in San Diego. He said officials have wrongly labeled him an extremist and described himself as a moderate Muslim, noting that he departed from strict Muslim practice by shaking hands with a female reporter at the interview.

Abdullah said he blames himself for trusting FBI agents who at first were charming and promised that his immigration status was of no concern to them, if he would just cooperate in the investigation of Sept. 11. He said he trusted the agents and made incriminating statements regarding his asylum application.

"I admitted I had a mistake in my application, that I misrepresented something, that my English was not good and I was trying to amend it, to fix it," he said.

"What I'm really upset about is that I cooperated with law enforcement officials. When I first was

approached I had a sense of obligation, because of the horrendous and horrific criminal act I felt an obligation to cooperate. I was willingly helping, trying to help; they intimidated me.

"I might disagree with the foreign policy of the United States, but this doesn't make me a terrorist or a threat to U.S. soil. I'm entitled to my political opinion. Freedom of speech was one of the motives of my coming here."

Kelly Thornton: (619) 542-4571; kelly.thornton@uniontrib.com

**Find this article at:**
http://www.signonsandiego.com/news/nation/terror/20030104-9999_1n4terror.html

☐ Check the box to include the list of links referenced in the article.





# U.S. Department of Justice
Immigration and Naturalization Service

**Application to Register Permanent Residence or Adjust Status**

OMB No. 1115-0053

---

## START HERE - Please Type or Print

### Part 1. Information about you.

| Family Name ABDULLAH | Given Name MOHDAR | Middle Initial |
|---|---|---|

**Address - C/O**

| Street Number and Name 7200 SARANAC ST. #38 LA MESA 91941 | Apt. # |
|---|---|

City     LA MESA

| State    CA | Zip Code    91941 |
|---|---|

| Date of Birth (month/day/year) 08/05/1978 | Country of Birth   SOMALIA |
|---|---|

| Social Security #   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 | A # (if any)   075-628-802 |
|---|---|

| Date of Last Arrival (month/day/year) 12/07/98 | I-94 #   519076737-04 |
|---|---|

| Current INS Status   ASYLEE | Expires on (month/day/year) INDEFINITELY |
|---|---|

### FOR INS USE ONLY

| Returned | Receipt |
|---|---|

May 9/00 002#17044 SND-NV
I-485    $220.00

Resubmitted

Reloc Sent

May 9/00 002#17044 SND-NV
FP-Fee/FD258 $25.00

Reloc Rec'd

☒ Applicant Interviewed
7/24/01

### Section of Law
☐ Sec. 209(b), INA
☐ Sec. 13, Act of 9/11/57
☐ Sec. 245, INA
☐ Sec. 249, INA
☐ Sec. 1 Act of 11/2/66
☐ Sec. 2 Act of 11/2/66
☐ Other _____

### Country Chargeable
ASØ

### Eligibility Under Sec. 245
☐ Approved Visa Petition
☐ Dependent of Principal Alien
☐ Special Immigrant
☐ Other _____

Preference   ASG

### Action Block

### Part 2. Application Type. *(Check one)*

**I am applying for adjustment to permanent resident status because**

a. ☐   an immigrant petition giving me an immediately available immigrant visa number has been approved (attach a copy of the approval notice), or a relative, special immigrant juvenile, or special immigrant military visa petition filed with this application will give me an immediately available visa number if approved.

b. ☐   My spouse or parent applied for adjustment of status or was granted lawful permanent residence in an immigrant visa category which allows derivative status for spouses and children.

c. ☐   I entered as a K-1 fiance(e) of a U.S. citizen whom I married within 90 days of entry, or I am the K-2 child of such a fiance(e) (attach a copy of the fiance(e) petition approval notice and the marriage certificate).

d. ☒   I was granted asylum or derivative asylum status as the spouse or child of a person granted asylum and am eligible for adjustment.

e. ☐   I am a native or citizen of Cuba admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least 1 year.

f. ☐   I am the husband, wife, or minor unmarried child of a Cuban described in (e) and am residing with that person, and was admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least 1 year.

g. ☐   I have continuously resided in the U.S. since before January 1, 1972.

h. ☐   Other-explain_____

**I am already a permanent resident and am applying to have the date I was granted permanent residence adjusted to the date I originally arrived in the U.S. as a nonimmigrant or parolee, or as of May 2, 1964, whichever is later, and:** *(Check one)*

i. ☐   I am a native or citizen of Cuba and meet the description in (e), above.

j. ☐   I am the husband, wife or minor unmarried child of a Cuban, and meet the description in (f), above.

### To Be Completed by Attorney or Representative, if any
☐ Fill in box if G-28 is attached to represent the applicant

VOLAG# _____

ATTY State License # _____

## Part 3. Processing Information

| | |
|---|---|
| **A.** City/Town/Village of Birth    BARAWE | Current occupation    CASHIER |
| Your mother's first name    FATUM | Your father's first name    MOHAMED |

Give your name exactly how it appears on your Arrival/Departure Record (Form I-94)

ABDULLAH MOHDAR MOHAMED

| | |
|---|---|
| Place of last entry into the U.S. (City/State) <br><br> NYC | In what status did you last enter? (Visitor, Student, exchange alien, crewman, temporary worker, without inspection, etc.) |
| Were you inspected by a U.S. Immigration Officer?   ☐ Yes ☒ No <br> M.A | UNDOCUMENT ( E W I ) |
| Nonimmigrant Visa Number | Consulate where Visa was issued |

| | | |
|---|---|---|
| Date Visa was issued (month/day/year) | Sex: ☒ Male ☐ Female | Marital Status: ☐ Married ☒ Single ☐ Divorced ☐ Widowed |

Have you ever before applied for permanent resident status in the U.S.?    ☒ No    ☐ Yes (give date and place of filing and final disposition):

**B.** List your present husband/wife, all of your sons and daughters (if you have none, write "none". If additional space is needed, use separate paper).

| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
|---|---|---|---|
| Country of Birth | Relationship | A # | Applying with you? ☐ Yes ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you? ☐ Yes ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you? ☐ Yes ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you? ☐ Yes ☐ No |
| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
| Country of Birth | Relationship | A # | Applying with you? ☐ Yes ☐ No |

**C.** List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any foreign military service in this part. If none, write "none". Include the name of organization, location, dates of membership from and to, and the nature of the organization. If additional space is needed, use separate paper.

NONE

## Part 3. Processing Information *(Continued)*

Please answer the following questions. (If your answer is "Yes" on any one of these questions, explain on a separate piece of paper. Answering "Yes" does not necessarily mean that you are not entitled to register for permanent residence or adjust status).

1. Have you ever, in or outside the U.S.:
   a. knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested?
   b. been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?
   c. been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action?
   d. exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S.?
   ☐ Yes   ☒ No

2. Have you received public assistance in the U.S. from any source, including the U.S. government or any state, county, city, or municipality (other than emergency medical treatment), or are you likely to receive public assistance in the future?
   ☐ Yes   ☒ No

3. Have you ever:
   a. within the past 10 years been a prostitute or procured anyone for prostitution, or intend to engage in such activities in the future?
   b. engaged in any unlawful commercialized vice, including, but not limited to, illegal gambling?
   c. knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S. illegally?
   d. illicitly trafficked in any controlled substance, or knowingly assisted, abetted or colluded in the illicit trafficking of any controlled substance?
   ☐ Yes   ☒ No

4. Have you ever engaged in, conspired to engage in, or do you intend to engage in, or have you ever solicited membership or funds for, or have you through any means ever assisted or provided any type of material support to, any person or organization that has ever engaged or conspired to engage, in sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity?
   ☐ Yes   ☒ No

5. Do you intend to engage in the U.S. in:
   a. espionage?
   b. any activity a purpose of which is opposition to, or the control or overthrow of, the Government of the United States, by force, violence or other unlawful means?
   c. any activity to violate or evade any law prohibiting the export from the United States of goods, technology or sensitive information?
   ☐ Yes   ☒ No

6. Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party?
   ☐ Yes   ☒ No

7. Did you, during the period March 23, 1933 to May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany, ever order, incite, assist or otherwise *participate in the persecution of any person because of race, religion, national origin or political opinion?*
   ☐ Yes   ☒ No

8. Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion?
   ☐ Yes   ☒ No

9. Have you ever been deported from the U.S., or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings?
   ☐ Yes   ☒ No

10. Are you under a final order of civil penalty for violating section 274C of the Immigration Act for use of fraudulent documents, or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit?
    ☐ Yes   ☒ No

11. Have you ever left the U.S. to avoid being drafted into the U.S. Armed Forces?
    ☐ Yes   ☒ No

12. Have you ever been a J nonimmigrant exchange visitor who was subject to the 2 year foreign residence requirement and not yet complied with that requirement or obtained a waiver?
    ☐ Yes   ☒ No

13. Are you now withholding custody of a U.S. Citizen child outside the U.S. from a person granted custody of the child?
    ☐ Yes   ☒ No

14. Do you plan to practice polygamy in the U.S.?
    ☐ Yes   ☒ No

## Part 4. Signature. *(Read the information on penalties in the instructions before completing this section. You must file this application while in the United States.)*

I certify under penalty of perjury under the laws of the United States of America that this application, the evidence submitted with it, is all true and correct. I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| *M.M. Abdullah* | ABDULLAH MOHDAR MOHAMED | 05-05-2000 | 619 337-1812 |

**Please Note:** *If you do not completely fill out this form, or fail to submit required documents listed in the instructions, you may not be found eligible for the requested document and this application may be denied.*

## Part 5. Signature of person preparing form if other than above. *(Sign Below)*

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| *Edward Lam* | EDWARD LAM | 5/5/00 | 619 287-9454 |
| **Firm Name and Address** | CATHOLIC CHARITIES 4575-A MISSION GORGE PL. SAN DIEGO, CA 92120 | | |

7/24/61

*Charles K Kotkin (signature)*

CHARLES
KOTKIN

U.S. Department of Justice

Immigration and Naturalization Service

 

**BIOGRAPHIC INFORMATION**

OMB No. 1115-0066

Approval expires 4-30-85

| (Family name) ABDULLAH | (First name) MOHDAR | (Middle name) M. | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) 08-05-1978 | NATIONALITY SOMALII | FILE NUMBER A- 075-628-802 |
|---|---|---|---|---|---|---|

| ALL OTHER NAMES USED (Including names by previous marriages) | CITY AND COUNTRY OF BIRTH BARAWE          SOMALIA | SOCIAL SECURITY NO. (If any) 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 |
|---|---|---|

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|---|
| FATHER | ABDULLAH | MOHAMED | UNK. | BARAWE,SOMALIA | DECEASED |
| MOTHER (Maiden name) | AHMED | FATUM | 1955 | BARAWE,SOMALIA | KENYA | NAIROBI |

| HUSBAND(If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| N/A | | | | | | |

FORMER HUSBANDS OR WIVES (If none, so state)

| FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| N/A | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 7200 SARANAC ST. #38 LA MESA 91941 | LA MESA | CA | US | 04 | 99 | PRESENT TIME | |
| 7240 EL CAJON BLVD. | SAN DIEGO | CA | US | 12 | 98 | 04 | 99 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| EASTLEIGH SECTION 2 | NAIROBI | | KENYA | 05 | 95 | 12 | 98 |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE.) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|
| LA MESA TEXACO        GAS STATION | CASHIER | 08 | 99 | PRESENT TIME | |
| | | | | | |
| | | | | | |
| | | | | | |

Show below last occupation abroad if not shown above. (Include all information requested above.)

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION ☐ OTHER (SPECIFY): ☒ STATUS AS PERMANENT RESIDENT | ✗ *M. M. Abdullah* | 5/5/2000 |
| Are all copies legible?  ☒ Yes | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPLICANT:

**BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.**

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| ABDULLAH | MOHDAR | M. | 075-628-802 |

| (OTHER AGENCY USE) | INS USE (Office of Origin) |
|---|---|
| | OFFICE CODE: TYPE OF CASE: DATE: |

<u>Ex. 21 (1 of 1)</u>



# CATHOLIC CHARITIES

*Refugee and Immigrant Services*

## AFFIDAVIT OF BIRTH CERTIFICATE

NAME IN FULL: *Mohdar Mohamed Abdullah*

SEX: ☒ Male ☐ Female   DATE OF BIRTH: *08 05 78* PLACE OF BIRTH: *Somalia*

FATHER'S FULL NAME: *Mohamed Abdullah*

FATHER'S OCCUPATION: *Deceased*

FATHER'S PRESENT ADDRESS: —

MOTHER'S FULL NAME: *Fatum Ahmeed*

MOTHER'S OCCUPATION: *House wife*

MOTHER'S PRESENT ADDRESS: *Nairobi, Keth, Kenya.*

MOTHER'S MARITAL STATUS: *Married*

TESTIMONY:

I, *ALI SAID DAWALEH*, a *ASYLUM (Asylee)* (immigration status), born

on *05 / 20 / 73*, in the country of *SOMALIA*, assigned the alien number

A# *75 590 381*, do hereby affirm that all the information as stated above for

*MOHDAR ABDULLAH*, whose relationship to me is that of *FRIEND*, is true and

correct to the best of my knowledge.

State of California
County of San Diego

Signed: *Abren Dewleh*

On ____ / ____ / ____, before me, the undersigned, a Notary Public in and for this state, personally

appeared _____ known to me or satisfactorily proven, to be the person whose name is

subscribed to within instrument and acknowledged that he/she executed the same.

SEAL

*See attached California All Purpose Acknowledgment*
NOTARY PUBLIC

CCSD/IMG: 01(11/15/93)

**Catholic Charities**
A COMMUNITY SERVICE MINISTRY

Ex. 22 (1 of 5)

4575 Mission Gorge Place, Suite A, San Diego, CA 92120 • Tel. (619) 287-9454 • Fax (619) 287-6328

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of __San Diego__ }ss.

On __5-4-00__, before me, __Ryan E. McGorish__,
    Date                 Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared __Ali Said Dawaloh__,
                                       Name(s) of Signer(s)

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

__Ryan E. McGl__
              Signature of Notary Public

OFFICIAL SEAL
RYAN E. MC GORISK
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1238316
SAN DIEGO COUNTY
MY COMM. EXP. OCT 17, 2003

Place Notary Seal Above

--- **OPTIONAL** ---
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: __Affidavit of Birth certificate__

Document Date: __5-4-00__       Number of Pages: __1__

Signer(s) Other Than Named Above: __N/A__

**Capacity(ies) Claimed by Signer**
Signer's Name: __Ali Said Dawaloh__
☒ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: __himself__

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827



THOLIC CHARITIES

*Refugee and Immigrant Services*

## AFFIDAVIT OF BIRTH CERTIFICATE

NAME IN FULL: _Mohdar Mohamed Abdullah_

SEX: ☒ Male ☐ Female   DATE OF BIRTH: _08/05/78_ PLACE OF BIRTH: _Somalia_

FATHER'S FULL NAME: _Mohamed Abdullah_

FATHER'S OCCUPATION: _Deceased_

FATHER'S PRESENT ADDRESS: _____

MOTHER'S FULL NAME: _Fatum Ahmed._

MOTHER'S OCCUPATION: _House wife_

MOTHER'S PRESENT ADDRESS: _Nairobi, Kenya_

MOTHER'S MARITAL STATUS: _Married_

TESTIMONY:

I, _Aliwe, Ahmed Sharif_, a _Refugee (Resident)_ (immigration status), born

on _01 / 01/62_, in the country of _Somalia_, assigned the alien number

A# _71714238_, do hereby affirm that all the information as stated above for

_Mohdar Abdullah_ whose relationship to me is that of _friend_, is true and

correct to the best of my knowledge.

State of California
County of San Diego

Signed: _Ahmed Aliwe_

On _____/____/____, before me, the undersigned, a Notary Public in and for this state, personally

appeared _____ known to me or satisfactorily proven, to be the person whose name is

subscribed to within instrument and acknowledged that he/she executed the same.

SEAL

_See attached Acknowledgment form_
NOTARY PUBLIC

CCSD/IMG: 01(11/15/93)

Catholic
Charities
A COMMUNITY SERVICE MINISTRY

Ex. 22  (3 of 5)

4575 Mission Gorge Place, Suite A, San Diego, CA 92120 • Tel. (619) 287-9454 • Fax (619) 287-6328

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ___San Diego___ } ss.

On __5-3-00__, before me, ___Ryan E. McGorisk___,
    Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared ___Ahmed Shariff Aliwe___,
                                    Name(s) of Signer(s)

☐ personally known to me

☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
        Signature of Notary Public

**OFFICIAL SEAL**
RYAN E. MC GORISK
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1238316
SAN DIEGO COUNTY
MY COMM. EXP. OCT 17, 2003

RBG-1

Place Notary Seal Above

——————— **OPTIONAL** ———————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: ___Affidavit of Birth Certificate___

Document Date: ___5-3-00___                    Number of Pages: ___1___

Signer(s) Other Than Named Above: ___N/A___

**Capacity(ies) Claimed by Signer**
Signer's Name: ___Ahmed Shariff Aliwe___

☒ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: ___himself___

| RIGHT THUMBPRINT OF SIGNER |
| --- |
| Top of thumb here |

© 1997 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402          Prod. No. 5907          Reorder: Call Toll-Free 1-800-876-6827

**Ex. 22  (4 of 5)**


NAME: Mohdar  Mohamed Abdullah

DATE OF BIRTH: 08-05-79

PLACE OF BIRTH: Barawe, Somalia.


JANUARY 7,1999.-


## TO WHOM IT MAY CONCERN

This is to certify thatMohdar  Mohamed Abdullah is a Somalia National(8)
who has fled from the civil war in Somalia. He was born on 08-5-1979
in Barawe, Somalia. Any assistance provided is highly appreciated .
Horn of Africa Community in North America is the largest non-profit
Organization that serves East African refugees. These include Somalis,
Ethiopians, Kenyans, Eretreans and Djibutians.-
Thank You.


                              Sincerely,

                       ABDULLAHI JAMA AMIR
                       V/Chairman of the Board

# In The Name Of The Merciful God

### Dr.
## Mohamed El Mohdar Zeid
BSc. General Medicine & Surgery
M.D. Gastreonterology & Endoscopy
Bologna & Home University

Name:                                          Date: March 20 1999
RP.

Dear Son Mohdar Mohamed Zied,

God bless you. Hope from God that you will be successful in your study and give you the best of health.

I am sending you this letter with a check and the fees that the universities have sent us. As for you being not set in your resident I ask, the DHL company to deliver this letter

---

Our health condition is good, our financial is bad, we ask from the great board to release our dignity soon God will hear.

$\longrightarrow$

Clenic Bab El Xemen building Al Mahdar Zeid
Telephone #   249239
                    235271

Clinic Times: From: 4:30pm To: 9pm

Nadia Terzibachian a certified Arabic interpreter, licensed by the state of California in 1982 with license #44027382, translated this document.

بسم الله الرحمن الرحيم

**Dr.**
**Mohamed El Mohdar Zeid**
BSc. General Medicine & Surgery
M D. Gastroenterology & Endoscopy
Bologna & Rome University

الدكتور محمد المحضار زيد
بكالوريوس طب وجراحة
جامعة بولونيا
دكتوراه في الأمراض الباطنية
ومناظير الجهاز الهضمي
جامعة روما

الاسم :          التاريخ : ٢/٧/٩٩٩

Rp.

والدي العزيز المحضار محمدزيد احفظكم
اعتني بهم ان توصيك في دراسته
و تتبعك لعهده وبصاحة .
العفو الى هذه اريته مع اهله والبعثة
الذا يسكى الكلية ، نظراً لسم اسعاره ولمكن
بلديته هم شرب DHL ان يستطيع ربما يعلمهم
١ محمـ
خوفنا الصحة صحة والمادة سنته وتعيني لعيه
جيد الم يعتمل انه يصلح في مناظرياً انقطع

العيادة : باب اليمن عمارة المحضار زيد
تلفون ٢٤٩٢٣٩/٢٣٠٢٧١
المواعيد تـ من ٤ /٣٠ - الى ٩ مساءً

طيب . لذلك اذا رجع اذا انقطعت طلبنا

أنا نرسل له فلوس من طرفه

أنا نرسل WESTERN UNION من العين

١ البنك

هذا والله نعطيك ورقة

ونرسلك نعم الشرط سلام

وأرجع ما لا تقصد فرصه وقرأت

بقوت دائما وانا حادم نرسل

للدفع نبعث دائما طبعاً لنا

ودمتم والسلام

من الرضا ...

*Illegible word.* For that if you received the money to send me $1000 by Western Union, International Bank of Yemen. God bless you, keep you safe, keep his eye on you and guide you. I hope that you will not forget your religious duties, and always read the holy Koran. With Gods wish we will send you the rest of the things through the mail.

Your Father
Mohdar Mohammad Al-Mohdar Zied

NADIA TERZIBACHIAN, A CERTIFIED ARABIC INTERPRETER, LICENCED BY THE STATE OF CALIFORNIA IN 1982 WITH LICENCE # 44027382, TRANSLATED THIS DOCUMENT.

00319

1 ‖ CAROL C. LAM
‖ United States Attorney
2 ‖ ROBERT H. PLAXICO
‖ Assistant U. S. Attorney
3 ‖ California State Bar No. 054953
‖ Office of U.S. Attorney
4 ‖ Federal Office Building
‖ 880 Front Street, Room 6293
5 ‖ San Diego, California 92101-8893
‖ Telephone:  (619) 557-7157
6 ‖
‖ Attorneys for Respondents
7 ‖

8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11 ‖ MOHDAR ABDULLAH,                    )    Case No. 03cv2479-WQH(AJB)
‖ [A75-628-802],                       )
12 ‖                                     )
‖                                       )
13 ‖        ━    Petitioner,             )
‖                                       )
14 ‖    v.                               )    DECLARATION OF
‖                                       )    TERRENCE EMERY
15 ‖ JOHN ASHCROFT, Attorney General,    )
‖ TOM RIDGE, Secretary of the          )
16 ‖ Department of Homeland Security,    )
‖ et al.,                              )
17 ‖                                     )
‖        Respondents.                   )
18 ‖                                     )

19      I, Terrence Emery, state and declare as follows:

20      1.   I am the Assistant Officer in Charge of the Otay Mesa

21 Detention facility and am a Detention and Deportation Officer of the

22 Bureau of Immigration and Customs Enforcement, a component of the

23 Department of Homeland Security.

24      2.   Mohdar Abdullah is detained at the Otay Mesa facility.

25      3.   On or about September 10, 2003, I talked with Mr. Abdullah.

26 He told me that the previous evening he had had a telephone

27 conversation with his mother who told him that she had been born in

28 ///

                        Ex. 24 (1 of 2)

1 | a part of Yemen called Abbyan-al-Baidha, had been taken to Djibouti

2 | as an infant, and did not have a birth certificate.

3 |     I declare under penalty of perjury that the foregoing is true and

4 | correct to the best of my knowledge. Executed on April 15, 2004, in

5 | San Diego, California.

6

7

TERRENCE EMERY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

03cv2479

Ex. 24 (2 of 2)

*United States Department of Justice*
*Executive Office for Immigration Review*
*United States Immigration Court*
*East Mesa Detention Facility*
*446 Alta Road*
*San Diego, CA 92158*

Bond Redetermination
A75-628-802
In the Matter of Al-Mohdar Mohamed Al-Mohdar Zeid
a/k/a Mohdar Mohamed Abdullah

Respondent is a native and citizen of Yemen who entered the United States from Canada on December 16, 1998 as a B1/B2 visitor. Respondent was authorized to remain in the United States for a temporary period, until June 14, 1999. On December 24, 1998, before the expiration of his authorized stay, respondent filed an application for political asylum (Form I-589) with the Immigration and Naturalization Service (INS). The INS granted respondent's application for political asylum on April 14, 1999.

On July 19, 2002, respondent pled guilty to a violation of 18 U.S.C. 1001 in that:

> *On or about February 23, 1999, . . .Mohdar Mohamed Abdullah, did knowingly and willfully make and caused to be made a false, fictitious, and fraudulent material statement and representation, to wit, that he last entered the United States without inspection on December 7, 1998, through New York, New York, on an Italian passport, which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada . . ..*

The maximum penalty for a violation of 18 U.S.C. 1001 is a term of imprisonment for not more than five years. On October 2, 2002, respondent was sentenced to six months in federal custody. [1]

Respondent was subsequently released into the custody of the INS and served with a Notice to Appear in removal proceedings pursuant to Sections 237(a)(1)(B) (nonimmigrant overstay) and 237(a)(2)(A)(i)(conviction for crime involving moral turpitude) of the Immigration and Nationality Act, as amended. The INS is holding respondent in custody, without bond. The Notice to Appear was filed with the United States Immigration Court in San Diego, California, on October 8, 2002. This Court has jurisdiction of these removal proceedings pursuant to 8 C.F.R. 3.14(a)(2002).

On October 3, 2002, the INS served respondent with a Notice of Intent to Terminate

---

[1] As part of respondent's plea agreement, he is obligated to plead guilty to a violation of California Penal Code § 647(a) in that on September 10, 2001, he took a minor, Wanda V. to a motel in San Diego, California, where he solicited her to engage in lewd and dissolute conduct, to wit: sexual intercourse. *Ex. 3, p.36*

000002

Asylum Status on the basis that he had applied for asylum status as a native and citizen of Somalia who had suffered persecution in Somalia based upon his membership in a particular social group. The INS also alleged that respondent's asylum application contained false statements claiming that he had entered the United States through the State of New York, without inspection, on December 7, 1998, using an Italian passport.

On December 12, 2002, respondent requested a bond redetermination hearing pursuant to Section 236 of the Act. Respondent has argued that a reasonable bond should be set by the Court because he is not a flight risk and is not a danger to the community. *Kim v. Ziglar, 276 F.3d 523 (9th Cir. 2002)*

This cases involves issues touching and concerning the credibility of respondent's citizenship and nationality. It also raises issues concerning respondent's identity, as well as his motives and rationale for entering the United States as a visitor from Yemen, and then applying for asylum as a Somali refugee. It is undisputed that respondent has been convicted for making false, fictitious, and fraudulent material statements in connection with his application for political asylum. It is also undisputed that respondent will enter a guilty plea to a violation of California law, as it relates to his relationship to an unnamed minor.

The INS has presented the Court with sufficient evidence justifying the continued detention of respondent. Having considered the entire record (including exhibits 1 through 5 and the arguments of counsel) the Court finds that respondent is both a flight risk and a potential danger to the community. *Id.* Until important questions with respect to respondent's presence in the United States have been answered to the satisfaction of the Department of Justice, the government is entitled to hold respondent without bond [2].

Dated this 12rd day of March, 2003

Zsa Zsá DePaolo
United States Immigration Court Judge

---

[2] Respondent, who is not a legal permanent resident, appears to be subject to the mandatory custody provisions pursuant to § 236(c)(1)(A) of the Act. Respondent's conviction for a violation of 8 U.S.C. 1001 renders him inadmissible to the United States for having committed an offense covered in Section 212(a) of the Act.

FILED

03 JUN -2 PM 3:52

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KININE KIM, | CASE NO.   02CV1524-J (LAB)<br>A25-289-140 |
|                                   Petitioner, | ORDER GRANTING MOTION<br>FOR RECONSIDERATION |
| v. |  |
| JOHN ASHCROFT, ET AL. |  |
|                                   Respondents. |  |

On August 5, 2002, Petitioner Kinine Kim, represented by counsel, filed his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. He challenged his custody by the Immigration and Naturalization Services ("INS") alleging that he has been indefinitely detained in violation of 8 U.S.C. § 1231(a)(6) and sought release from custody under the conditions of supervision set out in 8 U.S.C. § 1231(a)(3). The Court initially denied the Petition without prejudice as to refiling and later granted the refiled Petition and ordered that Petitioner be released on bond. Respondent timely filed its Motion to Alter or Amend the Judgment pursuant to Rule 59(a), (e). For the reasons set forth below, the Motion is granted, the renewed Petition for Writ of Habeas Corpus is denied and Respondent may continue to detain Petitioner. The Court grants Petitioner leave to refile his petition in six months if he has not been removed at that time and is able to plead facts sufficient to satisfy *Zadvydas v. Davis*,

- 1 -

02cv1524-J (LAB)

1 | 533 U.S. 678 (2001).

2 | *Background*[1]

3 |     Petitioner is a Cambodian national and refugee from Thailand who became a permanent
4 | resident on February 10, 1983. The state of California convicted him of assault with a firearm
5 | upon a person in violation of the California Penal Code § 245A(2); second degree burglary in
6 | violation of California Penal Code § 459; and driving with a suspended/revoked driver's
7 | license and failing to pay the $792 fine. When he filed his Petition on August 5, 2002, he had
8 | been in the custody of the Immigration and Naturalization Service ("INS") since November
9 | 19, 2001 and had been the subject of a final order of removal since January 17, 2002.
10 | Petitioner's January 22, 2002 request for a travel document from the Cambodian government
11 | was denied on January 25, 2002. The Cambodian government denied the application because
12 | it had no repatriation agreement with the United States. On March 22, 2002, the United States
13 | and the Cambodian government signed a "Memorandum Between the Government of the
14 | United States and the Royal Government of Cambodia for the Establishment and Operation
15 | of a United States-Cambodia Joint Commission on Repatriation," (hereinafter
16 | "Memorandum"), providing procedures for the repatriation of each other's nationals to their
17 | home state. After the Memorandum was signed, Petitioner filed a new application for travel
18 | documents on April 8, 2002. He was interviewed by Cambodian officials in early October
19 | 2002. At the time Petitioner filed, the Cambodian government had not decided whether to
20 | repatriate him.

21 |     In its Answer to the Petition, Respondent requested a stay of the proceedings pending
22 | the INS' review of Petitioner's circumstances to determine if there was a significant likelihood
23 | of removal in the reasonably foreseeable future pursuant to interim rules that have since been
24 | codified at 8 C.F.R. § 241.13. The Court found that although the six month period during
25 | which detention is presumptively reasonable had passed, that Petitioner had not met his burden
26 | of showing good reason why there is no significant likelihood of removal in the reasonably

27 |
28 |    [1]   These facts are set forth in the Court's Order Denying Petition Without Prejudice and
are reiterated here for convenience.

- 2 -

02cv1524-J (LAB)

1  foreseeable future. The Court denied the Petition without prejudice as to refiling if, within 45

2  days, the Government of Cambodia had not responded or had denied repatriation.

3  　　　Petitioner renewed his Petition after the 45 days had passed. This time, the Court

4  granted the Petition, stating that although the Untied States and Cambodian governments were

5  cooperating to repatriate Cambodian nationals detained by the INS, that

6  　　　　　Respondent ha[d] not made a sufficiently strong showing that Petitioner's
　　　　　repatriation [was] likely in the foreseeable future given that Petitioner ha[d] been
7  　　　　　in INS custody since November 19, 2001 and that his order of removal ha[d]
　　　　　been final since January 17, 2002.
8

9  *Order Granting Petition for Writ of Habeas Corpus* (March 3, 2003) at 2.

10  　　　Respondent raises two distinct but related issues, contending that the Court

11  impermissibly shifted the burden of proof to the Respondent and that application of the correct

12  standard requires that the Petition be denied because "the passage of time alone is not

13  sufficient to require the release of an alien detainee." *Mem. of P & A.* at 2. According to

14  Respondent, the burden remains with the alien to *prove* that his removal is not significantly

15  likely in the foreseeable future." *Id.* (emphasis added). The Court acknowledges that its March

16  3, 2003 Order imprecisely recited the standard, but disagrees with Respondent's contentions

17  that the alien must *prove* that removal is not significantly likely in the foreseeable future and

18  that the length of detention alone is always insufficient to show that there is good reason to

19  conclude that there is no significant likelihood of removal in the reasonably foreseeable future.

20  The Court nonetheless agrees with Respondent that continued detention is authorized under

21  *Zadvydas*.

22  　　　　　　　　　　　　*Discussion*

23  　　　The Attorney General has the discretion to arrest and detain certain classes of aliens,

24  including those who like Petitioner, who are removable because they have been convicted of

25  specified crimes, pending a decision on whether the alien is to be removed from the United

26  States. 8 U.S.C. § 1226(a)(2), (c). Generally, an alien must be removed within 90 days of an

27  issuance of a final order of removal. 8 U.S.C. § 1231(a)(1). However, "under no circumstance

28  during the removal period" shall the Attorney General release an alien who has been found

- 3 -

03ev1524-J (LAB)

inadmissible because he has committed certain crimes specified and defined in sections 1182(a)(2), (3) or section 1227(a)(2), (a)(4)(B). 8 U.S.C. § 1231(a)(2). In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the United States Supreme Court rejected the Government's argument that section 1226(a)(2) authorized indefinite detention and read into the section as implicitly limiting an alien's post-removal period detention to a period reasonably necessary to bring about that alien's removal from the United States. *Id.* at 690.

Contrary to Respondent's argument, *Zadvydas* does not impose on the alien the burden of *proving* that his removal is not significantly likely in the foreseeable future. Rather, *Zadvydas* creates a burden-shifting procedure setting forth the burdens of proof for when removal is reasonably foreseeable. Once the presumptively reasonable six-month period of detention has expired, the alien must "provide [ ] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701; *Xi v. United States I.N.S.*, 298 F.3d 832, 840 (9th Cir. 2002). *Zadvydas* thus sets forth what the alien must plead and does not impose an evidentiary burden. *Fahim v. Ashcroft*, 227 F. Supp.2d 1359 (2002)(holding that petitioner did not allege a significant likelihood that his removal is unlikely in the foreseeable future). Once the alien has provided "good reason," the Respondent "must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701; *Xi*, 298 F.3d at 840. The burden is therefore on Respondent to produce admissible, credible evidence concerning the likelihood of removal in the foreseeable future. While the Court did not specifically define "reasonably foreseeable future," it did set some parameters that guide our understanding of the phrase. The alien must allege something more than that there is no pending repatriation agreement and must consider the likelihood of successful future negotiations, but the alien does not have to show "the absence of *any* prospect of removal." *Id.* at 702 (emphasis in original).

The original Petition alleged that Petitioner had been in custody for longer than the presumptively reasonable six month period and that it was not certain that he would be removed in the reasonably foreseeable future because the Cambodian government had denied travel documents for Cambodian detainees in San Diego because they, like Petitioner, were

- 4 -

1 born in Thailand, and because Cambodian government officials had informed Petitioner during
2 his interview that he was not likely to receive travel documents because he was born in
3 Thailand. The Petitioner lodged documents showing that the other Cambodians were denied
4 travel documents for reasons other than those alleged by Petitioner, and the Court found that
5 the alleged statements by the Cambodian government officials were inadmissible hearsay.
6 Respondent produced evidence showing that the United States and Cambodian governments
7 were making progress in arranging for the repatriation of Cambodian nationals. Specifically,
8 the two countries had entered into the Memorandum on March 22, 2002. Moreover, Petitioner
9 had been interviewed by Cambodian government officials. The Memorandum had already
10 resulted in the removal of a number of Cambodian nationals. Thus, there were no institutional
11 barriers to repatriation.

12 The Court denied the original Petition subject to renewal because "Petitioner has not
13 shown good reason why there is no significant likelihood of removal in the reasonably
14 foreseeable future." *Order Denying Petition for Writ of Habeas Corpus* (Dec. 6, 2002) at 5.
15 The amended Petition, filed on February 4, 2003, alleged that the Cambodian government had
16 still not responded to Respondent's request for travel documents for the Petitioner and that
17 Petitioner remained in custody. In other words, Petitioner argued that the passage of time alone
18 demonstrated that Respondents were not able to effectuate his repatriation in the reasonably
19 foreseeable future.

20 In response to Petitioner's allegations in the amended Petition, Respondent filed an
21 amended Return and new evidence in the form of a declaration by an INS official stating that
22 two additional groups of Cambodians had in fact been repatriated since the original Return was
23 filed. Respondent argued that the renewed Petition should be denied because "the process is
24 functioning and . . . there is [no] evidence that Petitioners in particular have been rejected by
25 the Cambodian government." *Amended Return* at 4. In a footnote, Respondent stated that
26 another flight had been scheduled to Cambodia, "demonstrating that the March 22, 2002
27 memorandum is producing significant results in terms of an established removal process." *Id.*
28 n. 4.

-5-

1     In *Fahim v. Ashcroft*, 227 F. Supp.2d 1359 (2002), another district court held that the
2 petitioner had not met his burden of alleging a significant likelihood that his removal is
3 unlikely in the foreseeable future. The facts of that case are strikingly similar to those here.
4 The petitioner "relie[d] on the bare fact that the Egyptian consulate ha[d] not yet issued any
5 travel documents for him despite the efforts of the INS to secure them" and on his family's
6 statement that the Egyptian consulate had not responded to their inquiries. *Id.* at 1365. The
7 petitioner alleged "that it is unknown whether the Egyptian government will ever issue the
8 requested travel documents." *Id.* The district court found that those bare allegations were
9 speculative and insufficient because they did not include allegations of institutional or
10 individual barriers to repatriation. Evidence showed that Egypt was in fact repatriating
11 nationals and "the lack of visible progress since the INS requested travel documents from the
12 Egyptian government" was not sufficient to show no significant likelihood of removal in the
13 foreseeable future.

14     In reaching its conclusion, the *Fahim* court relied heavily on the rationale set forth in
15 an opinion issued from this district. *See Khan v. Fasano*, 194 F. Supp.2d 1134 (S.D. Cal.
16 2001)(Keep, J.). *Khan* held that new information presented in support of a motion for
17 reconsideration showed that progress was being made for the petitioner's deportation and that
18 institutional barriers were therefore not present. *Id.* at 1136. The court rejected petitioner's
19 argument that the lack of visible progress showed that there are individual barriers. In the
20 court's view, the lack of visible progress "simply show[ed] that the bureaucratic gears of the
21 INS are slowly grinding away. Progress, however slow, is being made on his individual case:
22 travel documents have been requested and there is scheduled a meeting with the Pakistani
23 Consulate to discuss [petitioner's] status." *Id.* at 1137. The court also noted that the newly-
24 formed HQPDU, as a specialized unit within the INS, was entitled to significant deference
25 from the judiciary." *Id.*
26 ///
27 ///
28 ///

- 6 -

02cv1524-J (LAB)

Both the *Khan* and *Fahim* courts contrasted the facts of their cases with those of the petitioners in *Zadvydas*. In *Zadvydas*, the Supreme Court addressed a situation where the petitioners were nationals of countries with which the United States had no repatriation agreement and the petitioners "faced detention that appeared to be 'indefinite and potentially permanent.'" *Khan*, 194 F. Supp.2d at 1136; *Fahim*, 227 F. Supp.2d at 1366. There was, therefore, "virtually no hope of repatriating [them] back to [their] native land[s]." *Fahim*, 227 F. Supp.2d at 1366.

This Court agrees with the *Khan* and *Fahim* courts that evidence of progress, albeit slow progress, in negotiating a petitioner's repatriation will satisfy *Zadvydas* until the petitioner's detention grows unreasonably lengthy.[2] At some point in time, however, lengthy detention demands almost immediate repatriation or release on bond. What "counts as the 'reasonably foreseeable future'" shrinks as the period of prior postremoval confinement grows. *Zadvydas*, 533 U.S. at 401. While the Court is unable to say precisely when detention becomes unreasonably lengthy given the degree of certainty regarding removal, the Court is confident that Petitioner's detention has not yet reached that point. Petitioner has been in custody following his state prison sentence since November 19, 2001, or approximately one year and four months at the time the Court granted the Petition. Petitioner's one year and four month detention does not violate *Zadvydas* given Respondent's production of evidence showing that the United States and Cambodian governments' negotiations are in progress and there is, therefore, reason to believe that removal is likely in the foreseeable future.

### Conclusion

For the reasons set forth below, the Motion for Reconsideration is GRANTED, the renewed Petition for Writ of Habeas Corpus is DENIED and Respondent may continue to detain Petitioner. The Court grants Petitioner leave to refile his petition six months from the

---

[2]     The Court notes that the *Khan* court concluded that the petitioner had failed to meet his burden of providing good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. *Khan*, 194 F. Supp.2d at 1137. This Court believes that conclusion misstates the petitioner's burden, which is one of pleading not of proving.

- 7 -                                                    02cv1524-J (LAB)

1 | date stamped "Filed" on this Order if he has not been removed at that time and is able to plead

2 | facts sufficient to satisfy *Zadvydas v. Davis*, 533 U.S. 678 (2001).

3 |     **IT IS SO ORDERED.**

4 | DATED: June 2, 2003

5 |                               NAPOLEON A. JONES, JR.
                                United States District Judge

6 |

7 | cc:    All Parties

8 |    Robert Plaxico
   Office of the United States Attorney

9 |    Federal Office Building
   880 Front Street room 6293

10 |    San Diego California 92101-8893

- 8 -

02cv1524-J (LAB)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ISSAJAN OSMAN,                          )    Case No. 03cv2582 J(NLS)
[A27-279-134],                          )
                                        )
                    Petitioner,         )
                                        )
        v.                              )    CERTIFICATE OF SERVICE
                                        )
TOM RIDGE, Secretary of the             )
Department of Homeland                  )
Security, et al.,                       )
                                        )
                    Respondents.        )
_____)

STATE OF CALIFORNIA  )
                     )  ss.
COUNTY OF SAN DIEGO  )

        IT IS HEREBY CERTIFIED THAT:

        I, Patricia C. Terrado, am a citizen of the United States over the
age of eighteen years and a resident of San Diego County, California;
my business address is 880 Front Street, Room 6293, San Diego,
California 92101-8893; I am not a party to the above-entitled action;
and

        On February 6, 2004, I deposited in the United States mail at
San Diego, California, in the above-entitled action, in an envelope
bearing the requisite postage, a copy of **GOVERNMENT'S RETURN** addressed
to **Issajan Osman, A27-279-134, BICE El Centro Detention Center, 1115
North Imperial Avenue, El Centro, CA 92243; and Lori B. Schoenberg,
225 Broadway, Suite 900, San Diego, CA 92101,** the last known address,
at which place there is delivery service of mail from the United States
Postal Service.

        I declare under penalty of perjury that the foregoing is true and
correct.  Executed on February 6, 2004.


                                        _Patricia C. Terrado_____
                                        Patricia C. Terrado

31. (a) HAVE YOU OR ANYONE ACTING FOR YOU EVER INDICATED TO A U.S. CONSULAR OR IMMIGRATION EMPLOYEE A DESIRE TO IMMIGRATE TO THE U.S.? (b) HAS ANYONE EVER FILED AN IMMIGRANT VISA PETITION ON YOUR BEHALF? (c) HAS LABOR CERTIFICATION FOR EMPLOYMENT IN THE U.S. EVER BEEN REQUESTED BY YOU OR ON YOUR BEHALF?

(a) ☑ No ☐ Yes    (b) ☑ No ☐ Yes    (c) ☑ No ☐ Yes

32. ARE ANY OF THE FOLLOWING IN THE U.S.? (If YES, circle appropriate relationship and indicate that person's status in the U.S., i.e., studying, working, U.S. permanent resident, U.S. citizen, etc.)

HUSBAND/WIFE _____    FIANCE/FIANCEE _____    BROTHER/SISTER _____

FATHER/MOTHER _____    SON/DAUGHTER _____

33. PLEASE LIST THE COUNTRIES WHERE YOU HAVE LIVED FOR MORE THAN 6 MONTHS DURING THE PAST 5 YEARS. BEGIN WITH YOUR PRESENT RESIDENCE.

| Countries | Cities | Approximate Dates |
|---|---|---|
| CANADA | | AUG/98 + PRESENT |

34. IMPORTANT: ALL APPLICANTS MUST READ AND CHECK THE APPROPRIATE BOX FOR EACH ITEM:

A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United States (except when a waiver is obtained in advance). Are any of the following applicable to you?

- Have you ever been afflicted with a communicable disease of public health significance, a dangerous physical or mental disorder, or been a drug abuser or addict? . . . . . . . . . . ☐ Yes ☑ No

- Have you ever been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or other such legal action? . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

- Have you ever been a controlled substance (drug) trafficker, or a prostitute or procurer? . . . . ☐ Yes ☑ No

- Have you ever sought to obtain or assist others to obtain a visa, entry into the U.S., or any U.S. immigration benefit by fraud or wilful misrepresentation? . . . . . . . . . . . . . . . ☐ Yes ☑ No

- Were you deported from the U.S.A. within the last 5 years? . . . . . . . . . . . . . . . . ☐ Yes ☑ No

- Do you seek to enter the United States to engage in export control violations, subversive or terrorist activities, or any unlawful purpose? . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☑ No

- Have you ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion under the control, direct or indirect, of the Nazi Government of Germany, or of the government of any area occupied by, or allied with, the Nazi Government of Germany; or have you ever participated in genocide? . . . . . ☐ Yes ☑ No

A YES answer does not automatically signify ineligibility for a visa, but if you answered YES to any of the above, or if you have any question in this regard, personal appearance at this office is recommended. If appearance is not possible at this time, attach a statement of facts in your case to this application.

35. I certify that I have read and understood all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my knowledge and belief. I understand that any false or misleading statement may result in the permanent refusal of a visa or denial of entry into the United States. I understand that possession of a visa does not entitle the bearer to enter the United States of America upon arrival at port of entry if he or she is found inadmissible.

DATE OF APPLICATION    10 Dec 1998

APPLICANT'S SIGNATURE

*Additional required question: If this application has been prepared by a travel agency or another person on your behalf, the agent should indicate name and address below, and the signature of individual preparing form.

**Are you a member or representative of a terrorist organization?** SIGNATURE OF PERSON PREPARING FORM ☐ Yes ☑ No

DO NOT WRITE IN THIS SPACE

GOOD WESTERN TIME

Ex. 27 (1 of 2)

149.1

PLEASE TYPE OR PRINT YOUR ANSWERS IN THE SPACE PROVIDED BELOW EACH ITEM.

**1. SURNAMES OR FAMILY NAMES** (Exactly as in Passport)

Zeid

**2. FIRST NAME AND MIDDLE NAME** (Exactly as in Passport)

Al-Mohdar Mohammed

**3. OTHER NAMES** (Maiden, Religious, Professional, Aliases)

Al-Mohelar

**4. DATE OF BIRTH** (Day, Month, Year)

05 August 1998

**8. PASSPORT NUMBER**

00076137

**5. PLACE OF BIRTH**

City, Province: AL-Baidha    Country: Yemen

**DATE PASSPORT ISSUED** (Day, Month, Year)

17 oct 1997

**6. NATIONALITY**

Yemeni

**7. SEX**

☒ MALE  ☐ FEMALE

**DATE PASSPORT EXPIRES** (Day, Month, Year)

17 oct 2003

**9. HOME ADDRESS** (Include apartment no., street, city, province, and postal zone)

1067, Baker Vale Dr. Ottawa

**10. NAME AND STREET ADDRESS OF PRESENT EMPLOYER OR SCHOOL** (Postal box number unacceptable)

Algonquin College - Woodroffe campus

**11. HOME TELEPHONE NO.**

(0613) 722-9221

**12. BUSINESS TELEPHONE NO.**

**13. COLOR OF HAIR**

Black

**14. COLOR OF EYES**

Black

**15. COMPLEXION,**

—

**16. HEIGHT**

176 cm

**17. MARKS OF IDENTIFICATION**

**18. MARITAL STATUS**

☐ Married  ☒ Single  ☐ Widowed  ☐ Divorced  ☐ Separated

If married, give name and nationality of spouse.

**19. NAMES AND RELATIONSHIPS OF PERSONS TRAVELING WITH YOU** (NOTE: A separate application must be made for a visa for each traveler, regardless of age.)

**20. HAVE YOU EVER APPLIED FOR A U.S. VISA BEFORE, WHETHER IMMIGRANT OR NONIMMIGRANT?**

☒ No
☐ Yes   Where? _____

When? _____ Type of visa? _____
☐ Visa was issued   ☐ Visa was refused

**21. HAS YOUR U.S. VISA EVER BEEN CANCELED?**

☒ No
☐ Yes   Where? _____

When? _____ By whom? _____

**22. Bearers of visitors visas may generally not work or study in the U.S. DO YOU INTEND TO WORK IN THE U.S.?** ☒ No ☐ Yes
If YES, explain.

**23. DO YOU INTEND TO STUDY IN THE U.S.?** ☒ No ☐ Yes
If YES, write name and address of school as it appears on form I-20.

**24. PRESENT OCCUPATION** (If retired, state past occupation)

Student

**25. WHO WILL FURNISH FINANCIAL SUPPORT, INCLUDING TICKETS?**

my father

**26. AT WHAT ADDRESS WILL YOU STAY IN THE U.S.A?**

San Diago - Califor

**27. WHAT IS THE PURPOSE OF YOUR TRIP?**

Visit

**28. WHEN DO YOU INTEND TO ARRIVE IN THE U.S.A?**

17 Dec 1998

**29. HOW LONG DO YOU PLAN TO STAY IN THE U.S.A?**

10 Days

**30. HAVE YOU EVER BEEN IN THE U.S.A?**

☒ No
☐ Yes   When? _____

For how long? _____

## NONIMMIGRANT VISA APPLICATION

COMPLETE ALL QUESTIONS ON REVERSE OF FORM

OPTIONAL FORM 156 (Rev. 8-93) PAGE 1
Department of State

SC156-108
PREVIOUS EDITIONS OBSOLETE

NSN 7540-00-139-0053

DO NOT WRITE IN THIS SPACE

B-1/B-2 MAX   B-1 MAX   B-2 MAX

OTHER 24649132 MAX

Visa Classification

MULT OR

Number Applications

MONTHS

Validity

L.O. CHECKED

ISSUED/REFUSED

ON 2/10   BY

UNDER SEC.   INA

REFUSAL REVIEWED BY

N!(T) 8/Aua/98

O/A 30/Aua/99  Algonquin College

Computer Engineering

Plans to finish Aprox. 2001

Father provides funds - USD 8600 -

Boo/month

Ex. 27 (2 of 2)



FILED

02 JUN 28 AM 11: 58

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

August 2001 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. __01CR3240-W__ |
| Plaintiff, | ) ) | I N D I C T M E N T **(Superseding)** |
| v. | ) ) | Title 18, U.S.C., Sec. 371; |
| AL-MOHDAR MOHAMED AL-MOHDAR ZEID (1), aka Mohdar Mohamed Abdullah, ABDULLAHI JAMA AMIR (2), ALI SAID DAWALEH (3), AHMED SHARIF ALIWE (4); | ) ) ) ) ) ) ) | Conspiracy; Title 18, U.S.C., Sec. 1546 - False Statement in Immigration Application; Title 18, U.S.C., Sec. 1001 - False Statements; Title 18, U.S.C., Sec. 2 - Aiding and Abetting |
| Defendants. | ) ) | |

The grand jury charges:

<u>Count 1</u>

Beginning at a date unknown to the grand jury and continuing up to and including July 24, 2001, within the Southern District of California, and elsewhere, defendants AL-MOHDAR MOHAMED AL-MOHDAR ZEID aka Mohdar Mohamed Abdullah, ABDULLAHI JAMA AMIR, ALI SAID DAWALEH, and AHMED SHARIF ALIWE, did knowingly and willfully combine, conspire, and agree together and with each other and with other persons unknown to the grand jury to knowingly commit offenses against the United

MGW:cks:San Diego
6/27/02

States, namely, to make false statements in immigration documents, in violation of Title 18, United States Code, Section 1546, and to make false statements to the Immigration and Naturalization Service, in violation of Title 18, United States Code, Section 1001.

## OVERT ACTS

In furtherance of said conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

1. On or about December 16, 1998, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, went to the United States Embassy in Ottawa, Canada, presented his Yemeni passport (No. 00076187), applied for and received a single entry B-2 visitor's visa to enter the United States.

2. On or about December 16, 1998, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, entered the United States at Los Angeles, California from Canada, as a B-2 visitor.

3. On or about December 24, 1998, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, filed an "Application for Asylum and for Withholding of Removal" [INS Form I-589] with the Immigration and Naturalization Service [INS], claiming to have entered the United States without inspection on December 7, 1998, through New York, New York.

//
//
//
//

2

4. On or about January 7, 1999, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, requested defendants ABDULLAHI JAMA AMIR, ALI SAID DAWALEH, and AHMED SHARIF ALIWE, to provide him with statements showing that he [Defendant AL-MOHDAR] was born in Somalia.

5. On or before January 7, 1999, in San Diego, California, defendant ABDULLAHI JAMA AMIR prepared and signed a letter, on Horn of Africa letterhead, claiming that defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in Somalia, and was fleeing the civil war in Somalia.

6. On or after January 7, 1999, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah submitted, and caused to be submitted, to the INS defendant ABDULLAHI JAMA AMIR's January 7, 1999, letter, on Horn of Africa letterhead claiming that defendant AL-MOHDAR was born in Somalia, and was fleeing the civil war in Somalia.

7. On or about February 23, 1999, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, stated to an INS Asylum Officer that he entered the United States without inspection on December 7, 1998, through New York, New York, using an Italian passport in the name of Franco de Pollo.

8. On or before May 3, 2000, in San Diego, California, defendant AHMED SHARIF ALIWE executed an "Affidavit of Birth Certificate," filed with defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah's Adjustment

3

1    Application (INS Form I485) claiming defendant AL-MOHDAR

2    MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was

3    born in Somalia.

4    9.   On or after May 3, 2000, in San Diego, California,

5    defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar

6    Mohamed Abdullah submitted, and caused to be submitted, to

7    the INS defendant AHMED SHARIF ALIWE's May 3, 2000,

8    "Affidavit of Birth Certificate," claiming defendant

9    AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed

10    Abdullah, was born in Somalia.

11    10.  On or before May 4, 2000, in San Diego, California,

12    defendant ALI SAID DAWALEH executed an Affidavit of Birth

13    Certificate filed with defendant AL-MOHDAR MOHAMED

14    AL-MOHDAR ZEID's, aka Mohdar Mohamed Abdullah's Adjustment

15    Application (INS Form I485) claiming defendant AL-MOHDAR

16    MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was

17    born in Somalia.

18    11.  On or after May 4, 2000, in San Diego, defendant AL-MOHDAR

19    MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah

20    submitted, and caused to be submitted, to the INS defendant

21    ALI SAID DAWALEH's May 4, 2000, "Affidavit of Birth

22    Certificate," claiming defendant AL-MOHDAR MOHAMED

23    AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, was born in

24    Somalia.

25    //

26    //

27    //

28    //

12. On or about May 5, 2000, in San Diego, California, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, filed an Application to Register as a Permanent Resident [INS Form I-485], claiming to have entered the United States without inspection on December 7, 1998.

All in violation of Title 18, United States Code, Section 371.

### Count 2

On or about December 24, 1998, in the Southern District of California, the defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly present to the Immigration and Naturalization Service an application required under the immigration laws, and regulations prescribed thereunder, to wit, an application for asylum and withholding of removal [Form I-589], which contained a statement, to wit, that he last entered the United States without inspection on December 7, 1998, through New York, New York; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1546(a).

### Count 3

On or about February 23, 1999, in the Southern District of California, in a matter within the jurisdiction of Immigration and Naturalization Service, an agency of the United States, defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly and willfully make and caused to be made a false, fictitious, and fraudulent material statement and representation, to wit, that he last entered the United States without inspection on

5

December 7, 1998, through New York, New York, on an Italian passport; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1001.

## Count 4

On or about May 5, 2000, in the Southern District of California, the defendant AL-MOHDAR MOHAMED AL-MOHDAR ZEID, aka Mohdar Mohamed Abdullah, did knowingly present to the Immigration and Naturalization Service an application required under the immigration laws, and regulations prescribed thereunder, to wit, an Application to Register as a Permanent Resident [INS Form I-485], which contained a statement, to wit, that he last entered the United States without inspection on December 7, 1998; which the defendant then and there knew was false, in that in truth and in fact he entered the United States on December 10, 1998, from Canada, on a Yemeni passport with a valid United States B-2 visitor's visa; in violation of Title 18, United States Code, Section 1546(a).

DATED: June 28, 2002.

A TRUE BILL:

_____
Foreperson

PATRICK K. O'TOOLE
United States Attorney

By: _____
     MICHAEL G. WHEAT
     Assistant U.S. Attorney

6

1  CAROL C. LAM
   United States Attorney
2  ROBERT H. PLAXICO
   Assistant U. S. Attorney
3  California State Bar No. 054953
   Office of U.S. Attorney
4  Federal Office Building
   880 Front Street, Room 6293
5  San Diego, California 92101-8893
   Telephone: (619) 557-7157
6
   Attorneys for Respondents
7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  MOHDAR ABDULLAH,              )   Case No. 03cv2479-WQH(AJB)
    [A75-628-802],                )
12                                )
                                  )
13          Petitioner,           )
                                  )
14      v.                        )   DECLARATION OF
                                  )   DANIEL GONZALEZ
15  JOHN ASHCROFT, Attorney General,  )
    TOM RIDGE, Secretary of the   )
    Department of Homeland Security, )
16  et al.,                       )
                                  )
17          Respondents.          )
                                  )
18  _____)

19      I, Daniel Gonzalez, state and declare as follows:

20      1.  I am employed as a Special Agent for the Federal Bureau of

21  Investigation and have been so employed for fourteen years.  I am

22  currently assigned to the San Diego Division and investigate a variety

23  of criminal offenses, particularly Public Corruption and Terrorism.

24      2.  I was involved in terrorism investigations in the aftermath

25  of the September 11, 2001 hijackings.

26      3.  On May 14, 2002, I interviewed Samir Abdoun, an alien who

27  it had been determined had been acquainted with Mohdar Abdullah in the

28  time before and just after the 9/11 events.  Abdoun was interviewed

1  in the presence of his attorney. Abdoun had previously pled guilty
2  to immigration and Social Security fraud.

3      4.   Abdoun told me that he had seen Abdullah with a Yemeni
4  passport and that he had actually held the passport and seen that it
5  was issued by Yemen. Abdoun further told me that after September 11,
6  2001, he saw Abdullah take the passport from a room at an apartment
7  on Saranac Street in San Diego. Abdoun told me that Abdullah told him
8  he was afraid the FBI would find the passport and discover he was
9  Yemeni, not Somalian. He further told Abdoun he was going to destroy
10 the passport.

11     I declare under penalty of perjury that the forgoing is true and
12 correct to the best of my knowledge. Executed on April 15, 2004, in
13 San Diego, California.

14

15                              DANIEL GONZALEZ

16

17

18

19

20

21

22

23

24

25

26

27

28



**Law No. 6 of 1990 on Yemeni Nationality**

| | |
|---|---|
| **Date of Entry into Force:** | August 1990 |
| **Comments:** | This is an unofficial translation. The Law has been amended on 5 March 2003 in relation to Article 10 for granting the Yemeni nationality to the children of a Yemeni divorced female who was previously married to a foreigner. This amendment is not taken into account in the present translation. |

In the name of the people

Whereas the President of the Presidency Council

- In view of the Agreement eatablishing the Yemeni Republic,

- In view of the Constitution ot the Yemeni Republic.

Whereas the Council of Deputies and the Council of the Presidency did adopt,

The President of the Presidency Council does hereby promulgate the Law of which the following is the text:

**CHAPTER ONE - Title and Definitions**

**Article (1)**

a - This Law shall be known as the "Yemeni Nationality Law".

b - The following terms and expressions shall have the meanings listed against each of them, unless the context indicates otherwise:

1 - A Yemeni: A person who enjoyes Yemeni Nationality.

2 - A foreigner: A preson who does not enjoy this Nationality.

3 - Age of Majority: eighteen full calendar years.

4 - The Minister: the Minister of the Interior

5 - Yemeni Nationality: Nationality of the Yemeni Republic.

**CHAPTER TWO - Nationality Acquisition**

**Section I - Nationality by Birth or Nationality by Origin**

Ex. 30 (1 of 8)

## Article (2)

Yemenis are: Those settled in Yemen who will have resided in the country for at least fifty calendar years by the time this Law enters into effect. The residence of ancestors shall be considered complementary to the residence of blood descendants and wite when they have the intention to settle.

## Article (3)

The following shall enjoy Yemeni Nationality:

a) Anyone born to a Yemeni father who enjoys Yemeni Nationality.

b) Anyone born in Yemen to a mother of Yemeni Nationality and a father of unknown nationality or without one.

c) Anyone born in Yemen to a mother of Yemeni Nationality and to a legally unknown father.

d) Anyone born in Yemen to unknown parents. A foundling in Yemen shall be considered born in it unless there is proof to the contrary.

e) Any Yemeni emigrant who had Yemini Nationality when he left the homeland and who has not abandoned it on the basis of a written request in accordance with the Law, even if he has acquired the Nationality of the country in which he resides by force of Law.

## Section II - The Granting of Nationality

## Article (4)

The Yemeni Nationality may be granted to any of the following by presidential decision made on the recommendation of the Ministers:

a) Anyone born abroad to a mother holding Yemeni Nationality and a father of unknown nationality or without one, provided that he had taken normal legal residence in Yemen for ten cosecutive years prior to majority and that his application for Yemeni Nationality be made within one year of his attaining majority.

b) Anyone born in Yemen to two foreign parents, who has resided in Yemen until majority, who is acquainted with Arabic, is of sound mind, free of inpairments that render him a burden on society of good conduct and reputation, who has never been sentenced for a criminal offence or been the subject of a sentence restricting his freedom for an offence arising from violation of public order or public decency, unless he has been reinstated, and provided he applies for Yemeni Nationality within a year of attaining majority.

c) Anyone born in Yemen to a non-Yemeni father who himself was born in Yemen.

d) Any one who has rendered a great service to Yemen or to the Arab Nation,

e) Any one of Yemeni origin who applies for Yemeni Nationality after five years of residence provided there is proof that his paternal grand father was resident in Yemen and that he will surrender all other nationalities upon award of Yemeni Nationality.

**Ex. 30  (2 of 8)**

## Article (5)

The Yemeni Nationality may be granted, by presidential decision upon the recommendation of the Minister, to any Moslem Arab or foreigner for whom the provisions of the preceding article do not apply provided he meets the following conditions:

1- That he has attained the age of majority.

2- That he has taken on normal legal residence in the Republic for ten consecutive years.

3- That he be of good conduct and reputation, never sentenced for a criminal offense or had his freedom restricted for an offense against public order or public decency, unless reinstated.

4- That he be in possession of a legitimate means of earning his living.

5- That he be acquainted with Arabic.

6- That he be in possession of a particular proficiency or expert needed by Yemen. In such a case he may be exempted from the Arabic language requirement.

## Article (6)

The period provided for in item (2) of the preceding Article may be reduced to five consecutive years in the case foreigner who obtains permission from the Minister to settle in Yemen for purposes of obtaining its nationality for urgent reasons. Actual residence in Yemen for five years shall be required, as shall be the condition that he applies for nationality within three months following the completion of the five year residence requirement. Should he die before he has been granted Yemeni Nationality, his wife and minor children who were with him at the time he was granted the permission and continued to live with him until his death may benefit from residence and from the length of residence of the deceased.

## Article (7)

The number of persons to be proposed for Yemeni nationality every year may be restricted by presidential decision upon the recommendation of the Minister.

## Article (8)

The Minister shall form a committee to be charged with the task of nominating those to be granted nationality within the limits set annually.

## Article (9)

The wife of a nationalized Yemeni shall not acquire her husband's nationality by mere dependence, but must apply for it and publish her request in a local newspaper. Nationality is not granted till after the lapse of four years of married life from the date of the application, assuming that the Minister has raised no objections during the said period. The minor children of the naturalised Yemeni shall acquire Yemeni nationality by dependence by virtue of their father's nationality if their normal residence is with their father in Yemen. They have the option of choosing their original nationality during the year following their majority on condition that they reimburse the state for expenses incurred for their up-



bringing and education.

## Section III - Mixed Marriages

### Article (10)

A Yemeni woman who married a Moslem foreigner shall keep her Yemeni nationality unless she indicates her desire to surrender her nationality on or during her marriage and provided the laws of her husband's country allow her into its nationality. Should the marriage contract of such a woman be legally void, she shall continue to hold the Yemeni nationality.

### Article (11)

Any foreign woman who legally marries a yemeni shall enter into his nationality provided that the following conditions are met:

a) The filing with the Minister of on application for that purpose.

b) The lapse of four years on the date of the marriage.

c) the non-objection by the Minister, during the said four year period, to the entry of the woman into Yemeni nationality. Such an objection should take the form of a written and justified decision. The husband may submit his own objection in this regard to the minister during the same period.

### Article (12)

The acquisition by a Yemeni of a foreign nationality, when authorized, shall not entail that his Yemeni wife shall, ipso facto, lose her yemeni nationality, unless she explicitly declares her desire to acquire the new nationality of her husband. Minor children, however, shall not lose the Yemeni nationality if they acquire the new nationality of their father by dependence.

### Article (13)

A woman who has acquired Yemeni nationality by dependence arising from marriage in accordance with Article(11) above, shall not lose this nationality by the mere termination of the marriage, provided that the marriage shall have continued for four years following her acquisition of the Yemeni nationality.

## Section IV - Recovery and Restoration of Nationality

### Article (14)

A Yemeni woman who lost her Yemeni nationality in accordance with Articles (10 and 12) above may recover it on the termination of the marriage should she request it back.

### Article (15)

A Yemeni who has acquired a foreign nationality and abandoned his original nationality may recover his Yemeni nationality should he request it in writing.

## Article (16):

The Yemeni nationality may be restored, by presidential decision on the recommendation of the Minister, to any one from whom it had been withdrawn in accordance with the provisions of Articles (18,19 and 21) below.

## CHAPTER THREE - Withdrawal of Nationality

## Article (17)

In accordance with the Constitution, no Yemeni may be deprived of the Yemeni Nationality. It may however be withdrawn from those who have acquired it in accordance with the provisions of this Law.

## Article (18)

The Yemeni nationality may be withdrawn by presidential decision upon the recommendation of the Minister, from any person who come to it by acquisition, anytime during a five year period following acquisition in anyone of the following cases:

a) The case of a person convicted for a criminal offense or sentenced to restriction of freedom for a crime against public order or public decency, unless reinstated.

b) The case of a person who has interrupted his residence in Yemen for two consecutive years without reasons acceptable to the Minister.

c) If the acquisition of the Yemeni Nationlity was based on inaccurate testimonies or facts. In such a case withdrawal of the Yemeni nationality may be effected anytime proof is established.

d) When the competent authorities have sufficient indi**cations that a person** has engaged in the promotion of principles likely to destroy the political, or economic, or social system in the country, or has belonged to a foreign political organisation, or is engaged in attempts to undertake actions considered a threat to the security of the state and the safety of the country.

e) If the person has obtained a foreign nationality without the authorisation provided for in Article (22) below.

## Article (19)

The Yemeni nationality may be withdrawn **from anyone** who obtained it by acquisition for ony of the following reasons:

a) Entering into military service in a foreign country without prior authorization from the competent Yemeni authority.

b) Working for a foreign state or government which is in a state of nor with Yemen or with which diplomatic relations are severed.

c) Accepting employment abroad for a foreign country or for an international or foreign organisation and remaining in his post despite orders from the Yemeni Government to leave it.

Ex. 30 (5 of 8)



d) The passing of a final sentence convicting him of crimes affecting his loyalty to the country or involving treason for it.

## Article (20)

The provisions of the two preceding articles shall not apply in the case of persons enjoying Yemeni nationality on the basis of Articles (2,3,14, and 15) above.

## Article (21):

The withdrawal of Yemeni Nationality from a person who had acquired it, shall apply to this person alone unless the withdrawal decision provides for its withdrawal from those who may have acquired it by virtue of dependence on him.

## CHAPTER FOUR - General Provisions

### Article (22)

With due regard to the conditions allowing Yemenis to acquire a foreign nationality by virtue of dependence in accordance with the provisions of this Law, no holder of the Yemeni nationality shall be allowed to take on another nationality before obtaining permission from the Minister. Should a Yemeni acquire a foreign nationality in violation of the provisions of the above paragraph, he shall continue to be treated as holder of the Yemeni nationality in all respects.

### Article (23)

A Moslem foreigner who has acquired the Yemeni Nationality in accordance with Articles (4, 5, 6, 9, 11) shall not have the right to exercise the political rights designated for Yemenia till after fifteen years of his acquiring the Yemeni nationality. He, moreover. may not be elected to, or appointed in, any parliamentary body till after the lapse of the period specified above.

### Article (24)

All rulings in nationality questions shall be considered of public interest and shall be published in the Official Gazette.

### Article (25)

The provisions of all international treaties and conventions concluded or to be concluded on nationality questions shall be applicable only after ratification by the Council of Deputies.

### Article (26)

All decisions on the acquisition, withdrawal, or restoration of the Yemeni nationality made in accordance with the provisions of this Law shall be effective as of the date of issue unless the law specifies otherwise. They shall be published in the Gazette within fifteen days of their issue. This does not affect the rights of persons with good intentions.

### Article (27)

The burden of proof falls upon whomever claims to be holder of the Yemeni nationality or


submits that he is not.

## Article (28)

Marriage shall be instrumental in the acquisition or loss of nationality only if proven by a legal document issued by a competent authority.

## Article (29)

All declarations, notices of choice, papers and applications specified in this Law shall be submitted to the Minister by handing them, against a receipt, to the official concerned in the Department of Passports ond Nationality in the Governorate to which the applicant's place of residence belongs administratively. Abroad, they shall be delivered to the political representative or to the consuls. The Minister may authorize any other official to receive the declarations, notices, papers, and applications.

## Article (30)

The Minister shall give every person who has acquired the Yemeni nationality a Yemeni Nationality Certificate against a fee to be determined by the Minister. The certificate shall be legally valid unless annulled by a decision from the Minister stating his reasons. The certificate shall be given within a year of the date of the application for it. Refusal by the Minister to issue the certificate shall be considered a rejection of the application.

The Minister shall form committees for the study and proof of Yemeni nationality for those concerned. These committees shall resort in the performance of their duties to all means of verification.

## Article (31)

The courts shall be in charge of nationality disputes arising from the application of this Law.

## Article (32)

Without prejudice to any severer penalty provided for in any other laws, any one who commits perjury before the competent authorities for the purpose of proving nationality for himself or for others or for disproving it for himself or for others, or submits inaccurate papers, shall be liable to imprisoment for no less than one year and no more than two years or to a fine of no more than twenty thousand ryals.

## Article (33)

The Minister shall issue the decisions, regulations, and by-laws necessary for the implementation of this Law and consonant with its provisions.

## Article (34)

This Law shall enter into force from the date of its promulgation and shall be published in the Official Gazette.

The Presidency, Sanaa

5 Safar 1411 H

Ex. 30 (7 of 8)

26 August 1990 AD

Lt. General Ali Abdulla Saleh.

President of the Presidency Council

FEDERAL

DEFENDERS

OF

SAN DIEGO

INC.

The Federal Community
Defender Organization
for the Southern
District of California

April 6, 2004

Glen Beck                                    Via: Mail and Facsimile
Deportation Officer
Bureau of Immigration and Customs Enforcement
Otay Mesa Detention Facility
446 Alta Road, Suite 5400
San Diego, CA 92158

    **Re:**   **Mohdar Abdullah  A75-628-802**

Dear Mr. Beck:

I am writing to you regarding the above named detainee. On March 4, 2003, you served Mr. Abdullah with a document entitled Decision to Continue Detention - Removal Period Held in Abeyance ("Abeyance Letter"). That letter alleged that Mr. Abdullah has been uncooperative with ICE attempts to obtain a travel document to effectuate his removal. This letter serves as formal written notice that Mr. Abdullah contests the allegations in that letter. This letter further informs ICE that Mr. Abdullah will provide whatever information or assistance is required to process any travel document requests. Mr. Abdullah has been, and will remain, cooperative with ICE.

The Abeyance Letter makes several arguments in support of its conclusion that Mr. Abdullah has been uncooperative with efforts to effectuate his removal. Each of those contentions will be addressed below. It is worth raising the timing of the Abeyance Letter. As you are aware, 8 C.F.R. § 241.13 controls your agency's inquiry into Mr. Abdullah's detention case. That regulatory provision applies to the instant matter because the removal period in Mr. Abdullah's case already has expired. An immigration judge ordered Mr. Abdullah removed from the United States to Italy, and in the alternative to Yemen, on May 12, 2003. That same day, Mr. Abdullah waived appeal of the immigration judge's order, which rendered it administratively final and commenced the 180-day removal period. See 8 C.F.R. § 241.1(b); 8 U.S.C. § 1231(a)(1)(B)(i). The removal period, thus, expired on November 8, 2003.

More importantly, the March 2004 Abeyance Letter does not retroactively toll the 180-day removal period. Prior to March 2004, ICE already had submitted formal written requests for travel documents from the governments of Italy and Yemen using information provided by Mr. Abdullah and received denials from those governments. ICE's affirmative use of that information in its travel document requests rebuts any subsequent claim regarding the veracity of such information.

Of greater concern to Mr. Abdullah is the fact that the Abeyance Letter issued only after he filed a Petition for Writ of Habeas Corpus in the federal district court pursuant to the Supreme Court's decision in Zadvydas v. Davis. The letter appears to be nothing more than an attempt to avoid the substantive issues raised in the petition before the district court - a proceeding that clearly favors Mr. Abdullah given the denials of travel documents by the governments of Italy and Yemen.

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
(619) 234-8467
FAX (619) 687-2666

Page 2
April 6, 2004
Re: Mohdar Abdullah  A75-628-802

## Alleged Failure to Submit Valid Identification

The Abeyance Letter alleges that Mr. Abdullah failed to provide valid identification to your agency. Documentary evidence clearly demonstrates to the contrary. Furthermore, ICE implicitly acknowledged these documents as true and authentic as evidenced by their submission in support of the travel document requests with the governments of Italy and Yemen.

### Italian Birth Certificate

Although relevant to the issue of Mr. Abdullah's submission of valid identification, the following discussion also addresses the Abeyance Letter's allegation that Mr. Abdullah's "Italian birth certificate [is] of questionable origin."

In May 2003, Mr. Abdullah provided ICE with his Italian birth certificate. See Attachment A. According to an e-mail by Kathleen Zapata, counsel for ICE at Mr. Abdullah's removal proceeding, ICE possessed "an original of the photocopied birth certificate [that ICE officials] saw earlier." See Attachment B. Based upon her assessment of that document, which demonstrated ties to Italy, she allowed Mr. Abdullah to request removal to Italy and Yemen, in the alternative. In support of the birth certificate's authenticity, ICE possesses an apostille certification. See Attachment A. With this certification by the Hague Convention apostille, the document is entitled to recognition in the country of intended use, and no certification by the Authentications Office or legalization by the embassy or consulate of the foreign country where the document is to be used is required. See U.S. Department of State Bureau of Administration, Office of Authentication, Apostille Information, available at http://www.state.gov/m/a/auth/c1267.htm. The Italian government has certified Mr. Abdullah's Italian birth certificate as authentic and "the document is entitled to recognition." Furthermore, in a letter dated June 5, 2003, Alberto Galluccio, First Counselor, Embassy of Italy, states that "Although Mr. Zeid's Birth Certificate is authentic, and although he was born in Italy, at the time of his birth his parents were not Italian citizens, and he never received Italian citizenship." See Attachment C. ICE provided this document to the government of Italy in its request for a travel document, which indicates that ICE did not doubt its veracity at that time. Surely, ICE would not have represented a document as being true if it believed, or suspected, that the document was false.

### Yemeni Picture Identification Card

Mr. Abdullah also provided ICE with a Yemeni picture identification card. ICE, in turn, provided this identification to the government of Yemen in a renewed request for a travel document. The Yemeni government never stated that the card was counterfeit in response. According to the letter from the Embassy of the Republic of Yemen, dated December 2, 2003, the card simply did not exist in official record. See Attachment D. The Embassy's letter did not state that the identification card was counterfeit. The Embassy's letter does not support such a conclusion.

ICE also appears to have information regarding Mr. Abdullah's Yemeni passport. Although Mr. Abdullah lost this passport, ICE's Record of Deportable/Inadmissible Alien notes that Mr. Abdullah once had a passport from the Republic of Yemen bearing passport number 00076187.

## Alleged Inconsistent Statements Regarding Place of Birth/Citizenship

The Abeyance Letter also alleges that Mr. Abdullah provided inconsistent statements regarding his place of birth and/or citizenship. ICE officials arrived at that conclusion after reviewing his Alien File, which includes documents that date back to his initial admission into the United States. The Abeyance Letter fails to provide any specific examples of the alleged inconsistent statements. Accordingly, counsel for Mr. Abdullah will try to address the allegation as best as possible.

Mr. Abdullah presumes that any inconsistent statements regarding his place of birth or citizenship occurred in relation to his entry into the United States. As you are aware, Mr. Abdullah entered a plea of guilty in federal court to the charge of making a false statement to a federal officer, in violation of 18 U.S.C. § 1001. The factual basis for that plea relied upon statements Mr. Abdullah made during an asylum interview that occurred on or about February 23, 1999. Mr. Abdullah conceded the inaccuracy of those statements as evidenced by his plea of guilty.

Those statements, however, preceded his entry into removal proceedings. Since that time, he has provided factually accurate information to ICE. Mr. Abdullah's candidness and willingness to cooperate subsequent to making these false statements has corrected any misinformation previous supplied to immigration officials. Accordingly, it cannot justify any current claim that Mr. Abdullah is uncooperative.

In Ford v. Quarantillo, 142 F.Supp.2d 585 (D. N.J. 2001), the district court refused to extend the removal period pursuant to § 1231(a)(1)(C) where the alien ("Ford") corrected misinformation previously supplied to the legacy INS regarding his country of origin. Ford originally told the legacy INS that he was a citizen of Jamaica. Id. at 587, n.2. He later informed the legacy INS that he was from Guyana. Id. at 588. Despite receipt of this information, the legacy INS continued to detain Ford beyond expiration of a se cond removal period, alleging that he impeded removal. Id. The district court however, considered the original misrepresentation insufficient to justify continued detention pursuant to § 1231(a)(1)(C). Id. That holding clearly would apply to the instant case.

## Mr. Abdullah's Statements Regarding His Italian/Yemeni Background Are True

Mr. Abdullah's statements regarding his Italian and Yemeni backgrounds are true. As already discussed, Mr. Abdullah's Italian birth certificate proves that he was born in Italy. Kathleen Zapata also noted that his father is a citizen of Italy and that his grandfather entered the United States using his Italian passport. Ms. Zapata even conceded that Mr. Abdullah "may be an Italian citizen." Ms. Zapata also did not doubt Mr. Abdullah's Yemeni background as she did not oppose the dual designation by the immigration judge, or Mr. Abdullah for that matter. ICE's notice to appear also indicates that Mr. Abdullah is a native of Italy and citizen of Yemen.

Page 4
April 6, 2004
Re: Mohdar Abdullah   A75-628-802

Conclusion

In conclusion, Mr. Abdullah is providing express notice that he remains willing to cooperate in whatever capacity necessary to facilitate application for a travel document from the governments of Italy and Yemen.

I would greatly appreciate notice of whatever steps will be undertaken by ICE or those that will be required of Mr. Abdullah. If you have any questions, please do not hesitate to contact my office.

Very truly yours,

JASON I. SER
Attorney

# Attachment A

Mod. f. 1 - C.E.U.-B
Codice 3



# COMUNE DI ROMA
### SERVIZI DEMOGRAFICI

UFFICIO DELLO STATO CIVILE

CERTIFICATO di NASCITA

L'UFFICIALE DELLO STATO CIVILE
sulle risultanze dei registri di stato civile

dell'anno 1978, atto 01354, parte 1, serie A14

certifica che:

ELMOHDAR ZEID

E' NATO
il cinque agosto millenovecentosettantotto
a ROMA (RM)

l'UFFICIALE di STATO CIVILE

Roma, 26/2/2003

Dichiaro, sotto la mia personale responsabilita', che
le informazioni contenute nel presente certificato
non hanno subito variazioni dalla data del rilascio.

Firma interessato _____ Data _____
N.B. Da firmare solo nel caso che il certificato
venga presentato oltre il termine di 180 gg. dalla
data di rilascio (Legge n.127 del 15/5/97 art.2 c.4)

**623**

624

## APOSTILLE

(Convention de la Haje du 5 ottobre 1907)

### REPUBBLICA ITALIANA

ALL SER
di Dr. ELEGIM
TRADUZIONE - INTERNI
Via Marghera, 21
P. IVA 0615

Il presente atto pubblico

è stato sottoscritto da .......... Corsi Roberto

.......... che in qualità di .......... funzionamento

.......... segnato dai contrassegno / timbro .......... Gov. Roma

### ATTESTATO

UFFICIO TERRITORIALE DEL GOVERNO DI ROMA il .......... 2 6 APR. 2003

La Ufficio Legalizzazioni

sotto il numero .......... 1158

contrassegno / timbro UFFICIO TERRITORIALE DEL GOVERNO DI ROMA

**COLLABORATORE AMM.VO**
*Augusto Mastrucci*



ICE
MOSSAD
f . SERVIZIO FAX
00185 Roma
.591008

## MUNICIPALITY OF ROME
### DEMOGRAFIC SERVCE

### CIVILAIN STATMENT OFFICE

CERTIFICATE OF BIRHT

The Official of the marital status
on the outcomes of the registries of marital status

of year 1978, action 01354, part 1, A14 series

it is certifyd that:

ELMOHDAR ZEID

Was born
On five august one thousand nine hundred and seventy eight
In ROME ( RM )

The Official of the marital status
Administrative instructor

( stamp of the Office and illeggible signature )

Rome, On 26/02/2003

I declar, under my personal responsibility, that the contained information in the
present certificate, they have not endured variations from the date of the release.

Signature of the interested part-----------------------------------------date-------------

Note:
to only sign in the case that the certificate comes introduced beyond the term of 180
days from the release date (law n. 127 of the 15/5/97 art.2 c.4)

625

# TRIBUNALE DI ROMA

### Ufficio Atti Notori - Perizie e Traduzioni

## VERBALE DI GIURAMENTO

CRONOLOGICO

N. 1 | 0 0 5 0 8 3

Roma 2 3 APR. 2003

IL COLLABORATORE

Addì 2 3 APR. 2003 avanti al sottoscritto Cancelliere è presente il

Signor: ELEGIME MOSSAD MAHMOUD MOSSAD

documento: Carta di identità N. AH635181

rilasciato da Comune di Roma il 3 1 0 1 2003

Il quale chiede di asseverare con giuramento il suesteso atto. Io

Cancelliere, previe ammonizioni di legge, invito il comparente al

giuramento, che egli presta ripetendo: "Giuro di avere bene e fedelmente

adempiuto all'incarico affidatomi al solo scopo di far conoscere la verità".

Letto, confermato e sottoscritto.

IL CANCELLIERE C:
(Carlo CECCARELLI)
Carlo Ceccarelli

## APOSTILLE

### Convention de la Haje du 5 ottobre 1961

## REPUBBLICA ITALIANA

Il presente atto è stato sottoscritto da CARLO CECCARELLI

Agente in qualità di CANCELLIERE

E' segnato dal contrassegno/timbro TRIBUNALE ORDINARIO ROMA

### ATTESTATO

dalla Procura della Repubblica presso il Tribunale Ordinario di Roma

in data 2 8 APR 2003 e sotto il N. 9 1 8 1 del Reg. delle Apostille



Ex. 31 (9 of 17)

# Attachment B

**Date:** 5/16/2003 11:55 AM
**Sender:** Joseph T Greene
**To:** Mario G Ortiz
**Priority:** Normal
**Subject:** Fwd[2]:ABDULLAH A75 628 802 final order of removal to Italy

_____Forward Header_____
Subject:    Fwd:ABDULLAH A75 628 802 final order of removal to Italy
Author:     Kathleen M Zapata
Date:       5/16/2003 11:41 AM

2nd cc:mail on Abdullah...

_____Forward Header_____
Subject:    ABDULLAH A75 628 802 final order of removal to Italy
Author:     Kathleen M Zapata
Date:       5/12/2003 12:29 PM

Hi Ken,

I am routing this file to you because this morning the IJ ordered Respondent's removal to Italy, with a secondary designation of Yemen. I agreed to this as Respondent produced an original of the photocopied birth certificate you saw earlier. Respondent waived appeal and indicated he will cooperate with trying to effectuate his removal to Italy. We have stipulated to reopening to allow Respondent to pursue his claim to withholding and CAT protection should Respondent's removal to Italy be impossible.

I suspect that one of R's motivations in pursuing this route today was to set himself up for eventual release after 90 days if we cannot effectuate the removal order to Italy. He asked about bond after we went off the record, and I made it clear the Gov't will not consider him for bond and that he will either be removed to Italy or the case will be reopened and back before the IJ long before 90 days have passed. (Note that the BIA has already dismissed R's bond appeal.)

With that in mind, it is important that we keep clear records of the efforts we have made with Respondent to get him to provide necessary information, and proof of his cooperation or lack thereof. In the event Respondent does not cooperate, I expect the USAO might be interested in pursuing criminal prosecution.

I spoke briefly this AM with Ms. Raffaella Buiano at the Italian Consulate in Los Angeles, and told her a bit about R's case. If he is an Italian citizen it will be an easy matter to resolve and R can be removed to Italy. If he is not and wishes to pursue asylum or perhaps immigrating through his Italian citizen brother, it seems likely that will take much longer than we want to wait. A third possibility Ms. Buiano mentioned, unofficially as she is not sure this would be permitted by her Embassy, would be if R gets a non-immigrant visa to enter Italy, perhaps with the assistance of his brother.

I am awaiting a letter from the FBI that may serve to clear Respondent of any connection to 9/11 or terrorism. Obviously such a letter is a delicate matter and so I am not certain we will receive this. If we do, though, it might be useful in getting R a non-immigrant visa to Italy.

Obviously you know the questions that need to be asked of R to facilitate his removal to Italy. I just have a couple that occurred to me while I was chatting with Ms. Buiano--these are probably standard but I want to make sure we have this information in addition to your usual inquiries:

1) Respondent's father's full name, DOB, citizenship (Yemen and/or Italy), and date citizenship acquired for each. Ditto for Respondent's mother and grandparents.

ATTORNEY WORK PRODUC
PRIVILEGE
DO NOT RELEASE

605

Given that the Italians do not recognize birth in their territory as conferring citizenship, we would need to prove that his father or mother was an Italian citizen, either at the time of Respondent's birth or, according to Ms. Buiano, if the father natz'd during the Respondent's period of minority. Buiano mentioned that obtaining citizenship in Italy is easy--a mere three years legal residence will suffice. Keep in mind that I have uncovered those NIIS entries showing entries for: 1) Mohamed ZEID, DOB 10 May 1931, citizen of Italy, admitted to the US at NYC from 8/17/91 to 8/25/91, and 2) Mohamed ZEID MOHAMED, DOB 1 May 1931, Italian passport # 221482A, admitted Chicago 3/18/94 to 3/24/94. If this was R's father or grandfather, R may be an Italian citizen since father would have acquired Italian citizenship while R was still a minor. Since R has never given us information about his family, this information is imperative to determining his citizenship status.

2) The name and contact information (phone, address) for Respondent's brother in Rome, Italy.

Ms. Buiano indicated the brother may have access to information that Respondent himself does not have. Her impression of Mohdar was that he was extremely agitated when she spoke to him, and she was disappointed that his attorney Randall Hamud had not followed up with her or the Italian Embassy to get some of these questions answered earlier. After she and I spoke, she expressed willingness to work with us to resolve Mohdar's citizenship issues.

3) All periods of R's prior residence in Italy, and with what immigration status.

4) All periods of R's prior residence in any other country, and with what immigration status. I know he mentioned wanting to be returned to Canada; does he claim to have a right to return there or to some third country?

Anything else you can think of? Let's talk...

Thanks again for all your help,

Kathy

ATTORNEY WORK PRODUCT
PRIVILEGE
DO NOT RELEASE

606

# Attachment C



*Embassy of Italy*
*3000 Whitehaven Street, N.W.*
*Washington D.C. 20008*

ANTICIPATO VIA FAX

June 5, 2003  Prot. 3001

RE:  ZEID, AL-MOHDAR MOHAMMED AL-NOHDAR ABDULLAH:
A75 628 802;

Dear Mr. Ortiz:

I make reference to your letter of May 29, 2003. I wish to confirm that Mr. Zeid is not an Italian citizen, as already stated by the Consulate General of Italy in Los Angeles with letters n. 4994 of May 30, 2003, and n. 5048 of June 3, 2003. Although Mr. Zeid's Birth Certificate is authentic, and although he was born in Italy, at the time of his birth his parents were not Italian citizens, and he never received Italian citizenship.

Regards

Sincerely,

Alberto Galluccio
First Counselor

Mr. Mario G. Ortiz
Deportation Officer - Removal Unit
US Department of Homeland Security
Immigration and Customs Enforcement
880 Front Street, Suite 1234
San Diego CA 92101-8834

Cc :  Consolato Generale d'Italia
      Los Angeles

**Ex. 31  (14 of 17)**

# Attachment D



### EMBASSY OF
## THE REPUBLIC OF YEMEN
SUITE 705
2600 VIRGINIA AVENUE, N.W.
WASHINGTON, D.C. 20037
TEL: (202) 965-4760
FAX: (202) 337-2017

سفارة الجمهورية اليمنية
واشنطن

Bret Bradford
Detention and Deportation Officer
Removal Support and Coordination Branch

December 2nd, 2003

RE: Zeid, Al-Mohdar Mohamed Al-Mohdar Abdullah (A75-628-802)

Dear Mr. Bret,

    After further investigation into the case of Mr. Zeid Al-Mohdar, it is with regret to inform you that his alleged Yemeni I.D. (which was brought to the attention of the embassy), does not exist in official record. Furthermore, the DOB certificate that was provided to the embassy indicates that he was born in Italy, not in Yemen.

    The embassy therefore, can not issue him a "Transit Permit" as requested by your office.

Sincerely,



Embassy of the Republic of Yemen

December 2nd, 2003
Washington, D.C.



# FEDERAL DEFENDERS OF SAN DIEGO, INC.

The Federal Community
Defender Organization
for the Southern
District of California

# FAX TRANSMITTAL

Date: April 6, 2004

TO: ___Glen Beck - BICE Deportation Officer_____

Fax #:___619-557-5004_____ Tel #: _____ ___

RE: ___U.S. v. Mohdar Abdullah A75-628-802_____

FROM:___Jason I. Ser_____

# of Pages (including cover sheet): ____17_____

Please call: _(619) 234-8467_____ Ext. # 743

should there be any problem in the transmission of this fax.

## COMMENTS

Attached: Correspondence w/attachments.

## CONFIDENTIALITY NOTE

The documents accompanying this telecopy transmission contain information from FEDERAL DEFENDERS OF SAN DIEGO, INC. which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this telecopied information is prohibited. If you have received this telecopy in error, please notify us by telephone immediately so that we can arrange for the retrieval of the faxed documents at no cost to you.

h:\forms\faxcover.CAH/ac(6/99)

Home Savings Tower
225 Broadway
Suite 900
San Diego,
California
92101-5008
(619) 234-8467
FAX (619) 687-2666



U.S. Department of Homeland Security
Detention and Removal Operation
446 Alta Road, Suite 5400
San Diego, CA 92158

 **U.S. Immigration
and Customs
Enforcement**

March 18, 2004

Mohdar ABDULLAH
% Correctional Corporation of America
446 Alta Road
San Diego, CA 92158

Re: File Review and Identification Documents

Mr. Abdullah,

You were previously served with notification of the Government's intention to hold your file review. This was based on the unreliable information that you supplied to ICE on various occasions. In order to remedy this situation and allow a determination in a file review, you **must** provide the following information:

School records from Yemen showing dates of attendance. These should include primary, secondary and university records.

Any documents showing citizenship of parents, including, but not limited to birth certificates, voting records, marriage licenses, or religious records.

Any religious records pertaining to you showing attendance or ceremonies conducted on your behalf.

Any military records, if applicable, showing dates of service.

Please forward any of these documents to me as soon as possible

Sincerely,

Glen W. Beck
Deportation Officer

Cc: to file

**Ex. 32  (1 of 3)**

**U.S. Department of Homeland Security**
Immigration and Customs Enforcement

| | |
|---|---|
| **File No.:** | **A75 628 802** |
| **Date:** | **March 18, 2004** |

## Mohdar ABDULLAH
(Full name of alien)

     Title 8, United States Code, Section 1253(a)(1), Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 1227(a) of this title, who - (A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court, **(B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure, (C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such,** or (D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order, shall be fined under **title 18, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 1227(a) of this title), or both.**

     As you have been notified, a final order of deportation is outstanding against you. It directs your deportation by reason of your being a member of one or more of the classes referred to above.

     Any action the Immigration and Naturalization may take to obtain a travel document for your deportation or to deport you will **NOT** relieve you of liability for the compliance with the provisions of the law referred to in the first paragraph above. It is requested that you provide us with any documentation regarding your true identity and/or citizenship and assist us in effecting your departure from the United States.



Right index print

Sincerely,

Mr. Ronald J. Smith
Field Director
San Diego Detention and Removal Branch

---

**Certificate of Service**

This document was served me on <u>03-18-04,</u> in the following manner:

☒ in person      ☐ by certified mail, return receipt requested      ☐ by regular mail

_M. M. Abdulbh_        _V. R_    IEA
(Signature of respondent if personally served)      (Signature and title of officer)

Form I-229 (Rev. 4-1-97)N

(619) 234-8467

Dear Mr. Beck,

I have submitted ~~Some of~~ the documents you requested to Jason Ser, Please contact him to get them. Be notified that I never served the military in Yemen, ~~and~~ ~~nor~~ I have ~~not~~ any religious records from there. ~~Thank you~~

"Thank you"

*Petition Denied*

*A# 28-058-427*

FILED

02 JUL -9 PM 1:58

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

CALENDAR:
DOCKETS
SECY
ATTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIRMAY GEBREMARIAM, | CASE NO. 02cv0214-H(AJB) |
| Petitioner, | Order Denying Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 |
| vs. | |
| JOHN ASHCROFT, Attorney General, IMMIGRATION & NATURALIZATION SERVICE, ADELE FASANO, INS District Director for San Diego District, | |
| Respondents. | |

On February 4, 2002, Petitioner Girmay Gebremariam ("Petitioner") filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Petitioner challenges his custody by the Immigration and Naturalization Services ("INS") alleging that he has been indefinitely detained in violation of 8 U.S.C. § 1231(a)(6). On April 3, 2002, the Court denied Petitioner's request for appointment of counsel. A return to the petition was filed by Respondent on May 3, 2002. Petitioner filed a traverse on May 31, 2002. In his traverse, Petitioner filed a renewed request for appointment of counsel.

## Background

On October 24, 1990, Petitioner lawfully entered the United States as a refugee from Ethiopia with his mother and siblings. He became a permanent resident on November 12, 1991. On October 11, 2000, Petitioner was convicted of possession of marijuana for sale, selling marijuana and conspiracy to commit a crime in state court. As a result, the INS ordered Petitioner removed from the

10

United States on June 14, 2001. Petitioner filed an appealed with the Board of Immigration Appeals contesting the decision; however, on June 16, 2001, Petitioner withdrew the appeal and requested to be removed as soon as possible. The removal order became final on June 14, 2001 and he has been held in INS custody since November 2, 2000.

## Discussion

Petitioner contends that his detention violates 8 U.S.C. § 1231(a)(6) under the United States Supreme Court decision in Zadvydas v. Davis, 533 U.S. 678 (2001) which held that the INS must release an alien from custody if there is not a "significant likelihood of removal in the reasonably foreseeable future." Id. at 701. Respondents contend that Petitioner has willfully failed to cooperate in securing necessary repatriation documents and has failed to demonstrate there is not "a significant likelihood of removal in the reasonably foreseeable future." See id.

Generally, when an alien is subject to a removal order, the alien must be removed within ninety days after the order of removal becomes administratively final. 8 U.S.C. § 1231(a)(1). However, an alien ordered removed for certain crimes can be held beyond the ninety day period. 8 U.S.C. § 1231(a)(6).

In Zadvydas, the United States Supreme Court concluded that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Id. at 699. The Court held that the Attorney General may presumptively detain an alien subject to a final removal order for a period of six months. Id. at 701. However, after the six month period, the alien must provide good reason demonstrating that "there is no significant likelihood of removal in the reasonably foreseeable future." Id. Once the alien has met his burden, the government must respond with sufficient evidence to rebut that showing. Id. The Court further stated that "[t]his 6-month presumption . . . does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." Id.

Here, the presumptive six month period has passed. Petitioner contends that the Ethiopian government has not been responsive to his requests for travel documents. However, Respondents demonstrate that Petitioner has declined to cooperate with INS agents to complete the necessary

- 2 -

1  paperwork to obtain the required travel documents.

2       On December 7, 2001, the San Diego INS District Office issued a Decision to Continue
3  Detention. (Return, Ex. C.) The INS concluded that Petitioner is perceived as being a threat to the
4  community, that there is a significant risk that he will abscond or fail to comply with conditions of
5  release and that he is perceived to have willfully failed to assist the INS in making a meaningful
6  application for a travel document. (Id.) On January 7, 2002, INS Headquarters in Washington, D.C.
7  also issued a Decision to Continue Detention. (Return, Ex. B.) In the decision, the INS concluded that
8  Petitioner has impeded the process by making contradictory remarks regarding his place of birth,
9  native language, place of birth of his father and refuses to complete the application for a travel
10 document. (Id.) In his papers, Petitioner does not explain the contradictory statements he has provided
11 regarding his place of birth and native language.

12      The INS has been able to carry out removal of Ethiopian nationals. (Return, Ex. B.) The INS
13 states that the "Government of Ethiopia historically takes an extensive time to issue travel document,
14 as a result of all applications being investigated in Ethiopia to verify identity and nationality, based
15 on materials that the applicant has provided. Only after that investigation has been completed does
16 the Government of Ethiopia request the INS to schedule a telephonic interview with the inmate. The
17 Government of Ethiopia has a history of issuing return travel documents to citizens and national who
18 render a valid application." (Id., Ex. C.) The INS further stated that "[h]eadquarters INS is at this time
19 actively pursuing issuance of a travel document, and no negative statements have been provided by
20 the Government of Ethiopia to state that a travel document will not be issued. Possible pressure will
21 be solicited of the Department of State to be brought against the Government of Ethiopia in the event
22 of failure to issue without cause." (Id.)

23      It appears that recent efforts have been made to obtain travel documents for Petitioner. On
24 April 25, 2002, the INS submitted a new application packet. (Return, Ex. D.) On May 7, 2002, a
25 telephonic interview was held with an Ethiopian Embassy official, an INS Deportation Officer,
26 Petitioner, and Jason Ser, an attorney at Federal Defenders, Inc. (Traverse, Ex. 11.)

27      Unlike the Petitioners in Zadvydas where there was no significant likelihood of removal in the
28 reasonably foreseeable future, the Government of Ethiopia has previously issued travel documents.

- 3 -

has begun to process Petitioner's application and has never stated that it will not issue a travel document to Petitioner. The Government of Ethiopia has granted travel documents but has been slow in issuing them. (Return, Ex. B.)

Based on the documents provided, the INS has been actively trying to obtain travel documents for Petitioner and has been closely monitoring its development. However, it appears that the discrepancies in Petitioner's statements made under oath before the INS have thwarted attempts to obtain travel documents from the Government of Ethiopia. Petitioner cannot hinder the process to obtain travel documents and argue that "there is no significant likelihood of removal in the reasonably foreseeable future." See Zadvydas, 533 U.S. at 701. Therefore, the Court concludes that Petitioner has failed to meet his burden.

## Conclusion

Based on the foregoing, the Court DENIES the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. The Court DENIES Petitioner's renewed request for appointment of counsel as MOOT.

IT IS SO ORDERED.

Dated: 7-8-02

_____
MARILYN L. HUFF, Chief Judge
UNITED STATES DISTRICT COURT

COPIES TO:

Girmay Gebremariam
A28-058-427
San Diego Detention Center
Po Box 439049
San Ysidro, CA 92143-9049

U.S. Attorney
Southern District of California
880 Front Street, Suite 6253
San Diego, CA 92101

- 4 -